ACCEPTED
03-15-00113-CV
5989837
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/8/2015 8:58:20 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00113-CV

# In the Court of Appeals
# for the Third Judicial District
# Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
7/8/2015 8:58:20 PM
JEFFREY D. KYLE
Clerk

EMC CORPORATION,

*Appellant,*

v.

GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS, AND
KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS,

*Appellees.*

On Appeal from the 353rd Judicial District Court
Travis County, Texas

## BRIEF OF APPELLEES

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney
   General

JAMES E. DAVIS
Deputy Attorney General for
   Civil Litigation

SCOTT A. KELLER
Solicitor General

RANCE CRAFT
Assistant Solicitor General
State Bar No. 24035655

CHARLES K. ELDRED
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-2872
(512) 474-2697 [fax]
rance.craft@texasattorneygeneral.gov

**Oral Argument Conditionally Requested**

# IDENTITY OF PARTIES AND COUNSEL

*Plaintiff/Appellant*
 EMC Corporation

*Trial and Appellate Counsel for Plaintiff/Appellant*
 Doug Sigel (Doug.Sigel@RyanLawLLP.com)
 State Bar No. 18347650
 RYAN LAW FIRM, LLP
 100 Congress Avenue, Suite 950
 Austin, Texas 78701
 (512) 459-6000
 (512) 459-6601 [fax]

*Appellate Counsel for Plaintiff/Appellant*
 Ryan Cotter (Ryan.Cotter@RyanLawLLP.com)
 State Bar No. 24075969
 RYAN LAW FIRM, LLP
 100 Congress Avenue, Suite 950
 Austin, Texas 78701
 (512) 459-6000
 (512) 459-6601 [fax]

*Trial Counsel for Plaintiff/Appellant*
 Olga Goldberg (olga.goldberg@sutherland.com)[*]
 State Bar No. 24083081
 SUTHERLAND ASBILL & BRENNAN LLP
 1001 Fannin, Suite 3700
 Houston, Texas 77002
 (713) 470-6121
 (713) 654-1301 [fax]

---

[*] Ms. Goldberg was associated with Ryan Law Firm LLP when she appeared as trial counsel. She is no longer counsel in this case. Her current contact information is listed here.

*Trial Counsel for Plaintiff/Appellant (continued)*

Gavin Justiss[**]
State Bar No. 24070027
MACDONALD DEVIN
3800 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 744-3300
(214) 747-0942 [fax]

*Defendants/Appellees*

Glenn Hegar, Comptroller of Public Accounts of the State of Texas[***]
Ken Paxton, Attorney General of the State of Texas[***]

*Appellate Counsel for Defendants/Appellees*

Rance Craft (rance.craft@texasattorneygeneral.gov)
Assistant Solicitor General
State Bar No. 24035655
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-2872
(512) 474-2697 [fax]

---

[**] Mr. Justiss was associated with Ryan Law Firm LLP when he appeared as trial counsel. He is no longer counsel in this case. His current contact information is listed here.

[***] This suit initially named Susan Combs, then Comptroller of Public Accounts, and Greg Abbott, then Attorney General, as defendants. Glenn Hegar succeeded Combs on January 2, 2015, and Ken Paxton succeeded Abbott on January 5, 2015. *See* TEX. R. APP. P. 7.2(a).

***Trial and Appellate Counsel for Defendants/Appellees***

      Charles K. Eldred (charles.eldred@texasattorneygeneral.gov)
      Assistant Attorney General
      State Bar No. 00793681
      OFFICE OF THE ATTORNEY GENERAL
      P.O. Box 12548 (MC 017)
      Austin, Texas 78711-2548
      (512) 475-1743
      (512) 477-2348 [fax]

# TABLE OF CONTENTS

Identity of Parties and Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Index of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxii

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxiii

Issues Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxiv

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.    The Texas Franchise Tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.    The Tax Base for the Franchise Tax . . . . . . . . . . . . . . . . . . 2

        B.    Apportionment of the Tax Base for the Franchise
              Tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

            1.    The gross-receipts apportionment method . . . . . . . . 4

            2.    Requests for alternative apportionment (1970-
                1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            3.    Narrow exceptions to the gross-receipts
                method . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            4.    Current apportionment statute . . . . . . . . . . . . . . . . . 7

        C.    Current Calculation of Franchise Tax Due . . . . . . . . . . . . 7

    II.    The Multistate Tax Compact . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.    Adoption of the Compact . . . . . . . . . . . . . . . . . . . . . . . . . 8

B.  The Compact's Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    1.  The Compact's purposes . . . . . . . . . . . . . . . . . . . . . . 9

    2.  The Multistate Tax Commission . . . . . . . . . . . . . . . 9

    3.  The Compact's income-tax articles . . . . . . . . . . . . . 10

    4.  Compact provisions addressing joinder, withdrawal, and severability . . . . . . . . . . . . . . . . . . 11

C.  State Variations from the Compact's Income-Tax Articles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.  The Franchise Tax and the Compact . . . . . . . . . . . . . . . . . . . . . 13

IV.  EMC's Tax-Refund Suit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

I.  In Calculating Its Franchise Tax, EMC Must Apportion Its Margin to Texas Using the Gross-Receipts Method in Section 171.106 of the Tax Code. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    A.  Section 171.106 Requires Taxpayers to Apportion Their Margin Using the Gross-Receipts Method, Subject Only to Certain Exceptions Provided in That Section. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    B.  The Compact's Three-Factor Income-Apportionment Method Does Not Apply to the Franchise Tax Because It Is Not an Income Tax. . . . . . . . . . . . . . . . . . . . . . . . . . 20

v

1.     Article III.1's "taxpayer option" and Article IV's apportionment method apply only to apportionment of "income" for a state's "income tax." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

2.     The Texas franchise tax is not an "income tax" and does not involve the apportionment of "income." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

3.     The Compact's "income tax" definition does not expand Articles III and IV to include the franchise tax. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

     a.     Texas law establishes that the franchise tax does not meet the Compact's "income tax" definition. . . . . . . . . . . . . . . . . . . . . . . . . . 23

     b.     The franchise tax does not meet the Compact's definition of an "income tax" on its own terms. . . . . . . . . . . . . . . . . . . . . . . . . . 24

4.     The Compact's definition of "gross receipts tax" does not support EMC's argument that the franchise tax falls within the Compact's "income tax" definition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

5.     The Georgia Tax Tribunal's analysis in *Rosenberg v. MacGinnittie* is inapposite. . . . . . . . . 27

C.     Section 171.106's Mandate to Use the Gross-Receipts Method Prevails over Any Conflicting Language in the Compact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

1.     As the later-enacted, more specific statute, section 171.106(a) prevails over the Compact. . . . . 29

2.   Section 171.106(a) and the Compact cannot be harmonized so that both apply to the franchise tax. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

3.   The presumption against implied repeals does not support EMC's reading of the Tax Code. . . . . 33

4.   *IBM v. Department of Treasury* is distinguishable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

   a.   The Michigan Supreme Court was evenly divided on the implied-repeal issue. . . . . . . . 36

   b.   The *IBM* plurality opinion hinges on Michigan's distinct tax history. . . . . . . . . . . . 37

   c.   The *IBM* plurality misconstrued Article III.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

5.   The rule that ambiguous tax statutes must be construed in taxpayers' favor does not apply here. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

II.   Texas's Membership in the Compact Does Not Preclude the Legislature from Requiring a Taxpayer to Use the Gross-Receipts Method to Apportion Margin. . . . . . . . . . . . . . . . . . . . . . 41

   A.   Articles III and IV of the Compact Do Not Apply to the Franchise Tax Because It Is Not an "Income Tax." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

   B.   The Legislature May Restrict the Compact's Application in Texas Law Because It Is Not a Binding Regulatory Compact. . . . . . . . . . . . . . . . . . . . . . . . . . 43

   1.   The term "compact" does not make this Compact binding. . . . . . . . . . . . . . . . . . . . . . . . . . 43

2. *U.S. Steel* did not address whether the Compact is a binding contract. . . . . . . . . . . . . . . . . . . . . . . . . . . 44

3. The Compact does not exhibit the indicia of a binding regulatory compact. . . . . . . . . . . . . . . . . . . . . 45

   a. The Commission is not a joint regulatory body. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

   b. The Compact provisions do not require reciprocal action to be effective. . . . . . . . . . . 47

   c. The Compact does not prohibit unilateral repeal or modification. . . . . . . . . . . . . . . . . . . 48

4. The Compact is an advisory compact with uniform laws. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

C. The Compact Does Not Preclude the Legislature from Mandating Exclusive Use of Section 171.106's Gross-Receipts Apportionment Method. . . . . . . . . . . . . . . . . . . . . 53

1. Article III.1 does not unambiguously bar the Legislature from enforcing an exclusive apportionment method. . . . . . . . . . . . . . . . . . . . . . . . 54

2. Article III.1 cannot constitutionally require Texas to allow a taxpayer to remove part of its tax base from Texas's taxing authority. . . . . . . . . . 56

D. The Compact Does Not Supersede Section 171.106 Because Any Conflict Does Not Unconstitutionally Impair Any Contractual Obligations. . . . . . . . . . . . . . . . . 59

viii

1. Binding compacts that Congress has not approved preempt state law only if the law unconstitutionally impairs contractual obligations. ................................ 59

2. Section 171.106 does not unconstitutionally impair any obligations to EMC under the Compact. .................................. 62

3. EMC waived the Contracts Clause issue. ........ 65

III. EMC's As-Applied Constitutional Challenges Are Jurisdictionally Barred, Waived, And Meritless. ........... 66

Prayer .................................................... 71

Certificate of Compliance ........................................ 72

Certificate of Service ............................................ 72

Appendix

# INDEX OF AUTHORITIES

**Cases**

*Alabama v. North Carolina,*
    560 U.S. 330 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 55

*Allied Stores of Ohio, Inc. v. Bowers,*
    358 U.S. 522 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Basic Capital Mgmt. v. Dynex Commercial, Inc.,*
    348 S.W.3d 894 (Tex. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*City of Charleston v. Pub. Serv. Comm'n,*
    57 F.3d 385 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 64

*Combs v. Chapal Zenray,*
    357 S.W.3d 751 (Tex. App.—Austin 2011, pet. denied) . . . . . . . . . . . . 40

*Combs v. Chevron, Inc.,*
    319 S.W.3d 836 (Tex. App.—Austin 2010, pet. denied) . . . . . . . . . . . . 67

*Cuyler v. Adams,*
    449 U.S. 433 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Employees Ret. Sys. v. Duenez,*
    288 S.W.3d 905 (Tex. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.,*
    459 U.S. 400 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63-65

*Foster v. TDCJ,*
    344 S.W.3d 543 (Tex. App.—Austin 2011, pet. denied) . . . . . . . . . . . . 26

*Gaar, Scott & Co. v. Shannon,*
    115 S.W. 361 (Tex. Civ. App.—Austin 1908, writ denied),
    *aff'd,* 223 U.S. 468 (1912) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Gen. Dynamics Corp. v. Sharp*,
  919 S.W.2d 861 (Tex. App.—Austin 1996, writ denied) . . . . . . . 2, 65, 69

*Gen. Expressways, Inc. v. Iowa Reciprocity Bd.*,
  163 N.W.2d 413 (Iowa 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Gordon v. Lake*,
  356 S.W.2d 138 (Tex. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Graphic Packaging Corp. v. Hegar*,
  No. 03-14-00197-CV (Tex. App—Austin) (argued June 3, 2015) . . . xxiii

*Green v. Biddle*,
  21 U.S. (8 Wheat.) 1 (1823) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Hess v. Port Authority Trans-Hudson Corp.*,
  513 U.S. 30 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*IBM v. Dep't of Treasury*,
  852 N.W.2d 865 (Mich. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-40

*In re Nestle USA, Inc.*,
  359 S.W.3d 207 (Tex. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*In re Nestle USA, Inc.*,
  387 S.W.3d 610 (Tex. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 70

*In re Park Mem'l Condo. Ass'n*,
  322 S.W.3d 447 (Tex. App.—Houston [14th Dist.] 2010, no pet.) . . . . 68

*Ingram Micro, Inc. v. Dep't of Treas.*,
  No. 11-000035-MT, slip op. (Mich. Ct. Cl. Dec. 19, 2014) . . . . . . . . . . 46

*INOVA Diagnostics, Inc. v. Strayhorn*,
  166 S.W.3d 394 (Tex. App.—Austin 2005, pet. denied) . . . . . . . . . . 3, 22

*Jackson v. SOAH*,
   351 S.W.3d 290 (Tex. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Kimberly Clark Corp. v. Comm'r of Revenue*,
   No. 8670-R, slip op. (Minn. Tax Ct. June 19, 2015)
   (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 58-59, 64

*Liberty Mut. Ins. Co. v. Tex. Dep't of Ins.*,
   187 S.W.3d 808 (Tex. App.—Austin 2006, pet. denied) . . . . . . . . . . . . 63

*McComb v. Wambaugh*,
   934 F.2d 474 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Moorman Mfg. Co. v. Bair*,
   437 U.S. 267 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 64, 65

*Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*,
   470 U.S. 451 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
   472 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45-47, 49

*Nw. Austin MUD No. 1 v. City of Austin*,
   274 S.W.3d 820 (Tex. App.—Austin 2008, pet. denied) . . . . . . . . . . . . 24

*Rathbun v. State*,
   280 N.W. 35 (Mich. 1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Rosenberg v. MacGinnittie*,
   No. 1414626, slip op. (Ga. Tax Trib. Nov. 25, 2014) . . . . . . . . . . . . 28, 29

*Seattle Master Builders Ass'n v. Pac. Nw. Elec. Power &*
   *Conservation Planning Council*,
   786 F.2d 1359 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 45-47, 49

*State v. $1,760.00 in U.S. Currency*,
   406 S.W.3d 177 (Tex. 2013) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . 24

*Sunbeam Envtl. Servs. v. Tex. Workers' Comp. Ins. Facility,*
    71 S.W.3d 846 (Tex. App.—Austin 2002, no pet.) . . . . . . . . . . . . . . . . . 66

*Tarrant Reg'l Water Dist. v. Hermann,*
    133 S. Ct. 2120 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 55, 56, 59

*U.S. Steel Corp. v. Multistate Tax Comm'n,*
    434 U.S. 452 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 44-48, 53, 62

*U.S. Trust Co. v. New Jersey,*
    431 U.S. 1 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63-64, 66

*Vincent v. Bank of Am., N.A.,*
    109 S.W.3d 856 (Tex. App.—Dallas 2003, pet. denied) . . . . . . . . . . . . 68

*W. Union Tel. Co. v. Kansas,*
    216 U.S. 1 (1910) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*W. Union Tel. Co. v. State,*
    126 S.W. 1197 (Tex. 1910) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*West Virginia ex rel. Dyer v. Sims,*
    341 U.S. 22 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 62

## Constitutional Provisions, Statutes, and Rules

1971 Fla. Laws ch. 71-980 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

1987 Minn. Law ch. 268 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

2010 Utah Laws ch. 155 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Act approved Apr. 30, 1897, 25th Leg., R.S., ch. 104,
    1897 Tex. Gen. Laws 140 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Act approved Mar. 17, 1917, 35th Leg., R.S., ch. 84,
    1917 Tex. Gen. Laws 168 ..................................... 5

Act of Aug. 13, 1991, 72d Leg., 1st C.S., ch. 5,
    1991 Tex. Gen. Laws 134 ......................... 3, 6-7, 14, 30, 34

Act of July 30, 1959, 56th Leg., 3d C.S., ch. 1,
    1959 Tex. Gen. Laws 187 ................................. 2-3, 5

Act of Mar. 1, 1989, 71st Leg., R.S., ch. 3,
    1989 Tex. Gen. Laws 200 ................................. 6, 35

Act of Mar. 18, 1919, 36th Leg., R.S., ch. 60,
    1919 Tex. Gen. Laws 100 ..................................... 5

Act of Mar. 19, 1987, 70th Leg., R.S., ch. 10,
    1987 Tex. Gen. Laws 27 ...................................... 6

Act of May 17, 1967, 60th Leg., R.S., ch. 566, § 1,
    1967 Tex. Gen. Laws 1254 .................................... 8

Act of Sept. 6, 1969, 61st Leg., 2d C.S., ch. 1,
    1969 Tex. Gen. Laws 61 ................................... 5, 35

Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1,
    2006 Tex. Gen. Laws 1 ....................... 3, 5, 14, 21, 23, 24, 34

Act of May 30, 1997, 75th Leg., R.S., ch. 1185, § 7,
    1997 Tex. Gen. Laws 4569 .................................... 7

Act of May 31, 1981, 67th Leg., R.S., ch. 389, § 1,
    1981 Tex. Gen. Laws 1490 .................................. 3, 5

Ala. Code § 40-27-1 ........................................... 13

Alaska Const. art. IX, § 1 ...................................... 57

ARK. CODE § 26-5-101 ............................... 12

ARK. CONST. art. 16, § 7 .......................... 57

CAL. CONST. art. XIII, § 31 ....................... 57

CAL. REV. & TAX CODE § 25128 ...................... 12

COLO. REV. STAT. § 24-60-1301 ..................... 13

COLO. REV. STAT. § 39-22-303.5(4)(a) .............. 13

D.C. CODE § 47-441 ................................ 13

FLA. STAT. § 220.15(4) (1971) ..................... 11

HAW. CONST. art. VII, § 1 ......................... 57

IDAHO CODE § 63-3027(i) ........................... 12

ILL. CONST. art. IX, § 1 .......................... 57

MICH. COMP. LAWS § 208.1301 ....................... 12

MICH. CONST. art. IX, § 2 ......................... 57

MINN. CONST. art. X, § 1 .......................... 57

MINN. STAT. § 290.191 ............................. 12

MINN. STAT. § 290.171 ............................. 12

MO. CONST. art. X, § 2 ............................ 57

MONT. CONST. art. VIII, § 2 ....................... 57

N.D. CONST. art. X, § 2 ........................... 57

O.C.G.A. § 48-7-27(d)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

OR. REV. STAT § 314.606 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

OR. REV. STAT § 314.650 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

OR. REV. STAT. § 305.653 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

S.D. CONST. art. XI, § 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

TEX. CONST. art. I, § 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

TEX. CONST. art. VIII, § 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

TEX. FAM. CODE § 60.010, art. XII.A.2 . . . . . . . . . . . . . . . . . . . . . . . . . . 51

TEX. GOV'T CODE § 311.005(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

TEX. GOV'T CODE § 311.025(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

TEX. GOV'T CODE § 311.026(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

TEX. GOV'T CODE § 510.017, art. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

TEX. GOV'T CODE § 510.017, art. XIII . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

TEX. R. APP. P. 38.1(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

TEX. R. APP. P. 7.2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TEX. R. CIV. P. 301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

TEX. TAX CODE § 112.151(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

TEX. TAX CODE § 112.152(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

TEX. TAX CODE § 141.001 . . . . . . . . . . . . . . . . . . . . . . . . . xxii, 8, 13, 18, 19, 21

TEX. TAX CODE § 141.001, art. I .................................. 9, 52

TEX. TAX CODE § 141.001, art. II.4 ........................ 23, 24, 25, 28

TEX. TAX CODE § 141.001, art. II.9 ................................ 27

TEX. TAX CODE § 141.001, art. III ............................... 20, 30

TEX. TAX CODE § 141.001, art. III.1 ..................... 11, 20, 32, 39, 54

TEX. TAX CODE § 141.001, art. III.2 ................................ 11

TEX. TAX CODE § 141.001, art. III.3 ............................. 11, 20

TEX. TAX CODE § 141.001, art. IV ............................. 10, 20, 30

TEX. TAX CODE § 141.001, art. IV.2 ........................ 10, 20, 21, 22

TEX. TAX CODE § 141.001, art. IV.2-3 .............................. 48

TEX. TAX CODE § 141.001, art. IV.9 ............................. 10, 21

TEX. TAX CODE § 141.001, art. VI ................................. 46

TEX. TAX CODE § 141.001, art. VI.1 ................................. 9

TEX. TAX CODE § 141.001, art. VI.3 ............................... 9, 46

TEX. TAX CODE § 141.001, art. VI.4 ................................ 49

TEX. TAX CODE § 141.001, art. VII ................................. 9

TEX. TAX CODE § 141.001, art. VII.3 ............................... 46

TEX. TAX CODE § 141.001, art. VIII ................................ 9

TEX. TAX CODE § 141.001, art. VIII.2 ............................ 47, 49

TEX. TAX CODE § 141.001, art. X . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

TEX. TAX CODE § 141.001, art. X.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 57

TEX. TAX CODE § 141.001, art. X.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 49

TEX. TAX CODE § 141.001, art. XII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 57

TEX. TAX CODE § 141.001, art.IV.1(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

TEX. TAX CODE § 141.001, art.IV.10-17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

TEX. TAX CODE § 141.001, arts. II-V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

TEX. TAX CODE § 141.001, arts. I-XII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

TEX. TAX CODE § 171.002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7, 21

TEX. TAX CODE § 171.101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 21

TEX. TAX CODE § 171.101(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

TEX. TAX CODE § 171.101(a)(1)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

TEX. TAX CODE § 171.101(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

TEX. TAX CODE § 171.101(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

TEX. TAX CODE § 171.101(B)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

TEX. TAX CODE § 171.106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

TEX. TAX CODE § 171.106(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

TEX. TAX CODE § 171.106(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 19

TEX. TAX CODE § 171.106(c) ...................................... 7, 19

TEX. TAX CODE § 171.106(d)-(g) .................................. 7, 19

TEX. TAX CODE § 171.1011 ........................................... 3

TEX. TAX CODE § 171.1011(e)-(x) .................................... 3

TEX. TAX CODE § 171.1012 ........................................... 4

TEX. TAX CODE § 171.1013 ........................................... 4

TEX. TAX CODE § 171.1014 ...................................... 24, 34

TEX. TAX CODE § 171.1014(a) ................................... 14, 15

TEX. TAX CODE § 171.1016 ....................................... 4, 22

TEX. TAX CODE § 171.1016(b)(2) ..................................... 7

TEX. TAX CODE § 171.1016(b)(3) ..................................... 8

TEX. TAX CODE § 171.1016(c) ................................... 23, 26

TEX. TRANSP. CODE § 523.007 ...................................... 51

U.S. CONST. art I, § 10, cl. 1 ....................................... 60

U.S. CONST. art. I, § 10, cl. 3 ...................................... 45

UTAH CODE § 59-1-801 .............................................. 13

UTAH CODE § 59-1-801.5 ............................................ 13

WASH. CONST. art. 7, § 1 ........................................... 57

WYO. CONST. art. 15, § 14 .......................................... 57

## Other Authorities

BLACK'S LAW DICTIONARY (9th ed. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

BLACK'S LAW DICTIONARY (6th ed. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CAROLINE N. BROUN, ET AL.,
    THE EVOLVING USE AND THE CHANGING
    ROLE OF INTERSTATE COMPACTS:
    A PRACTITIONER'S GUIDE (2006) . . . . . . . . . 43, 44, 46, 47, 51, 52, 53, 60

COMPTROLLER'S DECISION NOS. 104,752 & 104,753 (2011) . . . . . . . . . . . . . 41

WILLIAM FLETCHER,
    FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS (2014) . . . 26

WALTER HELLERSTEIN,
    STATE TAXATION (3d ed. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Annual Reports*, MULTISTATE TAX COMM'N,
    http://www.mtc.gov/The-Commission/Annual-Report . . . . . . . . . . . . . 13

MULTISTATE TAX COMM'N, FIRST ANNUAL REPORT (1969),
    *available at* http://www.mtc. gov/uploadedFiles/
    Multistate_Tax_Commission/Resources/Archives/
    Annual_Reports/FY67-68.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Member States*, MULTISTATE TAX COMM'N, http://www.mtc.gov/
    The- Commission/Member-States (last visited July 7, 2015) . . . . . . . . 8

SELECT COMM. ON TAX EQUITY,
    RETHINKING TEXAS TAXES (Jan. 1989) . . . . . . . . . . . . . . . . . . . . . . . 6, 35

NORMAN J. SINGER & J.D. SHAMBIE SINGER,
    SUTHERLAND STATUTES AND STATUTORY
    CONSTRUCTION (7th ed. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59-60

Kearns B. Taylor,
  *Texas' Exciting Answer in the Battle With*
  *Proponents of Federal Control Over State Taxation of*
  *Interstate Commerce*, 30 TEX. B.J. 773 (Oct. 1967) ............... 13

TEX. JUR. 3d *Statutes* § 62 (2015) .................................. 34

UNIF. DIV. OF INCOME FOR TAX PURPOSES ACT,
  7A U.L.A. 155 (2002) ........................................ 10

David A. Vanderhider,
  Comment, *A Marginal Tax: The New Franchise*
  *Tax in Texas*, 39 ST. MARY'S L.J. 615 (2008) ..................... 22

**STATEMENT OF THE CASE**

*Nature of the Case*: EMC Corporation filed this tax-refund suit against the Comptroller and the Attorney General (collectively, "the Comptroller") to recover franchise taxes that it paid to the State for report years 2010-2012. CR.4-10.[1] EMC claimed that it was entitled to reduce its franchise-tax liability for those years by electing the three-factor method for apportioning a multistate taxpayer's "business income" to a state under the Multistate Tax Compact, TEX. TAX CODE § 141.001, rather than using the single-factor gross-receipts method for apportioning margin to Texas required by the franchise-tax statutes, *id.* § 171.106(a). CR.6.

*Trial Court*: 353rd Judicial District Court, Travis County
The Honorable Darlene Byrne (presiding)

*Course of Proceedings*: The parties filed cross-motions for summary judgment. CR.666-1165.

*Trial Court Disposition*: The trial court granted the Comptroller's summary-judgment motion, denied EMC's summary-judgment motion, and rendered final judgment for the Comptroller. CR.1172.

---

1. Citations of the clerk's record will appear as "CR.[page number]." Citations of the appendix to this brief will appear as "App. [tab letter]."

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not necessary. All but two pages of the Argument section in EMC's opening brief concern the precise issues that the Court will decide in *Graphic Packaging Corp. v. Hegar*, No. 03-14-00197-CV, which was submitted with oral argument on June 3, 2015. EMC Br. 7-20. And, as discussed below, those two remaining pages concern issues that EMC waived by failing to present them in its motion for rehearing before the Comptroller or its petition in this suit. *See infra* Argument, Part III. Because the Court's decision in *Graphic Packaging* will control the only properly preserved issues in this case, hearing oral argument will not be an efficient use of the Court's or the parties' resources.

That said, if the Court sets this case for oral argument, the Comptroller respectfully requests the opportunity to participate.

## ISSUES PRESENTED

This appeal primarily concerns whether a taxpayer may reduce its franchise-tax liability by choosing to apportion its margin to Texas using the Multistate Tax Compact's three-factor method for apportioning business income for a state income tax, rather than using the single-factor method for apportioning margin for the franchise tax set forth in section 171.106 of the Tax Code. If taxpayers must use the single-factor method, EMC further contends that applying that method to its business in particular violates the Due Process and Commerce Clauses of the United States Constitution and the Equal and Uniform Taxation Clause of the Texas Constitution.

1. Does the Compact's three-factor method for apportioning business income for a state income tax also apply to apportioning margin for the franchise tax?

2. Does section 171.106 prohibit a taxpayer from electing the Compact's three-factor method to apportion its margin?

3. Does Texas's membership in the Compact prevent the Legislature from making section 171.106's single-factor method the exclusive method for apportioning margin?

4. Did EMC preserve its due-process, commerce-clause, and equal-and-uniform-taxation challenges for review?

5. Does application of the single-factor method to EMC violate the Due Process, Commerce, or Equal and Uniform Taxation Clauses?

No. 03-15-00113-CV

# In the Court of Appeals
# for the Third Judicial District
# Austin, Texas

EMC CORPORATION,

*Appellant,*

v.

GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS, AND
KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS,

*Appellees.*

On Appeal from the 353rd Judicial District Court
Travis County, Texas

**BRIEF OF APPELLEES**

TO THE HONORABLE THIRD COURT OF APPEALS:

To accept EMC's view that it may compute its franchise tax using the Compact's three-factor income-apportionment method, the Court would have to disregard (1) the Tax Code's command that the only exceptions to the gross-receipts apportionment method are provided in section 171.106, (2) the Legislature's directive that the franchise tax is not an income tax, and (3) the Compact states' contrary construction of their agreement over the past 42 years. The Court should reject EMC's position and affirm the judgment.

## STATEMENT OF FACTS

### I. THE TEXAS FRANCHISE TAX

Since 1893, Texas has imposed a franchise tax on certain business entities that are organized under Texas law or that operate in Texas. *See In re Nestle USA, Inc.*, 387 S.W.3d 610, 612-14 (Tex. 2012) (*Nestle II*). Those entities pay the franchise tax for the privilege of doing business here. *Id.* at 622.

The franchise-tax calculation has frequently changed. *See id.* at 612-16. Generally, though, it starts with the taxpayer's "tax base," which is some measure of the value of the taxpayer's entire business during the year. *See Gen. Dynamics Corp. v. Sharp*, 919 S.W.2d 861, 863 (Tex. App.—Austin 1996, writ denied). If the taxpayer transacted business both within and outside Texas, its tax base must be "apportioned" to Texas to determine the share that may fairly be attributed to its Texas business and thus taxed by Texas. *See id.* Finally, the taxpayer multiplies that Texas portion of its tax base by the tax rate to compute its tax due. *See id.* at 864. These components are discussed below.

#### A. The Tax Base for the Franchise Tax

From 1897 to 1991, the franchise tax base was exclusively some measure of "capital." Act approved Apr. 30, 1897, 25th Leg., R.S., ch. 104, § 1, 1897 Tex. Gen. Laws 140, 141 ("authorized capital stock"); Act of July 30, 1959, 56th Leg.,

2

3d C.S., ch. 1, § 1, 1959 Tex. Gen. Laws 187, 306 ("taxable capital"); Act of May 31, 1981, 67th Leg., R.S., ch. 389, § 1, 1981 Tex. Gen. Laws 1490, 1697 (same).

In 1991, the Legislature added "earned surplus" as an alternate tax base. Act of Aug. 13, 1991, 72d Leg., 1st C.S., ch. 5, § 8.09, 1991 Tex. Gen. Laws 134, 159-60. Earned surplus was an adjusted version of "reportable federal taxable income." *Id.* Different tax rates applied to capital and earned surplus, and the taxpayer used the tax base that yielded the higher tax. *See id.* § 8.03, 1991 Tex. Gen. Laws 153; *INOVA Diagnostics, Inc. v. Strayhorn*, 166 S.W.3d 394, 398 (Tex. App.—Austin 2005, pet. denied).

In 2008, "margin" replaced both capital and earned surplus as the franchise tax's main tax base. Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 2, 2006 Tex. Gen. Laws 1, 6-7 (eff. Jan. 1, 2008) (codified at TEX. TAX CODE § 171.002). The margin calculation begins with "total revenue," which is derived by adding together certain income reportable on a federal tax return, then subtracting bad debts and other items included as revenue on the federal return. TEX. TAX CODE §§ 171.101, .1011. Receipts associated with various transactions are also excluded from total revenue. *See id.* § 171.1011(e)-(x). Based on the resulting total revenue, the taxpayer's margin is the smallest of four amounts: (1) 70% of total revenue; (2) total revenue minus $ 1 million;

3

(3) total revenue minus "costs of goods sold"; or (4) total revenue minus a capped amount of wages and compensation paid and costs of benefits provided. *Id.* §§ 171.101, .1012, .1013.

Also beginning in 2008, a taxpayer whose total revenue does not exceed $10 million may use total revenue instead of margin as its tax base. *Id.* § 171.1016. Taxpayers using this option—named the "E-Z Computation"—pay a different tax rate and forgo credits and deductions. *Id.*

## B. Apportionment of the Tax Base for the Franchise Tax

### 1. The gross-receipts apportionment method

In 1910, the Texas Supreme Court ruled that the franchise tax was unconstitutional as applied to foreign corporations because it was based on a corporation's capital from its *entire* business, both within and outside Texas. *See W. Union Tel. Co. v. State*, 126 S.W. 1197, 1197 (Tex. 1910) (citing *W. Union Tel. Co. v. Kansas*, 216 U.S. 1 (1910) (holding that a similar privilege fee violated the Due Process and Commerce Clauses)).

In response, the Legislature amended the franchise tax to require both Texas and foreign corporations to "apportion" their capital and to use only the portion attributable to their Texas business in computing the tax. To do this, a corporation multiplied its capital by a fraction: the "gross receipts" from its

4

Texas business divided by the gross receipts from its entire business. Act approved Mar. 17, 1917, 35th Leg., R.S., ch. 84, § 1, 1917 Tex. Gen. Laws 168 (foreign corporations); Act of Mar. 18, 1919, 36th Leg., R.S., ch. 60, § 1, 1919 Tex. Gen. Laws 100 (Texas corporations).

Although the franchise tax's tax base has changed several times, the gross-receipts apportionment method has remained constant. The Legislature retained the gross-receipts fraction as the required method in the 1959 revision, the 1981 codification, and the 2006 restructuring of the franchise tax. Act of July 30, 1959, 56th Leg., 3d C.S., ch. 1, § 1, 1959 Tex. Gen. Laws 187, 307-08; Act of May 31, 1981, 67th Leg., R.S., ch. 389, § 1, 1981 Tex. Gen. Laws 1490, 1698; Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 21 (codified at TEX. TAX CODE § 171.106).

### 2. Requests for alternative apportionment (1970-1989)

From 1970 to 1989, a taxpayer could ask the Comptroller to allow it to use a different apportionment method that would more "fairly represent" its Texas business. Act of Sept. 6, 1969, 61st Leg., 2d C.S., ch. 1, art. 7, § 1, 1969 Tex. Gen. Laws 61, 96. Among the options, the taxpayer could request "inclusion of one or more additional factors [with the gross-receipts fraction]." *Id.*

5

This provision was later analyzed by the Select Committee on Tax Equity, a body created in 1987 to study the Texas tax system and its impact on the state economy. Act of Mar. 19, 1987, 70th Leg., R.S., ch. 10, §§ 1-2, 1987 Tex. Gen. Laws 27. The Committee recommended eliminating this option because it gave foreign corporations a tax advantage over Texas businesses:

> At the taxpayer's request, additional factors such as property and payroll can be included in the calculation. . . . [T]here is no incentive to use additional factors unless they result in reduced tax liability. . . . [B]usinesses that profit from the use of additional factors tend to be out-of-state corporations with substantial sales into Texas but more property and payroll in other states. *The Committee recommends that the use of additional factors be eliminated.*

1 SELECT COMM. ON TAX EQUITY, RETHINKING TEXAS TAXES 49 (Jan. 1989).

In 1989, the Legislature adopted the Committee's recommendation and repealed the provision, leaving the gross-receipts fraction as the exclusive apportionment method. Act of Mar. 1, 1989, 71st Leg., R.S., ch. 3, § 2, 1989 Tex. Gen. Laws 200.

### 3. Narrow exceptions to the gross-receipts method

Since 1989, the Legislature has carved out only two exceptions to the gross-receipts fraction. A tax base derived from sales of services to or for a regulated investment company is apportioned with a fraction based on company shares. Act of Aug. 13, 1991, 72d Leg., 1st C.S., ch. 5, § 8.07, 1991 Tex. Gen.

6

Laws 134, 157-58. And a tax base derived from sales of services to an employee retirement plan is apportioned with a fraction based on plan beneficiaries. Act of May 30, 1997, 75th Leg., R.S., ch. 1185, § 7, 1997 Tex. Gen. Laws 4569, 4571.

### 4. Current apportionment statute

Since the tax base changed to margin in 2008, section 171.106 of the Tax Code has continued to require use of the gross-receipts apportionment method. TEX. TAX CODE § 171.106(a). The only exceptions are: (1) the different methods related to investment companies and retirement plans discussed above, *id.* § 171.106(b), (c); and (2) adjustments to the gross-receipts figure for a few specific entities and transactions, *id.* § 171.106(d)-(g). An "E-Z Computation" filer also uses this section to apportion total revenue. *Id.* § 171.1016(b)(2).

### C. Current Calculation of Franchise Tax Due

To calculate its franchise tax, a taxpayer first multiplies its margin by the gross-receipts fraction to determine "apportioned margin." *Id.* § 171.101(a)(2). From apportioned margin, the taxpayer subtracts any allowable deductions to obtain "taxable margin." *Id.* § 171.101(a)(3). Finally, taxable margin is multiplied by the tax rate to compute the tax due. *Id.* § 171.002.

An "E-Z Computation" filer multiplies its total revenue by the gross-receipts fraction to obtain its "apportioned total revenue." *Id.* § 171.1016(b)(2).

7

That "apportioned total revenue" is multiplied by 0.575% to compute the tax due. *Id.* § 171.1016(b)(3).

## II.     THE MULTISTATE TAX COMPACT

### A.     Adoption of the Compact

In 1967, Texas adopted the Multistate Tax Compact, an interstate agreement concerning certain issues in the taxation of multistate taxpayers. Act of May 17, 1967, 60th Leg., R.S., ch. 566, § 1, 1967 Tex. Gen. Laws 1254, 1254-65. The Compact is codified in section 141.001 of the Tax Code. TEX. TAX CODE § 141.001 (App. A).

By its terms, *id.*, art. X.1, the Compact became effective in August 1967, after seven states had enacted it in their state laws, *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 454 (1978). Currently, 15 states and the District of Columbia are members. *Member States*, MULTISTATE TAX COMM'N, http://www.mtc.gov/The- Commission/Member-States (last visited July 7, 2015). Congress never has consented to this Compact under the Constitution's Compact Clause. *See U.S. Steel*, 434 U.S. at 458 n.8.

## B. The Compact's Provisions

### 1. The Compact's purposes

The Compact's stated purposes are to: (1) "[f]acilitate proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes"; (2) "[p]romote uniformity or compatibility in significant components of tax systems"; (3) "[f]acilitate taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration"; and (4) "[a]void duplicative taxation." TEX. TAX CODE § 141.001, art. I.

### 2. The Multistate Tax Commission

The Compact creates the Multistate Tax Commission, which is composed of the member states' tax administrators. *Id.*, art. VI.1. The Compact authorizes the Commission to study state and local tax systems, to develop proposals for increasing uniformity or compatibility of tax laws, and to publish information to help states implement the Compact and to aid compliance with tax laws. *Id.*, art. VI.3. The Commission also may draft model tax regulations, which have no force in a state unless the state adopts them. *Id.*, art. VII. A state may ask the Commission to audit a taxpayer on its behalf. *Id.*, art. VIII.

9

Still, the Compact grants the Commission no regulatory authority over the member states. *See id.*, arts. I-XII.

### 3.     The Compact's income-tax articles

Article IV, titled "Division of Income," reproduces nearly verbatim the Uniform Division of Income for Tax Purposes Act  ("UDITPA"), a model law promulgated in 1957. *Compare id.*, art. IV, *with* UNIF. DIV. OF INCOME FOR TAX PURPOSES ACT, 7A U.L.A. 155 (2002). Article IV.2 states that, subject to a few exceptions, a taxpayer "shall allocate and apportion his net income as provided in this article." TEX. TAX CODE § 141.001, art. IV.2. Article IV.9 provides that method, which uses the equally weighted average of three factors:

> All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three.

*Id.*, art. IV.9. The three factors are fractions representing the proportion of certain aspects of the taxpayer's business located in the taxing state: (1) value of in-state property divided by value of all property, (2) compensation paid in the state divided by all compensation paid, and (3) gross receipts from in-state sales divided by gross receipts from all sales. *Id.*, art.IV.1(g), 10-17.

10

Article III, "Elements of Income Tax Laws," sets forth two "Taxpayer Option[s]." *Id.*, art. III.1-2. Article III.1 states that a taxpayer subject to a Compact state's income tax may elect to apportion its income "in the manner provided by the laws of such state" (other than the Compact) or using Article IV's three-factor apportionment method. *Id.*, art. III.1. Article III.2 prescribes an alternate income-tax computation for small taxpayers. *Id.*, art. III.2. These options do not apply to "any tax other than an income tax." *Id.*, art. III.3.

### 4. Compact provisions addressing joinder, withdrawal, and severability

A state joins the Compact by enacting it into state law. *Id.*, art. X. A Compact provision held to violate a state constitution is severable. *Id.*, art. XII.

A state withdraws from the Compact "by enacting a statute repealing the same." *Id.*, art. X.2. Nothing in the Compact limits when a state may withdraw or requires notice of the withdrawal. *See id.*, art. X.

### C. State Variations from the Compact's Income-Tax Articles

In 1971, Florida repealed Articles III and IV of the Compact, 1971 Fla. Laws ch. 71-980, § 1; App. B at 8, and enacted a mandatory three-factor apportionment method placing double weight on the sales factor, FLA. STAT. § 220.15(4) (1971); App. B at 15. At the following Commission meeting, Florida

11

expressed its view that the repeal was "fully consistent with the principles of the Multistate Tax Compact." CR.879. In response, the other 17 member states unanimously approved a resolution recognizing Florida "as a regular member in good standing" of the Compact. *Id.*

Many Compact members followed Florida's example in some respect, enacting apportionment laws that disallowed use of Article IV's equally-weighted three-factor method and Article III.1's option to elect that method:

- In 1987, Minnesota repealed Articles III and IV and required apportionment based on a three-factor method that placed greater weight on the sales factor. 1987 Minn. Law ch. 268, art. I, §§ 74-75 (codified at MINN. STAT. §§ 290.171, .191).

- In 1993, California and Oregon disallowed application of Articles III and IV and required apportionment based on a three-factor method that placed greater weight on the sales factor. CAL. REV. & TAX CODE § 25128; OR. REV. STAT §§ 314.606, .650. In 2013, Oregon re-enacted the Compact without Articles III and IV. OR. REV. STAT. § 305.653.

- In 1995, Arkansas amended Article IV to double-weight the sales factor. ARK. CODE § 26-5-101.

- In 1996, Idaho disallowed application of Article III.1 and required apportionment based on a three-factor method that double-weighted the sales factor. IDAHO CODE § 63-3027(i).

- In 2008, Michigan required apportionment based only on the sales factor. MICH. COMP. LAWS § 208.1301.

- In 2009, Colorado repealed Article III.1, COLO REV. STAT. § 24-60-1301, and required apportionment based only on the sales factor, *id.* § 39-22-303.5(4)(a).

- In 2010, Utah amended Article IV to increase the weight of the sales factor for most taxpayers. 2010 Utah Laws ch. 155 (formerly codified at UTAH CODE § 59-1-801). In 2013, Utah re-enacted the Compact without Articles III and IV. UTAH CODE § 59-1-801.5.

- In 2011, Alabama amended Article IV to double-weight the sales factor. ALA. CODE § 40-27-1.

- In 2013, the District of Columbia re-enacted the Compact without Articles III and IV. D.C. CODE § 47-441.

Consistent with the Commission's 1972 Florida resolution, there is no record of any state ever objecting to these variations. *See Annual Reports*, MULTISTATE TAX COMM'N, http://www.mtc.gov/The-Commission/Annual-Report.

## III. THE FRANCHISE TAX AND THE COMPACT

When Texas adopted the Compact in 1967, the franchise tax was assessed only on capital. Thus, although the Compact's income-tax articles (III and IV) became part of Texas law, *see* TEX. TAX CODE § 141.001, they did not apply to any Texas tax. *See* Kearns B. Taylor, *Texas' Exciting Answer in the Battle With Proponents of Federal Control Over State Taxation of Interstate Commerce*, 30 TEX. B.J. 773, 821 (Oct. 1967) ("Texas, of course, not having an income tax is not affected by the Compact allocation formula.").

13

The introduction of the "earned surplus" tax base in 1991 might have implicated Articles III and IV because it was an adjusted version of a taxpayer's federal taxable income. But in that same act, the Legislature enacted former section 171.112(g), which stated: "Chapter 141 does not apply to this chapter." Act of Aug. 13, 1991, 72d Leg., 1st C.S., ch. 5, § 8.10, 1991 Tex. Gen. Laws 134, 162. That is, the Compact does not apply to the franchise tax. *Id.*

When the Legislature changed the tax base to "margin," it removed the obsolete references to capital and earned surplus. Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, §§ 2-7, 2006 Tex. Gen. Laws 1, 1-35. Among those deletions was the repeal of all of section 171.112 ("Gross Receipts for Taxable Capital"), including subsection (g)'s proviso that "Chapter 141 does not apply to this chapter." *Id.* § 5, 2006 Tex. Gen. Laws 28. The same act specified, though, that "[t]he franchise tax imposed by Chapter 171, Tax Code, as amended by this Act, is *not an income tax.*" *Id.* § 21, 2006 Tex. Gen. Laws 38 (emphasis added).

The 2006 legislation also added a reference to the Compact. Under new section 171.1014, taxpayers in an affiliated group must file a combined report. TEX. TAX CODE § 171.1014(a). But a combined group may not include a taxable entity that conducts business outside the United States "if 80 percent or more of the taxable entity's property and payroll, as determined by factoring under

14

Chapter 141, are assigned to locations outside the United States." *Id.* Chapter 171 otherwise does not refer to the Compact.

## IV. EMC'S TAX-REFUND SUIT

For report years 2010 through 2012, EMC calculated its franchise tax using the gross-receipts apportionment method required by section 171.106. CR.716. EMC later filed amended reports for those years that re-apportioned its margin using the Compact's three-factor income-apportionment method. CR.717. Based on those amended reports, EMC filed refund claims of $1,132,972.54 (2010), $2,110,606.50 (2011), and $2,305,684.62 (2012). *Id.*

The Comptroller denied EMC's refund claims, reasoning that section 171.106 required EMC to use the gross-receipts method to apportion its margin. CR.1139-42.

EMC filed a motion for rehearing with the Comptroller. CR.8-10. The sole ground of error presented in the motion was: "Texas is required to allow taxpayers to follow Article IV of the Multistate Tax Compact since Texas was a member of the compact for the years at issue." CR.8. The Comptroller denied the motion. CR.718.

EMC then filed this tax-refund suit. CR.4-10. EMC sought to recover $5,549,263.66—the sum of its refund claims—on the sole ground that, under the

15

Compact, Texas was required to allow EMC to apportion its margin using the Compact's three-factor income-apportionment method. CR.5-6.

The parties filed cross-motions for summary judgment. CR.666-1165. The district court granted the Comptroller's motion, denied EMC's motion, and rendered final judgment for the Comptroller. CR.1172. This appeal followed. CR.1166.

## SUMMARY OF THE ARGUMENT

As a matter of Texas law, EMC may not compute its franchise tax by invoking the "taxpayer option" in Article III.1 of the Compact and applying Article IV's income-apportionment method. Section 171.106 of the Tax Code compels EMC to apportion its margin to Texas using that statute's gross-receipts method. But even if EMC could venture outside of section 171.106 for an apportionment method, the Compact would not be an option because, as the Legislature has explicitly stated, the franchise tax is not an income tax. And to the extent that section 171.106 conflicts with the Compact's application, section 171.106 prevails as the later-enacted, more specific statute.

The Compact's status as an interstate compact does not mean that it trumps section 171.106 here. The Compact's structure and terms show that it is only an advisory agreement that contains uniform laws, not a regulatory

16

compact that binds its member states. Indeed, those states have expressly and consistently treated the Compact as a non-binding instrument. At least 12 (including Texas) have enacted laws that disable Article III.1's taxpayer option.

Even if the Compact were binding, Article III.1 would not preclude the Legislature from requiring taxpayers to use the gross-receipts apportionment method. That article purports to incorporate state law as an apportionment option, but it does not account for a law like section 171.106 that by its very terms is not optional. Nor can Article III.1 surmount the Texas Constitution's prohibition against contractual suspensions of the state's taxing authority.

Moreover, any conflict with the Compact would not automatically render section 171.106 invalid. The statute would yield only to the extent that it qualified as an unconstitutional impairment of contractual obligations under the Compact—a standard that EMC cannot meet here.

Finally, the Court should reject EMC's arguments based on the Due Process, Commerce, and Equal and Uniform Taxation Clauses. EMC waived those issues by failing to raise them in its motion for rehearing before the Comptroller and its petition in this suit. And EMC has not established a violation of those provisions in any event.

17

I.     **IN CALCULATING ITS FRANCHISE TAX, EMC MUST APPORTION ITS MARGIN TO TEXAS USING THE GROSS-RECEIPTS METHOD IN SECTION 171.106 OF THE TAX CODE.**

EMC claims that, in computing its franchise tax, it may apportion its margin to Texas pursuant to the Compact, as codified in section 141.001 of the Tax Code. EMC Br. 7-10. Specifically, EMC contends it may exercise the "option" in Article III.1 of the Compact to use Article IV's three-factor method for apportioning "income." *Id.* As a matter of Texas law, that argument fails because (1) section 171.106 of the Tax Code requires taxpayers to apportion margin using the gross-receipts method, subject only to a limited set of exceptions that does not include the Compact; (2) Articles III and IV of the Compact do not apply to the franchise tax because it is not an income tax; and (3) section 171.106's mandatory language prevails over any conflicting provision outside of the franchise-tax statutes.

A.     **Section 171.106 Requires Taxpayers to Apportion Their Margin Using the Gross-Receipts Method, Subject Only to Certain Exceptions Provided in That Section.**

Section 171.106(a) of the Tax Code requires taxpayers to apportion their margin to Texas using the gross-receipts method, unless one of the exceptions *in section 171.106* applies:

> *Except as provided by this section*, a taxable entity's margin is apportioned to this state to determine the amount of tax imposed under Section 171.002 by multiplying the margin by a fraction, the numerator of which is the taxable entity's gross receipts from business done in this state, as determined under Section 171.103, and the denominator of which is the taxable entity's gross receipts from its entire business, as determined under Section 171.105.

TEX. TAX CODE § 171.106(a) (emphasis added). The only exceptions "provided by this section" are: (1) different apportionment fractions related to investment companies and retirement plans, *id.* § 171.106(b), (c); and (2) changes to the gross-receipts figure for banks, defense readjustment projects, sellers of loans or securities, and internet hosts, *id.* § 171.106(d)-(g).

This statute—which EMC concedes is "unambiguous," EMC Br. 9—prohibits taxpayers from using the Compact's income-apportionment method to apportion their margin for the franchise tax. It permits exceptions to the gross-receipts method only as "provided by *this* section," TEX. TAX CODE § 171.106(a) (emphasis added), whereas the Compact is located in *another* section of the Tax Code, *id.* § 141.001. And nothing in section 171.106 refers to or incorporates section 141.001 as one of the allowed exceptions. *Id.* § 171.106. Thus, section 171.106(a) forecloses EMC's attempt to use the Compact's income-apportionment method.

19

**B.** **The Compact's Three-Factor Income-Apportionment Method Does Not Apply to the Franchise Tax Because It Is Not an Income Tax.**

EMC may not use the Compact's three-factor apportionment method for a second reason. That method applies only to the apportionment of "income" for an "income tax," *id.* § 141.001, arts. III, IV, not the apportionment of margin for the franchise tax.

**1.** **Article III.1's "taxpayer option" and Article IV's apportionment method apply only to apportionment of "income" for a state's "income tax."**

Articles III and IV of the Compact apply only to a member state's "income tax." Article III, captioned "Elements of Income Tax Laws," states that "[n]othing in this article relates to the reporting or payment of any tax other than an income tax." *Id.*, art. III.3. Similarly, Article IV, titled "Division of Income," covers only a "taxpayer having *income* from business activity which is *taxable* both within and without this state." *Id.*, art. IV.2 (emphases added).

Predictably, then, the apportionment methods in Articles III and IV address only the apportionment of "income." The Article III.1 option states that a taxpayer "may elect to apportion and allocate his income in the manner provided by the laws of such state" or "in accordance with Article IV." *Id.*, art. III.1. Under Article IV, a taxpayer "shall allocate and apportion his net income

20

as provided in this article," *id.*, art. IV.2, which states that "business income shall be apportioned to this state by multiplying the income by a fraction"—the equally weighted average of the property, payroll, and sales factors. *Id.*, art. IV.9.

### 2. The Texas franchise tax is not an "income tax" and does not involve the apportionment of "income."

Article III.1's "taxpayer option" and Article IV's apportionment method do not apply to the franchise tax because it does not impose an "income tax" or involve apportioning a tax base of "income," "net income," or "business income."

The Legislature made this distinction clear when it revised the franchise tax to its current form: "The franchise tax imposed by Chapter 171, Tax Code, as amended by this Act, is *not an income tax*." Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 21, 2006 Tex. Gen. Laws 1, 38 (emphasis added). Given that plain statement, the Legislature could not possibly have intended that the franchise tax would be subject to the Compact articles in section 141.001 of the Tax Code that relate exclusively to an "income tax."

Moreover, the franchise tax is assessed on and requires apportionment of "margin," which differs from the "net income" covered by Article IV's apportionment method. *Compare* TEX. TAX CODE §§ 171.002, .101, .106, *with*

21

*id.* § 141.001, art. IV.2. This Court has defined "net income" as the "'excess of all revenues and gains for a period over all expenses and losses of the period.'" *INOVA Diagnostics*, 166 S.W.3d at 401 n.7 (quoting BLACK'S LAW DICTIONARY 1040 (6th ed. 1990)). By contrast, "margin" never involves deducting "all expenses and losses." Some taxpayers do not deduct their expenses to compute margin; they calculate margin as 70% of total revenue or subtract $1 million from total revenue, regardless of their expenses. TEX. TAX CODE § 171.101(a)(1)(A), (B)(i). And those taxpayers that deduct some expenses to compute margin still do not deduct "all" expenses; they deduct only select expenses—"costs of goods sold" or "compensation." *Id.* § 171.101(a)(1)(B)(ii). For that reason, a taxpayer may have a positive margin, and thus owe franchise tax, even though it has no net income for the report year. *See* David A. Vanderhider, Comment, *A Marginal Tax: The New Franchise Tax in Texas*, 39 ST. MARY'S L.J. 615, 646-47 (2008) (observing that "[t]he fact that the margin tax could apply to a company without profits, therefore, undermines the argument that it is an income tax in disguise").

Similarly, the "total revenue" tax base used for the alternate "E-Z Computation" also differs from the "net income" covered by Article IV. *Compare* TEX. TAX CODE § 171.1016, *with id.* § 141.001, art. IV.2. In contrast

22

to a net-income calculation, an E-Z filer may not make deductions from total revenue.  *Id.* § 171.1016(c).

### 3. The Compact's "income tax" definition does not expand Articles III and IV to include the franchise tax.

EMC counters that the Compact defines "income tax" broadly enough to cover the franchise tax.  EMC Br. 15-16.  That definition states:

> "Income tax" means a tax imposed on or measured by net income including any tax imposed on or measured by an amount arrived at by deducting expenses from gross income, one or more forms of which expenses are not specifically and directly related to particular transactions.

TEX. TAX CODE § 141.001, art. II.4.  Based on this definition alone, EMC urges, Articles III and IV apply to the franchise tax, EMC Br. 15-16, and (presumably) we should read those articles' references to apportionment of "income," "net income," and "business income" to mean "margin" or "total revenue" to make them fit.  EMC is wrong.

### a. Texas law establishes that the franchise tax does not meet the Compact's "income tax" definition.

The Legislature already has determined that the franchise tax falls outside the Compact's "income tax" definition by decreeing that "[t]he franchise tax . . . is not an income tax."  Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 21, 2006 Tex. Gen. Laws 1, 38.  In enacting that law, the Legislature is presumed

23

to have been aware of the Compact's definitions. *Nw. Austin MUD No. 1 v. City of Austin*, 274 S.W.3d 820, 828 (Tex. App.—Austin 2008, pet. denied). That presumption cannot be rebutted because the Legislature referred to the Compact in the *same* act, adapting two of Article IV's "factors" to classify taxpayers for combined-reporting purposes. Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 17 (codified at TEX. TAX CODE § 171.1014). By legislating that the franchise tax "is not an income tax," without qualification, the Legislature foreclosed the possibility that a Tax Code provision could define that tax as an "income tax."

> **b.** **The franchise tax does not meet the Compact's definition of an "income tax" on its own terms.**

Even apart from the Legislature's conclusive statement, the franchise tax does not satisfy the Compact's "income tax" definition on its own terms. The Compact defines "income tax" principally as "a tax imposed on or measured by net income." TEX. TAX CODE § 141.001, art. II.4. Because the Compact does not define "net income," that phrase takes its ordinary meaning. *State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 180 (Tex. 2013) (per curiam). As discussed above, the franchise tax is not imposed on or measured by "net income," as that phrase is commonly understood. *See supra* Part I.B.2.

EMC argues that the definition's "including" clause captures the franchise tax. EMC Br. 15-16. Under that clause, an "income tax" includes "any tax imposed on or measured by an amount arrived at by deducting expenses from gross income, one or more forms of which expenses are not specifically and directly related to particular transactions." TEX. TAX CODE § 141.001, art. II.4. That language does not help EMC.

Again, some taxpayers do not deduct *any* expenses to arrive at margin: those that compute margin as (1) 70% of total revenue or (2) total revenue minus $1 million. *Id.* § 171.101(a)(1)(A), (B)(i). EMC tries to dodge that problem by reframing the first calculation as a "deduction" of 30% of total revenue. EMC Br. 15. But the Compact's "income tax" definition requires deduction of "expenses," not prescribed percentages of revenue or dollar amounts. TEX. TAX CODE § 141.001, art. II.4.

The other taxpayers who use margin do not arrive at that figure "by deducting expenses from gross income." They calculate margin by deducting *one type* of expense from total revenue: either "costs of goods sold" or "compensation." *Id.* § 171.101(a)(1)(B)(ii). The Compact's "income tax" definition would cover those taxpayers only if it could be rewritten to include "an amount arrived at by deducting [any] expense[] from gross income." *See*

25

*Foster v. TDCJ*, 344 S.W.3d 543, 548 (Tex. App.—Austin 2011, pet. denied) ("We are not free to rewrite the statute in the guise of construing it."). That rewrite also would remove the definition too far from its main clause, which defines an "income tax" as one imposed on "net income." The "including" clause may "enlarge" the meaning of "net income," not transmogrify it. *See* TEX. GOV'T CODE § 311.005(13) (noting that "including" is a "term[] of enlargement").

Finally, an "E-Z" taxpayer computes its franchise tax based on "total revenue," from which no deductions of expenses are permitted. TEX. TAX CODE § 171.1016(c).

Respected treatises agree that the Compact's "income tax" definition does not include the franchise tax. One adopts the Compact definition and notes that, although "[t]he majority of states have statutes imposing an income tax on corporations," "[t]he states *without* a corporate income tax are Nevada, *Texas*, and Washington." 14A WILLIAM FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 6904.50 & nn.1-2 (2014) (emphases added). Another observes that "there is considerable doubt as to whether the Texas margins tax constitutes a tax on 'income' under the Compact." WALTER HELLERSTEIN, STATE TAXATION ¶ 9.01 (3d ed. 2014). In sum, the franchise tax is a unique tax that does not qualify as an "income tax," even as defined by the Compact.

26

### 4. The Compact's definition of "gross receipts tax" does not support EMC's argument that the franchise tax falls within the Compact's "income tax" definition.

EMC also cites the Compact's definition of a "gross receipts tax," apparently to imply that, because the franchise tax does not meet that definition, it must be categorized as an "income tax." *See* EMC Br. 16. But the Compact does not demand that a tax be classified as either a "gross receipts tax" or an "income tax." The Compact defines "tax" as "an income tax, capital stock tax, gross receipts tax, sales tax, use tax, and *any other tax which has a multistate impact*." TEX. TAX CODE § 141.001, art. II.9 (emphasis added). The Compact's drafters thus anticipated that some taxes would not fit within a defined category. The franchise tax is an example, because generally it does not satisfy the Compact's definitions of "income tax" or "gross receipts tax," but instead is a hybrid of both (except the E-Z computation, which resembles a gross-receipts tax). Accordingly, the "gross receipts tax" definition does not advance EMC's argument.

### 5. The Georgia Tax Tribunal's analysis in *Rosenberg v. MacGinnittie* is inapposite.

Finally, EMC asserts that the Georgia Tax Tribunal "has construed the Texas franchise tax as an 'income tax,' to which the Multistate Tax Compact

27

election is applicable." EMC Br. 19 (citing *Rosenberg v. MacGinnittie*, No. 1414626, slip op. (Ga. Tax Trib. Nov. 25, 2014) (found at CR.1079-1122)). EMC is wrong.

*Rosenberg* did not address whether the Compact applies to Texas's franchise tax; in fact, the opinion did not even mention the Compact. Nor did *Rosenberg* concern whether the franchise tax is an "income tax" in any general sense. CR.1119 (explaining that "the issue in this case is *not* whether the Texas Franchise Tax is an 'income tax.'").

At issue in *Rosenberg* was whether the Texas franchise tax qualified as a "'tax on or measured by income'" under a Georgia tax statute. CR.1088 (quoting O.C.G.A. § 48-7-27(d)(1)(C)). If it did, the taxpayer could make an adjustment for its Texas franchise-tax payments in computing its Georgia income tax. *Id.* The tribunal held that the Texas franchise tax did qualify, primarily because the margin calculation starts with "total revenue," which is the sum of relevant items reported as "gross income" on a federal tax return. CR.1097-1100.

*Rosenberg*'s analysis has no bearing on this case. Whereas *Rosenberg* concerned whether the Texas franchise tax is a "tax on or measured by *income*," CR.1088 (emphasis added), the Compact defines an "income tax" as

28

a "a tax imposed on or measured by *net income*," TEX. TAX CODE § 141.001, art. II.4 (emphasis added). The *Rosenberg* tribunal itself specifically distinguished "income" from "net income," CR.1103-04, and concluded that whether the Texas franchise tax is measured by "net income" was irrelevant to the question before it, CR.1102-12. For that reason, it specifically declined to follow decisions from other state revenue departments holding that the Texas franchise tax is not imposed on or measured by "net income." CR.1115-16. Because the Compact likewise defines its reach in terms of "net income," *Rosenberg* is inapposite.

## C. Section 171.106's Mandate to Use the Gross-Receipts Method Prevails over Any Conflicting Language in the Compact.

EMC's arguments that the Compact's "taxpayer option" and income-apportionment method apply to the franchise tax do not help its cause in any event. Under Texas law, section 171.106's specific mandate to use the gross-receipts method prevails over any conflicting text in the Compact.

### 1. As the later-enacted, more specific statute, section 171.106(a) prevails over the Compact.

Reading Articles III and IV of the Compact to provide another method of apportioning margin creates an irreconcilable conflict with section 171.106(a) of the Tax Code. If a taxpayer may elect under Article III.1 to apportion its margin using Article IV's three-factor income-apportionment method, as EMC

29

urges, that would negate section 171.106(a)'s directive to apportion margin using the gross-receipts method "*[e]xcept as provided by this section*." *See* TEX. TAX CODE § 171.106(a) (emphasis added).

The Code Construction Act resolves any conflict resulting from EMC's interpretation in favor of section 171.106(a), in two respects. First, "if statutes enacted at the same or different sessions of the legislature are irreconcilable, the statute latest in date of enactment prevails." TEX. GOV'T CODE § 311.025(a). The Legislature adopted the Compact in 1967, but added the "except as provided" clause to section 171.106 in 1991.[2] Second, if a general provision irreconcilably conflicts with a special provision, "the special or local provision prevails as an exception to the general provision." TEX. GOV'T CODE § 311.026(b); *see also Jackson v. SOAH*, 351 S.W.3d 290, 297 (Tex. 2011). Section 171.106 specifically concerns the apportionment of margin for the franchise tax. TEX. TAX CODE § 171.106. By contrast, Articles III and IV of the Compact concern a category of taxes that qualify as "income taxes." *Id.* § 141.001, arts. III-IV.

---

2. Act of Aug. 13, 1991, 72d Leg., 1st C.S., ch. 5, § 8.07, 1991 Tex. Gen. Laws 134, 157-58 (codified at TEX. TAX CODE § 171.106(a)).

**2.** **Section 171.106(a) and the Compact cannot be harmonized so that both apply to the franchise tax.**

EMC counters that the Court need not reach the construction rules just discussed because section 171.106(a) and the Compact do not irreconcilably conflict and "can be harmonized to reconcile the various provisions and stand together." EMC Br. 11. Of course, the Legislature already has harmonized the statutes by declaring that the franchise tax is not an income tax. *See supra* Part I.B.2. But even assuming that Article III.1's "taxpayer option" and Article IV's income-apportionment method could apply to the franchise tax, those provisions cannot be reconciled with section 171.106(a).

EMC's harmonizing argument hinges on semantics. First, EMC heralds that "[t]here is no overriding mandate in Section 171.106(a) that taxpayers must use the Texas formula instead of the Multistate Tax Compact formula." EMC Br. 9. But section 171.106(a) expressly requires all taxpayers to use the gross-receipts method "[e]xcept as provided by this section," and the Compact is not one of the provided exceptions. TEX. TAX CODE § 171.106(a). EMC then offers that using the Compact's method would not constitute an exception to section 171.106(a)'s gross-receipts method, but an "equally enforceable alternative." EMC Br. 9, 10. That is no distinction at all. If a taxpayer can apportion its

31

margin using the Compact's three-factor income-apportionment method, then its margin is *not* "apportioned to this state . . . by multiplying the margin by [the gross-receipts] fraction," TEX. TAX CODE § 171.106(a), creating an unrecognized "exception" to that section's general rule.

EMC further claims that Article III.1's "taxpayer option" harmonizes the statutes "because a taxpayer that does not elect to use the Multistate Tax Compact formula effectively elects to use the Texas formula." EMC Br. 10. But Article III.1 does not do the harmonizing work that EMC ascribes to it. Article III.1 presumes that a state's tax laws (outside the Compact) merely "provide[]" a different "manner" of apportioning income. TEX. TAX CODE § 141.001, art. III.1. Article III.1 does not address the situation in which a state's tax law expressly makes an apportionment method exclusive, as section 171.106(a) does. And neither Article III.1 nor any other Compact provision contains language that resolves that conflict. There is no way to read the Tax Code as allowing taxpayers to elect to apportion margin using the Compact's income-apportionment method and still give full meaning to the words "[e]xcept as provided in this section" in section 171.106(a).

### 3. The presumption against implied repeals does not support EMC's reading of the Tax Code.

EMC next asserts that "the only argument" supporting the Comptroller's position is that section 171.106(a) impliedly repealed section 141.001 of the Tax Code, at least as applied to the franchise tax, and that the presumption against implied repeals should defeat that argument. EMC Br. 10-11. That contention fails on several fronts.

As an initial matter, the Court *also* can agree with the Comptroller by recognizing, as the Legislature did, that the franchise tax is not an income tax. *See supra* Part I.B. That holding would render Compact Articles III and IV in section 141.001 inapplicable to the franchise tax, not impliedly repealed.

Regardless, EMC admits that implied repeals are merely "disfavor[ed]," not forbidden. EMC Br. 10. "Where a later enactment is intended to embrace all the law upon the subject with which it deals, it repeals all former laws relating to the same subject." *Gordon v. Lake*, 356 S.W.2d 138, 139 (Tex. 1962). To the extent Articles III and IV of the Compact ever applied to the franchise tax, section 171.106's later-enacted "except as provided" clause embraces all apportionment options for the franchise tax, and thus necessarily repeals those articles' application.

More importantly, whether an implied repeal occurred ultimately "is a matter of legislative intent." TEX. JUR. 3d *Statutes* § 62 (2015). The Legislature *never* has intended to apply Article III.1's "taxpayer option" or Article IV's income-apportionment method to the franchise tax. When Texas adopted the Compact, Articles III and IV did not apply to the franchise tax because it was then imposed on capital, not income. When the Legislature added a tax base resembling income—"earned surplus"—it simultaneously enacted former section 171.112(g), which provided that "Chapter 141 [the Compact] does not apply to this chapter." Act of Aug. 13, 1991, 72d Leg., 1st C.S., ch. 5, §§ 8.09, .10, 1991 Tex. Gen. Laws 134, 159-60, 162. And when the Legislature replaced "earned surplus" with a tax base (margin) that rendered the tax "not an income tax," it sensibly repealed former section 171.112(g). Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, §§ 5, 21, 2006 Tex. Gen. Laws 1, 28, 38. After all, if the franchise tax no longer taxed income, Articles III and IV did not apply by their own terms. Also, removing the total ban against chapter 141's application paved the way for the same legislation to borrow two of Article IV's factors to classify a taxpayer for combined-reporting purposes. *See* TEX. TAX CODE § 171.1014.

When the Legislature wanted to provide a generally available alternative to the gross-receipts method, it did so expressly in the franchise-tax statutes.

34

From 1970 to 1989, the Legislature allowed taxpayers to ask the Comptroller to include factors other than gross receipts in the apportionment fraction. Act of Sept. 6, 1969, 61st Leg., 2d C.S., ch. 1, art. 7, § 1, 1969 Tex. Gen. Laws 61, 96, *repealed by* Act of Mar. 1, 1989, 71st Leg., R.S., ch. 3, § 2, 1989 Tex. Gen. Laws 200, 200. The Legislature revoked that option at the urging of the Select Committee on Tax Equity, which recommended that taxpayers not be allowed to reduce their tax by requesting the addition of property and payroll factors to the apportionment method. 1 SELECT COMM. ON TAX EQUITY, RETHINKING TEXAS TAXES 49 (Jan. 1989). Nothing in the franchise-tax statutes suggests that the Legislature has since reversed that policy and once again permits taxpayers to use a method with property and payroll factors, such as the Compact's, and now *at their option* without Comptroller approval.

### 4. *IBM v. Department of Treasury* is distinguishable.

EMC suggests that the Court seek guidance on the statutory-construction issue from *IBM v. Department of Treasury*, 852 N.W.2d 865 (Mich. 2014), calling it "an identical case" and involving a "directly analogous" situation. EMC Br. 16-18. But *IBM* is largely distinguishable, and the reasoning on which EMC relies is unpersuasive.

### a. The Michigan Supreme Court was evenly divided on the implied-repeal issue.

As a threshold matter, EMC inaccurately cites *IBM* as a controlling opinion of the Michigan Supreme Court. *Id.* To be clear, a *three-justice plurality* opined that one may harmonize the Compact and Michigan's mandatory sales-factor apportionment statute by treating the mandatory sales-factor method as an option that a taxpayer may elect under Article III.1 of the Compact. 852 N.W.2d at 871-76 (plurality op.) (Viviano, J., joined by Cavanaugh and Markman, JJ.). The same number of justices disagreed, reasoning that (1) reading the *mandatory* sales-factor method as *optional* does not harmonize the statutes; and (2) as the later-enacted statute, the mandatory sales-factor method impliedly, but necessarily, repealed Article III.1's "taxpayer option." *Id.* at 882-85 (McCormack, J., dissenting, joined by Young, C.J., and Kelly, J.).

The remaining justice stated that the implied-repeal issue was "a very close question" that he did not need to reach because of an intervening legislative act. *Id.* at 881-82 (Zahra, J., concurring). Specifically, the Michigan Legislature directly amended the Compact to provide that Article IV's three-factor method would be unavailable *beginning in 2011*. *Id.* By doing so, Justice

36

Zahra reasoned, the Legislature had affirmatively created a pre-2011 "window" (which encompassed the refund claims at issue) in which the Compact's "taxpayer option" would be available. *Id.*

Because the Texas Legislature never has affirmatively created a window in which the Compact's "taxpayer option" was operative, Justice Zahra's decisive concurrence is inapposite. What remains of *IBM*'s "guidance," then, is an evenly divided court on the implied-repeal issue. Of those opinions, the Comptroller maintains that Justice McCormack had the better view: treating a mandatory apportionment method as optional is not a "harmonious construction"; rather, the mandatory apportionment statute should prevail as the later enacted statute. *Id.* at 882-85 (McCormack, J., dissenting).

> **b.      The *IBM* plurality opinion hinges on Michigan's distinct tax history.**

In any event, the *IBM* plurality opinion offers EMC no help. The plurality began its discussion by noting that "the history of business taxation in Michigan" is "important to our analysis in this case." *Id.* at 869 (plurality op.). Specifically, the plurality stressed that history's role in the statutory-construction analysis because "'[t]he endeavor should be made, by tracing the history of legislation on the subject, to ascertain the uniform and consistent

37

purpose of the legislature, or to discover how the policy of the legislature with reference to the subject matter has been changed or modified from time to time.'" *Id.* at 872 (quoting *Rathbun v. State*, 280 N.W. 35, 43 (Mich. 1938)). That history led the plurality to conclude that the Michigan Legislature "uniform[ly] and consistent[ly]" intended "for the Compact's election provision to operate alongside Michigan's tax acts." *Id.* at 874.

Texas's history of business taxation does not support the same conclusion. For example, when Michigan adopted the Compact, it already had an income tax to which Articles III and IV would apply. *Id.* at 870. By contrast, when Texas adopted the Compact, it had nothing even resembling an income tax, meaning that Articles III and IV were inoperative when enacted. *See supra* Part I.C.3. Also, as the *IBM* plurality emphasized, "[t]hroughout the evolution of [Michigan's] method of business taxation, the Compact has remained in effect." 852 N.W.2d at 871 (plurality op.). But in Texas, when the Legislature added the earned-surplus tax base that potentially qualified the franchise tax as an income tax, it simultaneously overrode the Compact's application by enacting former section 171.112(g). *See supra* Part I.C.3. And while Michigan continues to "allow[] a taxpayer to petition to use another apportionment method," 852 N.W.2d at 875 n.55 (plurality op.), Texas revoked that option in

1989 specifically to preclude foreign corporations from using property and payroll factors to apportion their tax bases, *see supra* Part I.C.3.

In sum, in no sense does the history of Texas's franchise tax reveal a "uniform and consistent purpose" by the Legislature to allow taxpayers to invoke the Compact's "taxpayer option" and use its three-factor income-apportionment method. To the contrary, the Legislature has uniformly and consistently acted to preclude application of Articles III and IV to the franchise tax.

### c. The *IBM* plurality misconstrued Article III.1.

Finally, the *IBM* plurality's analysis is unpersuasive. To support its view that the Compact may be reconciled with Michigan's mandatory sales-factor apportionment method, the plurality reasoned that Article III.1 "contemplat[es] the future enactment of a state income tax with a *mandatory* apportionment formula different from the Compact's." 852 N.W.2d at 874 (plurality op.) (emphasis added). Article III.1 says no such thing. Again, it presumes only that a state's tax laws (outside the Compact) "provide[]" a different "manner" of apportioning income. TEX. TAX CODE § 141.001, art. III.1. It does not address the situation in which a state's tax law expressly makes an

39

apportionment method exclusive, as section 171.106(a) does.  The Court should decline to follow the *IBM* plurality's misreading of the Compact.

### 5. The rule that ambiguous tax statutes must be construed in taxpayers' favor does not apply here.

Finally, EMC suggests that, to the extent section 171.106's effect on the Compact's application is ambiguous, the Court must resolve that ambiguity in EMC's favor by applying the rule that "[a]ny ambiguity in the Tax Code regarding the scope of taxation must be resolved in favor of taxpayers."  EMC Br. 8.  That is incorrect.

The rule EMC invokes comes into play "only when doubt about a statute's application remains after the dominant rules of construction have been applied." *Combs v. Chapal Zenray*, 357 S.W.3d 751, 756 (Tex. App.—Austin 2011, pet. denied).  One such "dominant rule" requires deference to the Comptroller's construction of an ambiguous tax statute if that construction appears in a "formal opinion[] adopted after formal proceedings," is "reasonable," and does not contradict the statute's plain language.  *Id.* (internal quotation marks and citation omitted).

The conditions for agency deference are all met here.  The Comptroller resolved this specific issue in a formal decision issued after a formal hearing,

40

concluding that a taxpayer "may not elect the MTC three-factor apportionment formula and is required to use the single-factor method" in section 171.106. COMPTROLLER'S DECISION NOS. 104,752 & 104,753 (2011) (App. C). That conclusion is reasonable—it comports with the Legislature's express understanding that the franchise tax is not an income tax and the longstanding policy against allowing taxpayers to use an alternate apportionment method. *See supra* Parts I.B.2, C.3. And the Comptroller's position does not contradict the Tax Code's plain text. To the contrary, his reading enforces section 171.106's directive that any exceptions to the gross-receipts apportionment method must be provided by that section. TEX. TAX CODE § 171.106(a).

## II. TEXAS'S MEMBERSHIP IN THE COMPACT DOES NOT PRECLUDE THE LEGISLATURE FROM REQUIRING A TAXPAYER TO USE THE GROSS-RECEIPTS METHOD TO APPORTION MARGIN.

In the alternative, EMC urges that any Texas law that forbids it to invoke Article III.1's "taxpayer option" and use Article IV's income-apportionment method is invalid under contract law and the Contracts Clause of the United States Constitution. EMC Br. 11-15. Specifically, EMC contends that the Compact is a contract that bars the Legislature from altering its terms or application until Texas withdraws from the Compact, and that any alteration unconstitutionally impairs the obligations of that contract. *Id.* The Court

41

should reject that argument, for several reasons: (1) regardless of the Compact's legal status, Articles III and IV do not apply to the franchise tax because it is not an "income tax" under the Compact; (2) the Compact is an advisory agreement, not a binding regulatory compact; (3) Article III.1 does not clearly and validly preclude the Legislature from mandating exclusive use of the gross-receipts apportionment method; and (4) any conflict between Texas law and Articles III and IV would not satisfy the standard for an unconstitutional impairment of contracts.

## A. Articles III and IV of the Compact Do Not Apply to the Franchise Tax Because It Is Not an "Income Tax."

As an initial matter, this appeal does not hinge on whether Texas's enactment of the Compact in 1967 contractually bound all future Legislatures to maintain Articles III and IV as Texas law, because those articles do not apply to the franchise tax in any event. As discussed above, the franchise tax does not involve the apportionment of "income," nor does it meet the Compact's "income tax" definition. *See supra* Part I.B. Regardless of the Compact's legal force, then, Articles III and IV do not apply to the franchise tax by their own terms. For that reason alone, EMC's compact-related arguments fail.

42

**B. The Legislature May Restrict the Compact's Application in Texas Law Because It Is Not a Binding Regulatory Compact.**

Even if Articles III and IV somehow could be construed to apply to the franchise tax, the Compact does not contractually bar Texas from restricting those articles' operation elsewhere in Texas law. This Compact is an advisory compact containing model laws, not a binding regulatory compact that carries the preemptive force that EMC assigns to it.

**1. The term "compact" does not make this Compact binding.**

Contrary to EMC's assertions, EMC Br. 11-12, the mere fact that the Compact is an "interstate compact" does not resolve whether the Compact contractually obligates Texas to maintain the application of Articles III and IV in state law. Only "in *some* contexts" is a compact "a contract between the participating states." *McComb v. Wambaugh*, 934 F.2d 474, 479 (3d Cir. 1991) (emphasis added).

Of the three types of interstate compacts—"boundary," "regulatory," and "advisory"—only the first two potentially create a binding contract. CAROLINE N. BROUN, ET AL., THE EVOLVING USE AND THE CHANGING ROLE OF INTERSTATE COMPACTS: A PRACTITIONER'S GUIDE 12-15 (2006). Boundary compacts "establish official borders between states" "with a high degree of

43

finality." *Id.* at 12, 13. And in many "regulatory" compacts, "the member states have collectively and contractually agreed to reallocate governing authority away from individual states to a multilateral relationship." *Id.* at 21-22.

By contrast, "nonbinding" "advisory" compacts "are more akin to administrative agreements between states," which "lack formal enforcement mechanisms." *Id.* at 13, 14. "[A]dvisory compacts cede no state sovereignty nor delegate any governing power to a compact-created agency." *Id.* at 14. And they "generally do not require congressional consent." *Id.* As discussed below the Compact fits this advisory-compact category.

### 2. *U.S. Steel* did not address whether the Compact is a binding contract.

EMC cites the Supreme Court's *U.S. Steel* decision for its contention that the Compact is a "valid *and binding* interstate compact." EMC Br. 13 (emphasis added). But *U.S. Steel* does not support that proposition. Neither the word "binding" nor any variation thereof appears in the majority opinion. *See* 434 U.S. at 454-79. That is unsurprising because whether the Compact constitutes a binding compact or contract was not at issue in that case.

In *U.S. Steel*, corporations facing audits by the Commission filed suit to declare the Compact unconstitutional on the ground that the Compact's lack of

44

congressional consent violated the Compact Clause. *Id.* at 458 & n.7; *see* U.S. CONST. art. I, § 10, cl. 3 ("No State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State . . . ."). The Court rejected that challenge, holding that the Compact Clause does not apply to this Compact because it does not "enhance the political power of the member States in a way that encroaches upon the supremacy of the United States." 434 U.S. at 472. The Court also rejected claims that the Compact violated the Commerce Clause and the Fourteenth Amendment. *Id.* at 478-79. Thus, while the Court decided that the Compact was "valid" (at least under the provisions at issue), *see id.* at 454, it did not address or resolve what type of compact the Compact is or whether it contractually binds its member states.

### 3. The Compact does not exhibit the indicia of a binding regulatory compact.

Since *U.S. Steel*, the Supreme Court has identified three "classic indicia" of a binding regulatory compact: (1) the establishment of a joint regulatory body; (2) state enactments that require reciprocal action to be effective; and (3) the prohibition of unilateral repeal or modification of its terms. *See Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159, 175 (1985); *see also Seattle Master Builders Ass'n v. Pac. Nw. Elec. Power & Conservation*

45

*Planning Council*, 786 F.2d 1359, 1363 (9th Cir. 1986). As the Michigan Court of Claims recently concluded, the Compact does not exhibit any of these characteristics. *Ingram Micro, Inc. v. Dep't of Treas.*, No. 11-000035-MT, slip op. at 7-13 (Mich. Ct. Cl. Dec. 19, 2014) (App. D).

### a. The Commission is not a joint regulatory body.

The first trait of a binding regulatory compact is creation of a "joint organization for *regulatory* purposes," *Seattle Master Builders*, 786 F.2d at 1363 (emphasis added); *see also Ne. Bancorp*, 472 U.S. at 175. By contrast, an advisory compact "cede[s] no state *sovereignty* nor delegate[s] any *governing* power to a compact-created agency." BROUN, *supra*, at 14 (emphases added).

The Compact does not create a joint regulatory body. It forms the Multistate Tax Commission, TEX. TAX CODE § 141.001, art. VI, but that agency does not qualify. As the Court noted in *U.S. Steel:* "Nor is there any delegation of sovereign power to the Commission; each State retains complete freedom to adopt or reject the rules and regulations of the Commission." 434 U.S. at 473; *see also* TEX. TAX CODE § 141.001, art. VII.3. Aside from drafting non-binding rules, the Commission's other powers also evince an advisory compact. *Compare* TEX. TAX CODE § 141.001, art. VI.3 (granting the Commission power to "[s]tudy state and local tax systems," "[d]evelop and recommend proposals,"

46

and "[c]ompile and publish information"), *with* BROUN, *supra*, at 13 (explaining that advisory compacts "are designed not to actually resolve an interstate matter, but simply to study such matters"). The Commission conducts audits only upon request. TEX. TAX CODE § 141.001, art. VIII.2. And its arbitration functions are inoperative. *U.S. Steel*, 434 U.S. at 493 (White, J., dissenting).

> ### b. The Compact provisions do not require reciprocal action to be effective.

The second feature of a binding regulatory compact is the inclusion of "state enactments which require reciprocal action for their effectiveness." *Seattle Master Builders*, 786 F.2d at 1363; *see also Ne. Bancorp*, 472 U.S. at 175. For example, the Interstate Compact for Adult Offender Supervision provides a mechanism for Texas parolees to serve their parole in other compact states, and vice-versa. *See* TEX. GOV'T CODE § 510.017, art. I. That agreement requires reciprocal action to be effective because, among other things, a "sending" state "transfer[s] supervision authority" over a parolee to a "receiving" state, which in turn must allow a sending state's officials to enter the receiving state to "retake" an offender for a parole violation. *See id.*

The Multistate Tax Compact does not similarly require reciprocal action to effect its substantive terms. The Compact "does not purport to authorize the

47

member States to exercise any powers they could not exercise in its absence." *U.S. Steel*, 434 U.S. at 473. Each member state administers its tax laws, including the apportionment of its business tax base, without reference to or consideration of other states' laws. *See Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 278-79 (1978) (noting that states enact differing apportionment formulas "based on political and economic considerations that vary from State to State"). The Compact does nothing to change that. A Compact state can allow a taxpayer to exercise Article III.1's option and use Article IV to apportion its business income *regardless* of how other states tax or apportion that income or whether those states are even Compact members. TEX. TAX CODE § 141.001, art. IV.2-3 (noting that the only condition on Article IV's application is that the taxpayer's income be "taxable" in another state).[3]

### c. The Compact does not prohibit unilateral repeal or modification.

The third characteristic of a binding regulatory compact is "conditional consent" that prohibits a member state from unilaterally repealing or modifying

---

3. Likewise, Article V's "tax credit" and "exemption certificate" provisions do not depend on whether the other state imposing a sales or use tax or authorizing an exemption has similar provisions in its laws or is a Compact

48

its participation. *Seattle Master Builders*, 786 F.2d at 1363; *see also Ne. Bancorp*, 472 U.S. at 175. This Compact contains neither condition.

The Compact expressly provides that a state "may withdraw from this compact by enacting a statute repealing the same." TEX. TAX CODE § 141.001, art. X.2. Withdrawal does not affect any previously incurred liability—*e.g.*, dues, payments for audits, *id.*, art. VI.4, VIII.2—but the existence or non-payment of those liabilities does not prevent or delay withdrawal. *Id.*, art. X.2.

The Compact also does not prohibit a state from unilaterally modifying its participation. While no provision explicitly *allows* a state to unilaterally modify its participation, that silence favors a construction that states may do so. The "well-established" presumption is that, "absent some clear indication that the legislature intends to bind itself contractually," an enacted law does not create contractual rights. *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, 470 U.S. 451, 465-66 (1985). That presumption surely informs *Seattle Master Builders*' framing of this inquiry: the issue is whether a compact renders a state "*not free* to modify . . . its participation unilaterally," not whether a compact affirmatively allows modification. 786 F.2d at 1363 (emphasis added).

And because the Compact concerns taxation, its silence on modification weighs even more strongly against construing it as a binding contract. States "have the attribute of sovereign powers in devising their fiscal systems to ensure revenue." *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 526 (1959). Since "States rarely relinquish their sovereign powers," such as taxation, "when they do we would expect a clear indication of such devolution, not inscrutable silence." *Tarrant Reg'l Water Dist. v. Hermann*, 133 S. Ct. 2120, 2133 (2013). The Compact's silence on modification thus indicates that its members did not intend to contract away their sovereign right to amend their state tax laws in a way that varies from the Compact's substantive provisions.

To the contrary, the Compact states consistently have construed that silence to mean that members *may* unilaterally change or restrict the Compact's terms in their own laws. In 1972, the Compact states unanimously ratified Florida's decision to repeal Articles III and IV of the Compact in its law and to mandate a different apportionment method, recognizing that it remained a "regular" Compact member "in good standing." CR.879. And, as discussed above, 11 more former and current Compact members (including Texas) have since taken similar steps to remove or limit the operation of Articles III and IV in their jurisdictions, all without objection from other states. *See supra*

50

Statement of Facts, Parts II.C, III.  Because "the parties' course of performance under the Compact is highly significant" in interpreting its meaning, *see Alabama v. North Carolina*, 560 U.S. 330, 346 (2010), the Court should not construe the Compact to be a binding regulatory compact.

EMC argues that the Compact's status as an "interstate compact" alone means that it "is also a contract that cannot be amended, modified, or otherwise altered without consent of all parties."  EMC Br. 12.  But that begs the question.  "Once entered, the terms of the compact and any rules and regulations authorized by the compact can, *to the extent provided in the agreement*, supersede any substantive state laws that may be in conflict . . . ." BROUN, *supra*, at 22 (emphasis added).  Unlike other compacts, this Compact does not provide that it supersedes conflicting state law, nor does it expressly prohibit changes to the Compact's text or application in a member state's law.[4] And, in any event, the Compact parties *did* consent to individual members

---

4. *Cf.* TEX. FAM. CODE § 60.010, art. XII.A.2 (Uniform Interstate Compact on Juveniles) ("All compacting states' laws other than state constitutions and other interstate compacts conflicting with this compact are superseded to the extent of the conflict."); TEX. GOV'T CODE § 510.017, art. XIII (Interstate Compact for Adult Offender Supervision) ("Nothing in this compact prevents the enforcement of any other law of a compacting state that is not inconsistent with this compact."); TEX. TRANSP. CODE § 523.007 (Driver's License Compact of 1993) ("Except as expressly required by provisions of this compact, nothing contained herein shall be construed to affect the right of any state to apply any of its other laws relating to licenses to drive to any person or circumstance . . . .").

51

eliminating or restricting Article III.1's "taxpayer option" by unanimously adopting the 1972 Florida resolution. CR.879.

### 4. The Compact is an advisory compact with uniform laws.

Because the Compact lacks the indicia of a binding regulatory compact, it must be an advisory compact. The usual traits of advisory compacts are all present: it aims to "study" state tax systems, not "resolve" conflicts among them; it "lack[s] formal enforcement mechanisms"; it "cede[s] no state sovereignty nor delegate[s] any governing power to a compact-created agency"; and it "do[es] not require congressional consent." BROUN, *supra*, at 13-14.

The Compact's structure and terms show that Article II through V's tax-law "elements" constitute uniform laws contained within that advisory compact. The Compact simply inserts those articles into its text, without any prefatory language requiring members to maintain those provisions unchanged in their laws or any means of compelling them to do so. *See* TEX. TAX CODE § 141.001, arts. II-V. What prefaces those provisions instead is the "Purposes" article, which describes the Compact as "[f]acilitat[ing]" the determination of multistate taxpayers' tax liability and "[p]romot[ing]" uniformity in tax systems—words that are hortatory, not mandatory. *Id.*, art. I. Indeed, the Compact's sole method of implementing those tax-law elements is through the Commission's

52

draft regulations, which are "advisory only." *U.S Steel*, 434 U.S. at 457.

Moreover, Article IV's text *is* a uniform law—UDITPA. *See supra* Statement

of Facts, Part II.B.3. And the Commission's first annual report recounted that

the Compact had "been enacted as a uniform law" by 15 states. MULTISTATE

TAX COMM'N, FIRST ANNUAL REPORT 12 (1969), *available at* http://www.mtc.

gov/uploadedFiles/Multistate_Tax_Commission/Resources/Archives/Annual

_Reports/FY67-68.pdf. Because "[u]niform acts do not constitute a contract

between the states," the Compact members "may make changes to fit individual

state needs." BROUN, *supra*, at 16. Accordingly, Texas was free to restrict the

operation of Articles III.1 and IV in Texas law to the extent they would

otherwise apply.

## C. The Compact Does Not Preclude the Legislature from Mandating Exclusive Use of Section 171.106's Gross-Receipts Apportionment Method.

Regardless of whether the Compact as a whole is a binding contract, the

provisions that EMC relies on—Articles III.1 and IV—still do not compel its

desired outcome, for two reasons. First, applying Article III.1 to the franchise

tax creates a latent ambiguity that must be resolved in favor of section 171.106's

exclusive apportionment method. And second, under the Texas Constitution,

Article III.1 may not suspend Texas's authority to tax the part of a taxpayer's margin that would elude taxation under Article IV's apportionment method.

### 1. Article III.1 does not unambiguously bar the Legislature from enforcing an exclusive apportionment method.

Article III.1 states that a taxpayer "may elect to apportion and allocate his income in the manner provided by the laws of [a Compact] State . . . without reference to this compact, or may elect to apportion and allocate in accordance with [the three-factor income-apportionment method in] Article IV." TEX. TAX CODE § 141.001, art. III.1. Again, this language presumes that a state's laws do no more than "provide[]" a "manner" of apportioning income; it does not address the circumstance in which that state-law manner mandates exclusive use of one apportionment method, as section 171.106(a) does. *See supra* Part I.C.2. Nor does the Compact preclude a state from adding that sort of exclusive condition to the laws that Article III.1 incorporates by reference. For all that Article III.1 reveals, the taxpayer takes the state laws as it finds them. So what happens when the state law that Article III.1 incorporates as an option is by its very terms not optional? The Compact doesn't say.

Applying Article III.1 to section 171.106's exclusive apportionment method thus creates a latent ambiguity. *See* BLACK'S LAW DICTIONARY 93 (9th

ed. 2009) (defining "latent ambiguity" as an "ambiguity that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied"). That ambiguity warrants recourse to "other interpretive tools" to discern the Compact's meaning in this scenario. *See Tarrant Reg'l Water Dist.*, 133 S. Ct. at 2132.

Three construction aids already discussed support the Comptroller's view that the Compact does not prevent member states from enforcing exclusive apportionment provisions such as section 171.106. First, courts will not construe a compact to cede a sovereign power like tax apportionment without a "clear indication" of that purpose. *Id.* at 2133. Again, Article III.1 does not address the conflict that arises when it purports to incorporate a non-optional state law as an option, much less clearly indicate an intent to allow taxpayers to override a legislative command. *See supra* Part II.B.3.c. Second, "[t]he parties' conduct under the Compact" provides "'highly significant' evidence of [their] understanding of the [C]ompact's terms." *Tarrant Reg'l Water Dist.*, 133 S. Ct. at 2135 (quoting *Alabama*, 560 U.S. at 346). Both the 1972 Florida resolution and the unopposed disabling of Article III.1's taxpayer option by 12 Compact members reflect the parties' common, long-held view that the Compact does not preclude them from imposing an exclusive apportionment method. *See supra*

Part II.B.3.c. And third, comparisons to other compacts' text can shed light on the parties' intent here. *Tarrant Reg'l Water Dist.*, 133 S. Ct. at 2133. Unlike this Compact, other compacts to which Texas belongs explicitly state that the compact supersedes any conflicting state statute. *See supra* p. 51, n.4.

The Minnesota Tax Court, sitting en banc, recently reached a similar conclusion regarding the Compact. *Kimberly Clark Corp. v. Comm'r of Revenue*, No. 8670-R, slip op. (Minn. Tax Ct. June 19, 2015) (en banc) (App. E). Assuming without deciding that the Compact was a binding contract, *id.* at 26, the court held that nothing in the Compact "constitutes a clear and unmistakable promise to refrain from using the State's sovereign power to alter the apportionment election provided by Articles III and IV," *id.* at 40. The court further relied on the Compact members' course of performance in determining that "the Compact could not reasonably be understood as contractually requiring party states to refrain from using their sovereign powers to alter the apportionment election." *Id.* at 55.

> **2. Article III.1 cannot constitutionally require Texas to allow a taxpayer to remove part of its tax base from Texas's taxing authority.**

Construing Article III.1 to preclude Texas from enacting an exclusive apportionment method also would impermissibly conflict with the Texas

56

Constitution's prohibition against contractual suspensions of the sovereign power of taxation—a conflict that the Compact itself aims to avoid.

By its terms, the Compact operates within a member state only to the extent that the state enacts the Compact as a statute. TEX. TAX CODE § 141.001, art. X.1. Thus, the Compact's drafters understood that its provisions could not conflict with any Compact state's constitution. To address that constraint, the Compact decrees that if any provision or part thereof is declared to be contrary to a state constitution, it is severable, and the Compact otherwise remains in effect. *Id.*, art. XII.

Article VIII, section 4 of the Texas Constitution provides that the Legislature may not surrender or suspend the power to tax corporations "by any contract or grant to which the State shall be a party." TEX. CONST. art. VIII, § 4. Thirteen other former and current Compact states' constitutions contain similar prohibitions.[5] Yet EMC construes Article III.1 to effect such a contractual suspension. Under EMC's reasoning, Texas contracted away its power to tax that portion of a taxpayer's tax base that the taxpayer removes

---

5. ALASKA CONST. art. IX, § 1; ARK. CONST. art. 16, § 7; CAL. CONST. art. XIII, § 31; HAW. CONST. art. VII, § 1; ILL. CONST. art. IX, § 1; MICH. CONST. art. IX, § 2; MINN. CONST. art. X, § 1; MO. CONST. art. X, § 2; MONT. CONST. art. VIII, § 2; N.D. CONST. art. X, § 2; S.D. CONST. art. XI, § 3; WASH. CONST. art. 7, § 1; WYO. CONST. art. 15, § 14.

from Texas's taxing authority by electing Article IV's income-apportionment method over section 171.106's exclusive apportionment method. Here, for example, EMC claims a contractual right to withdraw part of its margin from Texas's taxing power to the tune of over $5 million in forgone revenue. CR.5. That is precisely the sort of claim that Texas courts have rejected in light of the constitutional prohibition against contractual suspensions of the taxing power. *See, e.g., Gaar, Scott & Co. v. Shannon*, 115 S.W. 361, 362 (Tex. Civ. App.—Austin 1908, writ denied) (holding that business permit under which taxpayer paid franchise tax for 10-year term could not foreclose state from amending franchise tax to impose additional tax burdens during that term), *aff'd*, 223 U.S. 468 (1912).

Because EMC's reading of Article III.1 cannot be squared with the constitutions of most Compact states (including Texas), it is not one that the Compact states could have intended or that the Court should embrace. As the Minnesota Tax Court reasoned, "[c]onsidering that at least fourteen States have constitutional provisions prohibiting them from contracting away their taxing power, it is highly unlikely that the state tax officials and attorneys general who drafted the Compact intended that party States would surrender their sovereign authority to alter or repeal the apportionment election." *Kimberly*

58

*Clark Corp.*, No. 8670-R, slip. op. at 55; *see also Employees Ret. Sys. v. Duenez*, 288 S.W.3d 905, 910 (Tex. 2009) (noting that courts "must avoid constitutionally suspect constructions" of statutes).

## D. The Compact Does Not Supersede Section 171.106 Because Any Conflict Does Not Unconstitutionally Impair Any Contractual Obligations.

A holding that the Compact obligates its members to provide Article III.1's "taxpayer option" still would not win this appeal for EMC. Section 171.106's mandate to use the gross-receipts method would yield only to the extent that disabling Article III.1 would violate the Contracts Clauses of the United States and Texas Constitutions. EMC has not shown a violation here.

### 1. Binding compacts that Congress has not approved preempt state law only if the law unconstitutionally impairs contractual obligations.

When Congress approves an interstate compact, it "transforms" the compact into federal law. *Cuyler v. Adams*, 449 U.S. 433, 440 (1981). Under the Supremacy Clause, then, an approved compact "pre-empts any state law that conflicts with the Compact." *Tarrant Reg'l Water Dist.*, 133 S. Ct. at 2130 n.8.

By contrast, a non-approved compact like the Multistate Tax Compact operates only as a state statute and, in some cases, a binding contract among states. *See* 1A NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND

59

STATUTES AND STATUTORY CONSTRUCTION § 32:5, at 723 (7th ed. 2009). As a statute, the compact may be trumped by other state law under "the doctrine of implied repeal" or rules that "give effect to the latest in time." *Id.* § 32:6, at 727. But when the compact also creates a binding contract, it *may* supersede a conflicting statute if the statute's effect on the compact violates the Contracts Clauses, U.S. CONST. art I, § 10, cl. 1; TEX. CONST. art. I, § 16, which prohibit laws impairing contractual obligations. *Green v. Biddle*, 21 U.S. (8 Wheat.) 1, 92 (1823) (holding that a statute abrogating a compact violated Contracts Clause); *Gen. Expressways, Inc. v. Iowa Reciprocity Bd.*, 163 N.W.2d 413, 419-21 (Iowa 1968) (evaluating conflicts between a statute and a compact under contracts-clause principles); SINGER, *supra*, § 32:3, at 719 (describing compacts as "deriv[ing] binding force" from the Contracts Clause); BROUN, *supra*, at 22 (explaining that "[a] compact controls over a state's application of its own law through the Supremacy Clause [in the case of approved compacts] and the Contracts Clause").

EMC seems to suggest that a non-approved compact preempts other state law simply by virtue of being an interstate agreement, independent of the "binding force" of the Contracts Clauses. *See* EMC Br. 13. In support, EMC

60

relies primarily on *West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22 (1951). But that reliance is misplaced.

EMC misconstrues *Dyer*'s analysis as concerning conflicts between compacts and later-enacted statutes. In *Dyer*, although the West Virginia legislature had ratified an interstate compact, the State's highest court had invalidated that ratification on state common-law and constitutional grounds. *Id.* at 26. On certiorari review, the Supreme Court confronted the antecedent question whether it had jurisdiction to review a state supreme court judgment based on a state-law determination. *Id.* at 28. In this context, the Court held that it did:

> It requires no elaborate argument to reject the suggestion that an agreement solemnly entered into between States by those who alone have political authority to speak for a State can be unilaterally nullified, or given final meaning by an organ of one of the contracting States. A State cannot be its own ultimate judge in a controversy with a sister State. To determine the nature and scope of obligations as between States, whether they arise through the legislative means of compact or the federal common law governing interstate controversies . . . is the function and duty of the Supreme Court of the Nation.

*Id.* (citation and internal quotation marks omitted). In other words, the Supreme Court distinguished between "those who alone have political authority to speak for a State"—the legislature—and "an organ of one of the contracting

61

States"—*e.g.*, a court—and held that the latter could not nullify or conclusively construe an agreement adopted by the former. *Id.* The Court did not address what happens when the same legislature that adopts a compact later enacts a potentially conflicting statute, much less prescribe a rule that the statute is automatically invalid.

Moreover, EMC ignores the Supreme Court's later recognition that, in light of *Dyer*'s statement that "all compacts" require congressional consent, *id.* at 27, *Dyer*'s discussion is necessarily cabined to the subset of compacts that actually require that consent under the Compact Clause. *U.S. Steel*, 434 U.S. at 471 n.23.[6] Because Congress has not consented to the Multistate Tax Compact, EMC must rely on the Contracts Clauses to give the Compact controlling effect over subsequent Texas law.

### 2. Section 171.106 does not unconstitutionally impair any obligations to EMC under the Compact.

Whether a state law violates the federal Contracts Clause involves a three-part inquiry: (1) whether the state law substantially impairs a contractual relationship; (2) whether a significant, legitimate public purpose motivated the

---

6. EMC likewise misplaces reliance on *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30 (1994). EMC Br. 12. *Hess*'s analysis concerns "compact[s] accorded congressional consent." 513 U.S. at 40-42.

state law; and (3) whether the adjustment to the contracting parties' rights is based on reasonable conditions and appropriate to the law's purpose. *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-13 (1983). The Texas Constitution's Contracts Clause requires "[a] similar analysis." *Liberty Mut. Ins. Co. v. Tex. Dep't of Ins.*, 187 S.W.3d 808, 825 (Tex. App.—Austin 2006, pet. denied). Under this test, section 171.106 validly overrides any possible application of Article III.1 's "taxpayer option" to the franchise tax.

EMC cannot establish the first requirement because it is not a party to the Compact. Nor is EMC a third-party beneficiary. *See Basic Capital Mgmt. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 900 (Tex. 2011) (holding that a third party may not recover on a contract unless the contracting parties intended to secure benefits to that third party and entered into the contract directly for the third party's benefit).

But even if EMC were an intended Compact beneficiary, disabling Article III.1's option would not constitute a "substantial" impairment. "In determining whether an impairment is substantial and so not 'permitted under the Constitution,' of *greatest* concern appears to be the contracting parties' *actual* reliance on the abridged contractual term." *City of Charleston v. Pub. Serv. Comm'n*, 57 F.3d 385, 392 (4th Cir. 1995) (quoting *U.S. Trust Co. v. New Jersey*,

63

431 U.S. 1, 21 (1977)). EMC could not have reasonably relied on Article III.1's taxpayer option because the Compact did not clearly and unmistakably obligate its members to refrain from altering or eliminating that option. *See supra* Part II.C; *see also Kimberly Clark Corp.*, No. 8670-R, slip op. at 57 (holding that, because there was no such obligation, Minnesota did not substantially impair a contractual relationship under the Contracts Clause by repealing Articles III and IV of the Compact). EMC also could not have reasonably expected that the option would remain in place because the Compact permits states to withdraw at will. *See City of Charleston*, 57 F.3d at 392-93 (noting that the reliance analysis turns in part on whether the contract "indicated that the abridged term was subject to impairment by the legislature"). By contrast, since at least 1991 Texas has significantly relied on the Compact states' shared interpretation that Article III.1 does not preclude them from adopting exclusive apportionment methods.

And even if EMC could demonstrate the threshold substantial impairment, that still would not establish a constitutional violation because section 171.106 serves a significant and legitimate purpose. *See Energy Reserves*, 459 U.S. at 411-12. States enjoy "wide latitude in the selection of apportionment formulas." *Moorman*, 437 U.S. at 274. Texas once allowed

taxpayers to request a multi-factor apportionment method, but later changed that policy because it disproportionately favored foreign corporations. *See supra* Statement of Facts, Part I.B.2. In imposing a single-factor method, and disallowing any option under the Compact, section 171.106 "treats both local and foreign concerns with an even hand." *Moorman*, 437 U.S. at 277 n.12.

Finally, to the extent section 171.106 adjusts any taxpayer rights under the Compact, it does so under reasonable and appropriate conditions. The Supreme Court has repeatedly held that single-factor apportionment methods are "presumptively valid." *Id.* at 273. Indeed, this Court has specifically upheld Texas's gross-receipts method as constitutional. *Gen. Dynamics*, 919 S.W.2d at 867-69.

### 3. EMC waived the Contracts Clause issue.

EMC makes no effort to apply the *Energy Reserves* analysis. EMC Br. 14. Instead, EMC simply asserts that the Comptroller's interpretation and application of section 171.106 "impairs Texas's contractual obligation to allow taxpayers the three-factor apportionment formula election under the Multistate Tax Compact." *Id.* But merely identifying a breached contractual term does not establish a Contracts Clause violation. As described above, the Supreme Court has adopted a standard that requires more, confirming that "[t]he

65

Contract[s] Clause is not an absolute bar to subsequent modification of a State's own financial obligations" under a compact. *U.S. Trust*, 431 U.S. at 25. Having failed to brief the proper test, EMC has waived its Contracts Clause issue. *See Sunbeam Envtl. Servs. v. Tex. Workers' Comp. Ins. Facility*, 71 S.W.3d 846, 851 (Tex. App.—Austin 2002, no pet.).

## III. EMC's As-Applied Constitutional Challenges Are Jurisdictionally Barred, Waived, And Meritless.

In its final issue, EMC contends that section 171.106's gross-receipts apportionment method, as applied to its business, violates the Due Process and Commerce Clauses of the United States Constitution and the Equal and Uniform Taxation Clause of the Texas Constitution. EMC Br. 20-22. In support, EMC argues that the gross-receipts method "attributes to Texas a percentage of income that is disproportionate to the business EMC transacts in Texas and leads to a grossly distorted result." *Id.* at 21.

As a threshold matter, the district court lacked jurisdiction over those challenges because EMC failed to raise them in its motion for rehearing before the Comptroller. Among the jurisdictional prerequisites to a tax-refund suit, a taxpayer must have filed a motion for rehearing that the Comptroller denied, Tex. Tax Code § 112.151(a)(2), and "[t]he grounds of error contained in the

66

motion for rehearing are the only issues that may be raised in [the] suit," *id.* § 112.152(a). *See Combs v. Chevron, Inc.*, 319 S.W.3d 836, 845 (Tex. App.—Austin 2010, pet. denied) (describing this requirement as a "necessary" "condition for trial-court jurisdiction"); *see also In re Nestle USA, Inc.*, 359 S.W.3d 207, 211-12 (Tex. 2012) (*Nestle I*) (dismissing constitutional challenges to the franchise tax for failure to comply with the administrative prerequisites to suit in chapter 112 of the Tax Code).

EMC's motion for rehearing listed a single ground of error: "Texas is required to allow taxpayers to follow Article IV of the Multistate Tax Compact since Texas was a member of the compact for the years at issue." CR.8. The motion elaborated that the Compact was binding on Texas, that Texas could not deviate from the Compact's terms without withdrawing from the Compact, and that any law purporting to override the Compact would unconstitutionally impair Texas's contract obligations. CR.8-9. But the motion never mentioned the Due Process, Commerce, or Equal and Uniform Taxation Clauses, and it never complained that EMC's use of the gross-receipts method resulted in a disproportionate or grossly distorted tax burden. *Id.* Accordingly, EMC was jurisdictionally barred from raising those issues in this suit.

Alternatively, the district court correctly granted summary judgment to the Comptroller on these issues because EMC failed to plead them. A trial court may not grant relief on a claim that was neither pleaded nor tried by consent. *In re Park Mem'l Condo. Ass'n*, 322 S.W.3d 447, 450-51 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (citing TEX. R. CIV. P. 301); *accord Vincent v. Bank of Am., N.A.*, 109 S.W.3d 856, 863 (Tex. App.—Dallas 2003, pet. denied) ("A party may not obtain a judgment based on a theory not pled.").

EMC's petition alleged only that the Compact contractually obligated Texas to allow EMC to elect the Compact's three-factor apportionment method. CR.5-6. It did not mention the Due Process, Commerce, or Equal and Uniform Taxation Clauses, and it did not assert that the gross-receipts method caused EMC to suffer a disproportionate or grossly distorted tax burden. CR.4-7. Nor were those issues tried by consent. When EMC included those issues in its summary-judgment briefing, the Comptroller specifically objected that they were outside the pleadings and asked the district court to disregard them. CR.1133-34. Thus, if the Court does not dismiss these issues as jurisdictionally barred, it should affirm the judgment for the Comptroller.

Finally, EMC's arguments lack merit. As this Court has explained, Texas's gross-receipts apportionment method is presumptively valid under the

Due Process and Commerce Clauses. *Gen. Dynamics*, 919 S.W.2d at 868. To meet its "heavy burden" to overcome that presumption, EMC was required to show by "clear and cogent evidence" that the part of its margin apportioned to Texas is "out of all appropriate proportion to the business transacted" here or "has led to a grossly distorted result." *Id.* (citations and internal quotation marks omitted). And that showing must rest on a comparison of the apportioned margin under EMC's proposed formula to that actually apportioned under the gross-receipts method. *Id.* at 868-69. Surveying Supreme Court precedent on this issue, this Court has observed that the Supreme Court "has only twice held the application of a single-factor formula to be unconstitutional"—specifically, in cases where the challenged formula increased the apportioned tax base by 162-205% (depending on the method used) and 250%. *Id.* at 869. By contrast, the Supreme Court has upheld apportionment formulas that increased the apportioned tax base within a range of 14-93%. *Id.*

Here, the evidence showed that application of the gross-receipts method rather than the Compact's three-factor method increased EMC's apportioned margin within the range of 57.6-61.8% (depending on the year). CR.1135, 1143-54. Because those increases fall well within the range of apportionment

69

differences upheld as constitutional by the Supreme Court, and well outside those that the Court has found unconstitutional, EMC failed to show that, as applied to its business, the gross-receipts method violates the Due Process or Commerce Clauses.[7]

---

7. EMC offers no argument regarding the Equal and Uniform Taxation Clause. *See* EMC Br. 20-22. And EMC's discussion regarding the Due Process and Commerce Clauses does not support an action under the Equal and Uniform Taxation Clause; the claims and standards are different. *See Nestle II*, 387 S.W.3d at 618-26 (treating these as distinct claims). Accordingly, EMC has waived any equal-and-uniform-taxation issue. *See* TEX. R. APP. P. 38.1(i).

## PRAYER

The district court's judgment should be affirmed.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney
  General

JAMES E. DAVIS
Deputy Attorney General for
  Civil Litigation

SCOTT A. KELLER
Solicitor General

/s/ Rance Craft
RANCE CRAFT
Assistant Solicitor General
State Bar No. 24035655

CHARLES K. ELDRED
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-2872
(512) 474-2697 [fax]
rance.craft@texasattorneygeneral.gov

## CERTIFICATE OF COMPLIANCE

According to WordPerfect 12, this brief contains 14,850 words, excluding the portions of the brief exempted by Texas Rule of Appellate Procedure 9.4(i)(1).

/s/ Rance Craft
Rance Craft

## CERTIFICATE OF SERVICE

On July 8, 2015, this **Brief of Appellees** was served by File & Serve Xpress on:

Doug Sigel
RYAN LAW FIRM, LLP
100 Congress Avenue, Suite 950
Austin, Texas 78701
Doug.Sigel@RyanLawLLP.com

*Lead Counsel for Appellant*

/s/ Rance Craft
Rance Craft

# APPENDIX

## APPENDIX TABLE OF CONTENTS

A.  TEX. TAX CODE § 141.001

B.  Addendum to Volume 1 of Florida Statutes, 1971

C.  COMPTROLLER'S DECISION NOS. 104,752 & 104,753 (2011)

D.  *Ingram Micro, Inc. v. Dep't of Treas.*, No. 11-000035-MT, slip op. (Mich. Ct. Cl. Dec. 19, 2014)

E.  *Kimberly Clark Corp. v. Comm'r of Revenue*, No. 8670-R, slip op. (Minn. Tax Ct. June 19, 2015) (en banc)




**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle D. Compacts and Uniform Laws
        Chapter 141. Multistate Tax Compact (Refs & Annos)
          **§ 141.001. Adoption of Multistate Tax Compact**

The Multistate Tax Compact is adopted and entered into with all jurisdictions legally adopting it to read as follows:

MULTISTATE TAX COMPACT

ARTICLE I. PURPOSES

The purposes of this compact are to:

1. Facilitate proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes.

2. Promote uniformity or compatibility in significant components of tax systems.

3. Facilitate taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration.

4. Avoid duplicative taxation.

ARTICLE II. DEFINITIONS

As used in this compact:

1. "State" means a state of the United States, the District of Columbia, the Commonwealth of Puerto Rico,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

or any territory or possession of the United States.

2. "Subdivision" means any governmental unit or special district of a state.

3. "Taxpayer" means any corporation, partnership, firm, association, governmental unit or agency or person acting as a business entity in more than one state.

4. "Income tax" means a tax imposed on or measured by net income including any tax imposed on or measured by an amount arrived at by deducting expenses from gross income, one or more forms of which expenses are not specifically and directly related to particular transactions.

5. "Capital stock tax" means a tax measured in any way by the capital of a corporation considered in its entirety.

6. "Gross receipts tax" means a tax, other than a sales tax, which is imposed on or measured by the gross volume of business, in terms of gross receipts or in other terms, and in the determination of which no deduction is allowed which would constitute the tax an income tax.

7. "Sales tax" means a tax imposed with respect to the transfer for a consideration of ownership, possession or custody of tangible personal property or the rendering of services measured by the price of the tangible personal property transferred or services rendered and which is required by state or local law to be separately stated from the sales price by the seller, or which is customarily separately stated from the sales price, but does not include a tax imposed exclusively on the sale of a specifically identified commodity or article or class of commodities or articles.

8. "Use tax" means a nonrecurring tax, other than a sales tax, which (a) is imposed on or with respect to the exercise or enjoyment of any right or power over tangible personal property incident to the ownership, possession or custody of that property or the leasing of that property from another including any consumption, keeping, retention, or other use of tangible personal property and (b) is complementary to a sales tax.

9. "Tax" means an income tax, capital stock tax, gross receipts tax, sales tax, use tax, and any other tax which has a multistate impact, except that the provisions of Articles III, IV and V of this compact shall apply only to the taxes specifically designated therein and the provisions of Article IX of this compact shall apply only in respect to determinations pursuant to Article IV.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

## ARTICLE III. ELEMENTS OF INCOME TAX LAWS

### Taxpayer Option, State and Local Taxes

1. Any taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state or pursuant to the laws of subdivisions in two or more party states may elect to apportion and allocate his income in the manner provided by the laws of such state or by the laws of such states and subdivisions without reference to this compact, or may elect to apportion and allocate in accordance with Article IV. This election for any tax year may be made in all party states or subdivisions thereof or in any one or more of the party states or subdivisions thereof without reference to the election made in the others. For the purposes of this paragraph, taxes imposed by subdivisions shall be considered separately from state taxes and the apportionment and allocation also may be applied to the entire tax base. In no instance wherein Article IV is employed for all subdivisions of a state may the sum of all apportionments and allocations to subdivisions within a state be greater than the apportionment and allocation that would be assignable to that state if the apportionment or allocation were being made with respect to a state income tax.

### Taxpayer Option, Short Form

2. Each party state or any subdivision thereof which imposes an income tax shall provide by law that any taxpayer required to file a return, whose only activities within the taxing jurisdiction consist of sales and do not include owning or renting real estate or tangible personal property, and whose dollar volume of gross sales made during the tax year within the state or subdivision, as the case may be, is not in excess of $100,000 may elect to report and pay any tax due on the basis of a percentage of such volume, and shall adopt rates which shall produce a tax which reasonably approximates the tax otherwise due. The Multi-state Tax Commission, not more than once in five years, may adjust the $100,000 figure in order to reflect such changes as may occur in the real value of the dollar, and such adjusted figure, upon adoption by the commission, shall replace the $100,000 figure specifically provided herein. Each party state and subdivision thereof may make the same election available to taxpayers additional to those specified in this paragraph.

### Coverage

3. Nothing in this article relates to the reporting or payment of any tax other than an income tax.

## ARTICLE IV. DIVISION OF INCOME

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

1. As used in this article, unless the context otherwise requires:

(a) "Business income" means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations.

(b) "Commercial domicile" means the principal place from which the trade or business of the taxpayer is directed or managed.

(c) "Compensation" means wages, salaries, commissions and any other form of remuneration paid to employees for personal services.

(d) "Financial organization" means any bank, trust company, savings bank, industrial bank, land bank, safe deposit company, private banker, savings and loan association, credit union, cooperative bank, small loan company, sales finance company, investment company, or any type of insurance company.

(e) "Nonbusiness income" means all income other than business income.

(f) "Public utility" means any business entity (1) which owns or operates any plant, equipment, property, franchise, or license for the transmission of communications, transportation of goods or persons, except by pipe line, or the production, transmission, sale, delivery, or furnishing of electricity, water or steam; and (2) whose rates of charges for goods or services have been established or approved by a federal, state or local government or governmental agency.

(g) "Sales" means all gross receipts of the taxpayer not allocated under paragraphs of this article.

(h) "State" means any state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, and any foreign country or political subdivision thereof.

(i) "This state" means the state in which the relevant tax return is filed or, in the case of application of this article to the apportionment and allocation of income for local tax purposes, the subdivision or local taxing district in which the relevant tax return is filed.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

2. Any taxpayer having income from business activity which is taxable both within and without this state, other than activity as a financial organization or public utility or the rendering of purely personal services by an individual, shall allocate and apportion his net income as provided in this article. If a taxpayer has income from business activity as a public utility but derives the greater percentage of his income from activities subject to this article, the taxpayer may elect to allocate and apportion his entire net income as provided in this article.

3. For purposes of allocation and apportionment of income under this article, a taxpayer is taxable in another state if (1) in that state he is subject to a net income tax, a franchise tax measured by net income, a franchise tax for the privilege of doing business, or a corporate stock tax, or (2) that state has jurisdiction to subject the taxpayer to a net income tax regardless of whether, in fact, the state does or does not.

4. Rents and royalties from real or tangible personal property, capital gains, interest, dividends or patent or copyright royalties, to the extent that they constitute nonbusiness income, shall be allocated as provided in paragraphs 5 through 8 of this article.

5. (a) Net rents and royalties from real property located in this state are allocable to this state.

(b) Net rents and royalties from tangible personal property are allocable to this state: (1) if and to the extent that the property is utilized in this state, or (2) in their entirety if the taxpayer's commercial domicile is in this state and the taxpayer is not organized under the laws of or taxable in the state in which the property is utilized.

(c) The extent of utilization of tangible personal property in a state is determined by multiplying the rents and royalties by a fraction, the numerator of which is the number of days of physical location of the property in the state during the rental or royalty period in the taxable year and the denominator of which is the number of days of physical location of the property everywhere during all rental or royalty periods in the taxable year. If the physical location of the property during the rental or royalty period is unknown or unascertainable by the taxpayer, tangible personal property is utilized in the state in which the property was located at the time the rental or royalty payer obtained possession.

6. (a) Capital gains and losses from sales of real property located in this state are allocable to this state.

(b) Capital gains and losses from sales of tangible personal property are allocable to this state if (1) the property had a situs in this state at the time of the sale, or (2) the taxpayer's commercial domicile is in this state and the taxpayer is not taxable in the state in which the property had a situs.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(c) Capital gains and losses from sales of intangible personal property are allocable to this state if the taxpayer's commercial domicile is in this state.

7. Interest and dividends are allocable to this state if the taxpayer's commercial domicile is in this state.

8. (a) Patent and copyright royalties are allocable to this state: (1) if and to the extent that the patent or copyright is utilized by the payer in this state, or (2) if and to the extent that the patent or copyright is utilized by the payer in a state in which the taxpayer is not taxable and the taxpayer's commercial domicile is in this state.

(b) A patent is utilized in a state to the extent that it is employed in production, fabrication, manufacturing, or other processing in the state or to the extent that a patented product is produced in the state. If the basis of receipts from patent royalties does not permit allocation to states or if the accounting procedures do not reflect states of utilization, the patent is utilized in the state in which the taxpayer's commercial domicile is located.

(c) A copyright is utilized in a state to the extent that printing or other publication originates in the state. If the basis of receipts from copyright royalties does not permit allocation to states or if the accounting procedures do not reflect states of utilization, the copyright is utilized in the state in which the taxpayer's commercial domicile is located.

9. All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three.

10. The property factor is a fraction, the numerator of which is the average value of the taxpayer's real and tangible personal property owned or rented and used in this state during the tax period and the denominator of which is the average value of all the taxpayer's real and tangible personal property owned or rented and used during the tax period.

11. Property owned by the taxpayer is valued at its original cost. Property rented by the taxpayer is valued at eight times the net annual rental rate. Net annual rental rate is the annual rental rate paid by the taxpayer less any annual rental rate received by the taxpayer from subrentals.

12. The average value of property shall be determined by averaging the values at the beginning and ending

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

of the tax period but the tax administrator may require the averaging of monthly values during the tax period if reasonably required to reflect properly the average value of the taxpayer's property.

13. The payroll factor is a fraction, the numerator of which is the total amount paid in this state during the tax period by the taxpayer for compensation and the denominator of which is the total compensation paid everywhere during the tax period.

14. Compensation is paid in this state if:

  (a) the individual's service is performed entirely within the state;

  (b) the individual's service is performed both within and without the state, but the service performed without the state is incidental to the individual's service within the state; or

  (c) some of the service is performed in the state and (1) the base of operations or, if there is no base of operations, the place from which the service is directed or controlled is in the state, or (2) the base of operations or the place from which the service is directed or controlled is not in any state in which some part of the service is performed, but the individual's residence is in this state.

15. The sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period.

16. Sales of tangible personal property are in this state if:

  (a) the property is delivered or shipped to a purchaser, other than the United States government, within this state regardless of the f. o. b. point or other conditions of the sale; or

  (b) the property is shipped from an office, store, warehouse, factory, or other place of storage in this state and (1) the purchaser is the United States government or (2) the taxpayer is not taxable in the state of the purchaser.

17. Sales, other than sales of tangible personal property, are in this state if:

  (a) the income-producing activity is performed in this state; or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(b) the income-producing activity is performed both in and outside this state and a greater proportion of the income-producing activity is performed in this state than in any other state, based on costs of performance.

18. If the allocation and apportionment provisions of this article do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for or the tax administrator may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

(a) separate accounting;

(b) the exclusion of any one or more of the factors;

(c) the inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or

(d) the employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income.

## ARTICLE V. ELEMENTS OF SALES AND USE TAX LAWS

### Tax Credit

1. Each purchaser liable for a use tax on tangible personal property shall be entitled to full credit for the combined amount or amounts of legally imposed sales or use taxes paid by him with respect to the same property to another state and any subdivision thereof. The credit shall be applied first against the amount of any use tax due the state, and any unused portion of the credit shall then be applied against the amount of any use tax due a subdivision.

### Exemption Certificates, Vendors May Rely

2. Whenever a vendor receives and accepts in good faith from a purchaser a resale or other exemption certificate or other written evidence of exemption authorized by the appropriate state or subdivision taxing authority, the vendor shall be relieved of liability for a sales or use tax with respect to the transaction.

### ARTICLE VI. THE COMMISSION

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Organization and Management

1. (a) The Multistate Tax Commission is hereby established. It shall be composed of one "member" from each party state who shall be the head of the state agency charged with the administration of the types of taxes to which this compact applies. If there is more than one such agency the state shall provide by law for the selection of the commission member from the heads of the relevant agencies. State law may provide that a member of the commission be represented by an alternate but only if there is on file with the commission written notification of the designation and identity of the alternate. The attorney general of each party state or his designee, or other counsel if the laws of the party state specifically provide, shall be entitled to attend the meetings of the commission, but shall not vote. Such attorneys general, designees, or other counsel shall receive all notices of meetings required under paragraph 1(e) of this article.

(b) Each party state shall provide by law for the selection of representatives from its subdivisions affected by this compact to consult with the commission member from that state.

(c) Each member shall be entitled to one vote. The commission shall not act unless a majority of the members are present, and no action shall be binding unless approved by a majority of the total number of members.

(d) The commission shall adopt an official seal to be used as it may provide.

(e) The commission shall hold an annual meeting and such other regular meetings as its bylaws may provide and such special meetings as its executive committee may determine. The commission bylaws shall specify the dates of the annual and any other regular meetings, and shall provide for the giving of notice of annual, regular and special meetings. Notices of special meetings shall include the reasons therefor and an agenda of the items to be considered.

(f) The commission shall elect annually, from among its members, a chairman, a vice-chairman and a treasurer. The commission shall appoint an executive director who shall serve at its pleasure, and it shall fix his duties and compensation. The executive director shall be secretary of the commission. The commission shall make provision for the bonding of such of its officers and employees as it may deem appropriate.

(g) Irrespective of the civil service, personnel or other merit system laws of any party state, the executive director shall appoint or discharge such personnel as may be necessary for the performance of the functions of the commission and shall fix their duties and compensation. The commission bylaws shall

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

provide for personnel policies and programs.

(h) The commission may borrow, accept or contract for the services of personnel from any state, the United States, or any other governmental entity.

(i) The commission may accept for any of its purposes and functions any and all donations and grants of money, equipment, supplies, materials and services, conditional or otherwise, from any governmental entity, and may utilize and dispose of the same.

(j) The commission may establish one or more offices for the transacting of its business.

(k) The commission shall adopt bylaws for the conduct of its business. The commission shall publish its bylaws in convenient form, and shall file a copy of the bylaws and any amendments thereto with the appropriate agency or officer in each of the party states.

(l) The commission annually shall make to the governor and legislature of each party state a report covering its activities for the preceding year. Any donation or grant accepted by the commission or services borrowed shall be reported in the annual report of the commission, and shall include the nature, amount and conditions, if any, of the donation, gift, grant or services borrowed and the identity of the donor or lender. The commission may make additional reports as it may deem desirable.

Committees

2. (a) To assist in the conduct of its business when the full commission is not meeting, the commission shall have an executive committee of seven members, including the chairman, vice-chairman, treasurer and four other members elected annually by the commission. The executive committee, subject to the provisions of this compact and consistent with the policies of the commission, shall function as provided in the bylaws of the commission.

(b) The commission may establish advisory and technical committees, membership on which may include private persons and public officials, in furthering any of its activities. Such committees may consider any matter of concern to the commission, including problems of special interest to any party state and problems dealing with particular types of taxes.

(c) The commission may establish such additional committees as its bylaws may provide.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Powers

3. In addition to powers conferred elsewhere in this compact, the commission shall have power to:

(a) Study state and local tax systems and particular types of state and local taxes.

(b) Develop and recommend proposals for an increase in uniformity or compatibility of state and local tax laws with a view toward encouraging the simplification and improvement of state and local tax law and administration.

(c) Compile and publish information as in its judgment would assist the party states in implementation of the compact and taxpayers in complying with state and local tax laws.

(d) Do all things necessary and incidental to the administration of its functions pursuant to this compact.

Finance

4. (a) The commission shall submit to the governor or designated officer or officers of each party state a budget of its estimated expenditures for such period as may be required by the laws of that state for presentation to the legislature thereof.

(b) Each of the commission's budgets of estimated expenditures shall contain specific recommendations of the amounts to be appropriated by each of the party states. The total amount of appropriations requested under any such budget shall be apportioned among the party states as follows: one-tenth in equal shares; and the remainder in proportion to the amount of revenue collected by each party state and its subdivisions from income taxes, capital stock taxes, gross receipts taxes, sales and use taxes. In determining such amounts, the commission shall employ such available public sources of information as, in its judgment, present the most equitable and accurate comparisons among the party states. Each of the commission's budgets of estimated expenditures and requests for appropriations shall indicate the sources used in obtaining information employed in applying the formula contained in this paragraph.

(c) The commission shall not pledge the credit of any party state. The commission may meet any of its obligations in whole or in part with funds available to it under paragraph 1(i) of this article: provided that the commission takes specific action setting aside such funds prior to incurring any obligation to be met in whole or in part in such manner. Except where the commission makes use of funds available to it under paragraph 1(i), the commission shall not incur any obligation prior to the allotment of funds by the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

party states adequate to meet the same.

(d) The commission shall keep accurate accounts of all receipts and disbursements. The receipts and disbursements of the commission shall be subject to the audit and accounting procedures established under its bylaws. All receipts and disbursements of funds handled by the commission shall be audited yearly by a certified or licensed public accountant and the report of the audit shall be included in and become part of the annual report of the commission.

(e) The accounts of the commission shall be open at any reasonable time for inspection by duly constituted officers of the party states and by any persons authorized by the commission.

(f) Nothing contained in this article shall be construed to prevent commission compliance with laws relating to audit or inspection of accounts by or on behalf of any government contributing to the support of the commission.

## ARTICLE VII. UNIFORM REGULATIONS AND FORMS

1. Whenever any two or more party states, or subdivisions of party states, have uniform or similar provisions of law relating to an income tax, capital stock tax, gross receipts tax, sales or use tax, the commission may adopt uniform regulations for any phase of the administration of such law, including assertion of jurisdiction to tax, or prescribing uniform tax forms. The commission may also act with respect to the provisions of Article IV of this compact.

2. Prior to the adoption of any regulation, the commission shall:

(a) As provided in its bylaws, hold at least one public hearing on due notice to all affected party states and subdivisions thereof and to all taxpayers and other persons who have made timely request of the commission for advance notice of its regulation-making proceedings.

(b) Afford all affected party states and subdivisions and interested persons an opportunity to submit relevant written data and views, which shall be considered fully by the commission.

3. The commission shall submit any regulations adopted by it to the appropriate officials of all party states and subdivisions to which they might apply. Each such state and subdivision shall consider any such regulation for adoption in accordance with its own laws and procedures.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

## ARTICLE VIII. INTERSTATE AUDITS

1. This article shall be in force only in those party states that specifically provide therefor by statute.

2. Any party state or subdivision thereof desiring to make or participate in an audit of any accounts, books, papers, records or other documents may request the commission to perform the audit on its behalf. In responding to the request, the commission shall have access to and may examine, at any reasonable time, such accounts, books, papers, records, and other documents and any relevant property or stock of merchandise. The commission may enter into agreements with party states or their subdivisions for assistance in performance of the audit. The commission shall make charges, to be paid by the state or local government or governments for which it performs the service, for any audits performed by it in order to reimburse itself for the actual costs incurred in making the audit.

3. The commission may require the attendance of any person within the state where it is conducting an audit or part thereof at a time and place fixed by it within such state for the purpose of giving testimony with respect to any account, book, paper, document, other record, property or stock of merchandise being examined in connection with the audit. If the person is not within the jurisdiction, he may be required to attend for such purpose at any time and place fixed by the commission within the state of which he is a resident: provided that such state has adopted this article.

4. The commission may apply to any court having power to issue compulsory process for orders in aid of its powers and responsibilities pursuant to this article and any and all such courts shall have jurisdiction to issue such orders. Failure of any person to obey any such order shall be punishable as contempt of the issuing court. If the party or subject matter on account of which the commission seeks an order is within the jurisdiction of the court to which application is made, such application may be to a court in the state or subdivision on behalf of which the audit is being made or a court in the state in which the object of the order being sought is situated. The provisions of this paragraph apply only to courts in a state that has adopted this article.

5. The commission may decline to perform any audit requested if it finds that its available personnel or other resources are insufficient for the purpose or that, in the terms requested, the audit is impracticable of satisfactory performance. If the commission, on the basis of its experience, has reason to believe that an audit of a particular taxpayer, either at a particular time or on a particular schedule, would be of interest to a number of party states or their subdivisions, it may offer to make the audit or audits, the offer to be contingent on sufficient participation therein as determined by the commission.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

6. Information obtained by any audit pursuant to this article shall be confidential and available only for tax purposes to party states, their subdivisions or the United States. Availability of information shall be in accordance with the laws of the states or subdivisions on whose account the commission performs the audit, and only through the appropriate agencies or officers of such states or subdivisions. Nothing in this article shall be construed to require any taxpayer to keep records for any period not otherwise required by law.

7. Other arrangements made or authorized pursuant to law for cooperative audit by or on behalf of the party states or any of their subdivisions are not superseded or invalidated by this article.

8. In no event shall the commission make any charge against a taxpayer for an audit.

9. As used in this article, "tax," in addition to the meaning ascribed to it in Article II, means any tax or license fee imposed in whole or in part for revenue purposes.

## ARTICLE IX. ARBITRATION

1. Whenever the commission finds a need for settling disputes concerning apportionments and allocations by arbitration, it may adopt a regulation placing this article in effect, notwithstanding the provisions of Article VII.

2. The commission shall select and maintain an arbitration panel composed of officers and employees of state and local governments and private persons who shall be knowledgeable and experienced in matters of tax law and administration.

3. Whenever a taxpayer who has elected to employ Article IV, or whenever the laws of the party state or subdivision thereof are substantially identical with the relevant provisions of Article IV, the taxpayer, by written notice to the commission and to each party state or subdivision thereof that would be affected, may secure arbitration of an apportionment or allocation, if he is dissatisfied with the final administrative determination of the tax agency of the state or subdivision with respect thereto on the ground that it would subject him to double or multiple taxation by two or more party states or subdivisions thereof. Each party state and subdivision thereof hereby consents to the arbitration as provided herein, and agrees to be bound thereby.

4. The arbitration board shall be composed of one person selected by the taxpayer, one by the agency or agencies involved, and one member of the commission's arbitration panel. If the agencies involved are

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

unable to agree on the person to be selected by them, such person shall be selected by lot from the total membership of the arbitration panel. The two persons selected for the board in the manner provided by the foregoing provisions of this paragraph shall jointly select the third member of the board. If they are unable to agree on the selection, the third member shall be selected by lot from among the total membership of the arbitration panel. No member of a board selected by lot shall be qualified to serve if he is an officer or employee or is otherwise affiliated with any party to the arbitration proceeding. Residence within the jurisdiction of a party to the arbitration proceeding shall not constitute affiliation within the meaning of this paragraph.

5. The board may sit in any state or subdivision party to the proceeding, in the state of the taxpayer's incorporation, residence or domicile, in any state where the taxpayer does business, or in any place that it finds most appropriate for gaining access to evidence relevant to the matter before it.

6. The board shall give due notice of the times and places of its hearings. The parties shall be entitled to be heard, to present evidence, and to examine and cross-examine witnesses. The board shall act by majority vote.

7. The board shall have power to administer oaths, take testimony, subpoena and require the attendance of witnesses and the production of accounts, books, papers, records, and other documents, and issue commissions to take testimony. Subpoenas may be signed by any member of the board. In case of failure to obey a subpoena, and upon application by the board, any judge of a court of competent jurisdiction of the state in which the board is sitting or in which the person to whom the subpoena is directed may be found may make an order requiring compliance with the subpoena, and the court may punish failure to obey the order as a contempt. The provisions of this paragraph apply only in states that have adopted this article.

8. Unless the parties otherwise agree the expenses and other costs of the arbitration shall be assessed and allocated among the parties by the board in such manner as it may determine. The commission shall fix a schedule of compensation for members of arbitration boards and of other allowable expenses and costs. No officer or employee of a state or local government who serves as a member of a board shall be entitled to compensation therefor unless he is required on account of his service to forego the regular compensation attaching to his public employment, but any such board member shall be entitled to expenses.

9. The board shall determine the disputed apportionment or allocation and any matters necessary thereto. The determinations of the board shall be final for purposes of making the apportionment or allocation, but for no other purpose.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

10. The board shall file with the commission and with each tax agency represented in the proceeding: the determination of the board; the board's written statement of its reasons therefor; the record of the board's proceedings; and any other documents required by the arbitration rules of the commission to be filed.

11. The commission shall publish the determinations of boards together with the statements of the reasons therefor.

12. The commission shall adopt and publish rules of procedure and practice and shall file a copy of such rules and of any amendment thereto with the appropriate agency or officer in each of the party states.

13. Nothing contained herein shall prevent at any time a written compromise of any matter or matters in dispute, if otherwise lawful, by the parties to the arbitration proceeding.

## ARTICLE X. ENTRY INTO FORCE AND WITHDRAWAL

1. This compact shall enter into force when enacted into law by any seven states. Thereafter, this compact shall become effective as to any other state upon its enactment thereof. The commission shall arrange for notification of all party states whenever there is a new enactment of the compact.

2. Any party state may withdraw from this compact by enacting a statute repealing the same. No withdrawal shall affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal.

3. No proceeding commenced before an arbitration board prior to the withdrawal of a state and to which the withdrawing state or any subdivision thereof is a party shall be discontinued or terminated by the withdrawal, nor shall the board thereby lose jurisdiction over any of the parties to the proceeding necessary to make a binding determination therein.

## ARTICLE XI. EFFECT ON OTHER LAWS AND JURISDICTION

Nothing in this compact shall be construed to:

(a) Affect the power of any state or subdivision thereof to fix rates of taxation, except that a party state shall be obligated to implement Article III 2 of this compact.

(b) Apply to any tax or fixed fee imposed for the registration of a motor vehicle or any tax on motor fuel,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

other than a sales tax; provided that the definition of "tax" in Article VIII 9 may apply for the purposes of that article and the commission's powers of study and recommendation pursuant to Article VI 3 may apply.

(c) Withdraw or limit the jurisdiction of any state or local court or administrative officer or body with respect to any person, corporation or other entity or subject matter, except to the extent that such jurisdiction is expressly conferred by or pursuant to this compact upon another agency or body.

(d) Supersede or limit the jurisdiction of any court of the United States.

ARTICLE XII. CONSTRUCTION AND SEVERABILITY

This compact shall be liberally construed so as to effectuate the purposes thereof. The provisions of this compact shall be severable and if any phrase, clause, sentence or provision of this compact is declared to be contrary to the constitution of any state or of the United States or the applicability thereof to any government, agency, person or circumstance is held invalid, the validity of the remainder of this compact and the applicability thereof to any government, agency, person or circumstance shall not be affected thereby. If this compact shall be held contrary to the constitution of any state participating therein, the compact shall remain in full force and effect as to the remaining party states and in full force and effect as to the state affected as to all severable matters.

CREDIT(S)

Acts 1981, 67th Leg., p. 1528, ch. 389, § 1, eff. Jan. 1, 1982.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

**B**

# ADDENDUM

## to

## VOLUME 1

### of

## FLORIDA STATUTES, 1971

The Florida Legislature met in special session between November 29 and December 9, 1971, and enacted a number of measures appropriate for inclusion in the *Florida Statutes*. However, the printing of this 1971 edition had by then proceeded too far to permit incorporation of these measures at the appropriate places in these volumes. Therefore, it has been decided to publish the product of the special session as Addenda to volumes 1 and 2. However, entries reflecting the special session have been inserted at the proper places in the tables of section changes, tracing table, and alphabetical index.

The format is the same as that used for the Supplement to the *Florida Statutes*, 1969. The full text of each section amended during the special session is published in the Addendum to the volume in which it would otherwise have appeared. Repealed sections are identified by catchline and bracketed note only. In order to make the Addenda more noticeable, colored paper has been used.

## CHAPTER 199
## INTANGIBLE PERSONAL PROPERTY TAX ACT

### PART I
### GENERAL PROVISIONS

199.032   Levy.

*199.032 Levy.—There is hereby levied, to be assessed and collected as provided by this chapter:

(1) An annual tax of one mill on the dollar of the just valuation of all intangible personal property except money as defined in §199.023 (1)(a), and except notes, bonds, and other obligations for payment of money which are secured by mortgage, deed of trust, or other lien upon real property situated in the state;

(2) A nonrecurring tax of two mills on the dollar of the just valuation of all notes, bonds, and other obligations for payment of money, which are secured by mortgage, deed of trust, or other lien upon real property situated in the state.

History.—§1, ch. 71-134; §1, ch. 71-987.
*Note.—Section, as amended, effective July 1, 1972.

---

## CHAPTER 212
## TAX ON SALES,
## USE AND OTHER TRANSACTIONS

212.02   Definitions.
212.03   Transient rentals tax; rate, procedure, enforcement, etc.
212.031   Lease or rental of real property.
212.08   Sales, rental, storage, use tax; specified exemptions.

212.02 Definitions.— The following terms and phrases when used in this chapter, shall have the meaning ascribed to them in this section, except where the context clearly indicates a different meaning:

(1) "Person" includes any individual, firm, copartnership, joint adventure, association, corporation, estate, trust, business trust, receiver, syndicate, or other group or combination acting as a unit, and shall include any political subdivision, municipality, state agency, bureau or department, and the plural as well as the singular number.

(2) "Sale" means and includes:

(a) Any transfer of title or possession, or both, exchange, barter, lease or rental, conditional or otherwise, in any manner or by any means whatsoever of tangible personal property for a consideration;

(b) The rental of living quarters, sleeping or housekeeping accommodations in hotels, apartment houses or rooming houses, tourist or trailer camps, as hereinafter defined in this chapter;

(c) The producing, fabricating, processing, printing or imprinting of tangible personal property for a consideration for consumers who furnish either directly or indirectly the materials used in the producing, fabricating, processing, printing or imprinting; and

(d) The furnishing, preparing or serving for a consideration of any tangible personal property for consumption on or off the premises of the person furnishing, preparing, or serving such tangible personal property which includes the sale of meals or prepared food by an employer to his employees.

(e) A transaction whereby the possession of property is transferred but the seller retains title as security for the payment of the price.

(3) (a) "Retail sale" or a "sale at retail" means a sale to a consumer or to any person for any purpose other than for resale in the form of tangible personal property, and shall mean and include all such transactions that may be made in lieu of retail sales or sales at retail. A resale must be in strict compliance with rules and regulations and any dealer making a sale for resale which is not in strict compliance with rules and regulations shall himself be liable for and pay the tax.

(b) The terms "retail sales," "sales at retail," "use," "storage," and "consumption" shall include the sale, use, storage or consumption of all tangible advertising materials imported or caused to be imported into this state. Tangible advertising material shall include displays, display containers, brochures, catalogs, price lists, point of sale advertising and technical manuals or any tangible personal property which does not accompany the product to the ultimate consumer.

(c) The terms "retail sales," "sale at retail," "use," "storage," and "consumption" shall not include materials, containers, labels, sacks, or bags intended to be used one time only for packaging tangible personal property for sale, and shall not include the sale, use, storage, or consumption of industrial materials for future processing, manufacture, or conversion into articles of tangible personal property for resale when such industrial materials become a component or ingredient of the finished product. However, said terms shall include the sale, use, storage, or consumption of tangible personal property, including fuels. used and dissipated in fabricating, converting, or processing tangible personal property for sale.

(d) The term "gross sales" means the sum total of all retail sales of tangible personal property as defined herein, without any deduction whatsoever of any kind or character, except as provided in this chapter.

(4) "Sales price" means the total amount paid for tangible personal property, including any services that are a part of the sale, valued in money, whether paid in money or otherwise,

and includes any amount for which credit is given to the purchaser by the seller, without any deduction therefrom on account of the cost of the property sold, the cost of materials used, labor or service cost, interest charged, losses or any other expense whatsoever. Sales price also includes the consideration for a transaction which requires both labor and material to alter, remodel, maintain, adjust or repair tangible personal property. Trade-ins or discounts allowed and taken at the time of sale shall not be included within the purview of this subsection.

(5) "Cost price" means the actual cost of articles of tangible personal property without any deductions therefrom on account of the cost of materials used, labor or service costs, transportation charges, or any expenses whatsoever.

(6) "Lease," "let," or "rental" means leasing or renting of living quarters, sleeping or housekeeping accommodations in hotels, apartment houses, rooming houses, tourist or trailer camps and real property, the same being defined as follows:

(a) Every building or other structure kept, used, maintained, advertised as or held out to the public to be a place where sleeping accommodations are supplied for pay to transient or permanent guests or tenants, in which ten or more rooms are furnished for the accommodation of such guests, and having one or more dining rooms or cafes where meals or lunches are served to such transient or permanent guests, such sleeping accommodations and dining rooms or cafes being conducted in the same building or buildings in connection therewith, shall, for the purpose of this chapter, be deemed a hotel.

(b) Any building or part thereof, where separate accommodations for two or more families living independently of each other are supplied to transient or permanent guests or tenants, shall for the purpose of this chapter be deemed an apartment house.

(c) Every house, boat, vehicle, motor court, trailer court or other structure or any place or location kept, used, maintained, advertised or held out to the public to be a place where living quarters, sleeping or housekeeping, accommodations are supplied for pay to transient or permanent guests or tenants, whether in one or adjoining buildings, shall for the purpose of this chapter be deemed a rooming house.

(d) In all hotels, apartment houses and rooming houses within the meaning of this chapter, the parlor, dining room, sleeping porches, kitchen, office and sample rooms shall be construed to mean rooms.

(e) A "tourist camp" is a place where two or more tents, tent houses, or camp cottages are located and offered by a person or municipality for sleeping or eating accommodations, most generally to the transient public for either a direct money consideration or an indirect benefit to the lessor or owner in connection with a related business.

(f) A "trailer camp" is a place where space is offered, with or without service facilities, by any persons or municipality to the public for the parking and accommodation of two or more automobile trailers which are used for lodging, for either a direct money consideration or an indirect benefit to the lessor or owner in connection with a related business, such space being hereby defined as living quarters, and the rental price thereof shall include all service charges paid to the lessor.

(g) "Lease," "let" or "rental" also means the leasing or rental of tangible personal property and the possession or use thereof by the lessee or rentee for a consideration, without transfer of the title of such property, except as expressly provided to the contrary herein. Provided that, where two taxpayers, in connection with the interchange of facilities, rent or lease property, each to the other, for use in providing or furnishing any of the services mentioned in §167.431, the term lease or rental shall mean only the net amount of rental involved.

*(h) "Real property" means any interest in the surface of real property unless said property is:

1. Assessed as agricultural property under §193.461.

2. Used exclusively as dwelling units.

3. Property subject to tax on parking, docking or storage spaces under §212.03(6).

(7) "Storage" mears and includes any keeping or retention in this state of tangible personal property for use or consumption in this state, or for any purpose other than sale at retail in the regular course of business.

(8) "Use" means and includes the exercise of any right or power over tangible personal property incident to the ownership thereof, or interest therein, except that it shall not include the sale at retail of that property in the regular course of business.

(9) "Business" means any activity engaged in by any person, or caused to be engaged in by him, with the object of private or public gain, benefit, or advantage, either direct or indirect. Except for sales of motor vehicles, the term "business" shall not be construed in this chapter to include occasional or isolated sales or transactions involving tangible personal property by a person who does not hold himself out as engaged in business, but shall include other charges for the sale or rental of tangible personal property, sales of or charges of admission, communication services, all rentals and leases of living quarters, other than low rent housing operated under chapter 421, sleeping or housekeeping accommodations in hotels, apartment houses, rooming houses, tourist or trailer camps, and all rentals of real property, other than low rent housing operated under chapter 421, all leases or rentals of parking lots or garages for motor vehicles, docking or storage spaces for boats in boat docks or marinas as defined in this chapter and made subject to a tax

imposed by this chapter. Any tax on such sales, charges, rentals, admissions, or other transactions made subject to the tax imposed by this chapter shall be collected by the state, county, municipality, any political subdivision, agency, bureau or department or other state or local governmental instrumentality in the same manner as other dealers, unless specifically exempted by this chapter.

(10) "Retailer" means and includes every person engaged in the business of making sales at retail, or for distribution, or use, or consumption, or storage to be used or consumed in this state.

(11) The term "department" means the department of revenue.

(12) "Tangible personal property" means and includes personal property which may be seen, weighed, measured, or touched or is in any manner perceptible to the senses, including electric power or energy, boats, motor vehicles as defined in §320.01(1), aircraft as defined in §330.01, and all other types of vehicles. The term "tangible personal property" shall not include stocks, bonds, notes, insurance, or other obligations or securities; intangibles as defined by the intangible tax law of the state; or pari-mutuel tickets sold or issued under the racing laws of the state.

(13) The term "use tax" referred to in this chapter includes the use, the consumption, the distribution, and the storage as herein defined.

(14) The term "intoxicating" or "alcoholic beverages" referred to in this chapter includes all such beverages as are so defined or may be hereafter defined by the laws of the state.

(15) The terms "cigarettes" or "tobacco" or "tobacco products" referred to in this chapter include all such products as are defined or may be hereafter defined by the laws of the state.

(16) The term "admissions" means and includes the net sum of money after deduction of any federal taxes for admitting a person or vehicle or persons to any place of amusement, sport, or recreation or for the privilege of entering or staying in any place of amusement, sport or recreation, including but not limited to theaters, outdoor theaters, shows, exhibitions, games, races or any place where charge is made by way of sale of tickets, gate charges, seat charges, box charges, season pass charges, cover charges, greens fees, participation fees, entrance fees or other fees or receipts of anything of value measured on an admission or entrance or length of stay or seat box accommodations in any place where there is any exhibition, entertainment, including admissions to performances of philharmonic associations, opera guilds, little theaters, and similar organizations, amusement, sport or recreation, and all dues paid to private clubs providing recreational facilities, including but not limited to golf, tennis, swimming, yachting and boating facilities.

(17) "In this state" or "in the state" means within the exterior limits of Florida and includes all territory within these limits owned by or ceded to the United States.

History.—§2, ch. 26319, 1949; §§1-3, ch. 26871, 1951; §1, ch. 29883, 1955; §13, ch. 59-1; §§1-4, ch. 59-288; §3, ch. 61-274; §1, ch. 63-526; §7, ch. 63-253; §§1-3, ch. 65-329; §5, ch. 65-371; §2, ch. 65-420; §1, ch. 67-180; §§1, 2, ch. 68-27; §1, ch. 68-119; §§21, 35, ch. 69-106; §§1-3, ch. 69-222; §1, ch. 70-206; §1, ch. 71-360; §47, ch. 71-377; §2, ch. 71-986.

*Note.—Paragraph (h), as amended, effective March 1, 1972.

## 212.03 Transient rentals tax; rate, procedure, enforcement, etc.—

(1) It is hereby declared to be the legislative intent that every person is exercising a taxable privilege who engages in the business of renting, leasing or letting any living quarters, sleeping or housekeeping accommodations in, from, or a part of, or in connection with any hotel, apartment house, rooming house, tourist or trailer camp, as hereinbefore defined in this chapter. For the exercise of said privilege a tax is hereby levied as follows: in the amount equal to four per cent of and on the total rental charged for such living quarters, sleeping or housekeeping accommodations by the person charging or collecting the rental; provided that such tax shall apply to hotels, apartment houses, rooming houses, tourist or trailer camps, as hereinbefore defined in this chapter, whether or not there be in connection with any of the same, any dining rooms, cafes or other places where meals or lunches are sold or served to guests.

(2) The tax provided for herein shall be in addition to the total amount of the rental and shall be charged by the lessor or person receiving the rent in and by said rental arrangement to the lessee or person paying the rental, and shall be due and payable at the time of the receipt of such rental payment by the lessor or person, as defined in this chapter, who receives said rental or payment. The owner, lessor or person receiving the rent shall remit the tax to the department at the times and in the manner hereinafter provided for dealers to remit taxes under this chapter. The same duties imposed by this chapter upon dealers in tangible personal property respecting the collection and remission of the tax, the making of returns, the keeping of books, records and accounts and the compliance with the rules and regulations of the department in the administration of this chapter shall apply to and be binding upon all persons who manage or operate hotels, apartment houses, rooming houses, tourist and trailer camps, and to all persons who collect or receive such rents on behalf of such owner or lessor taxable under this chapter.

(3) Where rentals are received by way of property, goods, wares, merchandise, services or other things of value, the tax shall be at the rate of four per cent of the value of said property, services or other things of value.

(4) The tax levied by this section shall not apply to, be imposed upon, or collected from

any person who shall reside continuously longer than twelve months at any one hotel, apartment house, rooming house, tourist or trailer camp, and shall have paid the tax levied by this section for twelve months of residence in any one hotel, rooming house, apartment house, tourist or trailer camp. Notwithstanding other provisions of this chapter, no tax shall be imposed upon rooms provided guests when there is no consideration involved between guest and the public lodging establishment.

(5) The tax imposed by this section shall constitute a lien on the property of the lessee or rentee of any sleeping accommodations in the same manner as and shall be collectible as are liens authorized and imposed by §§713.68 and 713.69.

(6) It is the legislative intent that every person is engaging in a taxable privilege who leases or rents parking or storage spaces for motor vehicles in parking lots or garages or who leases or rents docking or storage spaces for boats in boat docks or marinas. For the exercise of this privilege a tax is hereby levied at the rate of four per cent on the total rental charged.

*(7)(a) The tax levied by this section shall not apply to or be imposed upon or collected on the basis of rentals to any person who resides in any building or group of buildings intended primarily for lease or rent to persons as their permanent or principal place of residence.

(b) It is the intent of the legislature that this subsection provide tax relief for persons who rent living accommodations rather than own their homes, while still providing a tax on the rental of lodging facilities that primarily serve transient guests.

(c) The rental of facilities, including trailer lots, which are intended primarily for rental as a principal or permanent place of residence is exempt from the tax imposed by this chapter. The rental of facilities that primarily serve transient guests is not exempt by this subsection. In the application of this law, or in making any determination against the exemption, the department shall consider and be guided by, among other things:

1. Whether or not a facility caters primarily to the traveling public;

2. Whether less than half of its tenants have a continuous residence in excess of three months; and

3. The nature of the advertising of the facility involved.

(d) The provisions of this subsection shall become effective March 1, 1972, but shall not be construed to exempt taxes on rentals paid, or for services received, prior to March 1, 1972.

History.—§3, ch. 26319, 1949; §4, ch. 26871, 1951; §§2, 3, ch. 29883, 1955; §§2, 7, ch. 63-526; §7, ch. 63-253; §5, ch. 65-371; §2, ch. 65-420; §3, ch. 68-27; §2, ch. 68-119; §§4, 5, ch. 69-222; §15, ch. 69-353; §§21, 35, ch. 69-106; §1, ch. 71-986.
*Note.—Effective Mar. 1, 1972.
cf.—Ch. 85 Enforcement of statutory liens.

## 212.031 Lease or rental of real property.—

(1)*(a) It is declared to be the legislative intent that every person is exercising a taxable privilege who engages in the business of renting, leasing, or letting any real property unless such property is:

1. Assessed as agricultural property under §193.461.

2. Used exclusively as dwelling units.

3. Property subject to tax on parking, docking or storage spaces under §212.03(6).

*(b) When a lease involves multiple use of real property wherein a part of the real property is subject to the commercial rental tax herein, and a part of the property would be excluded from the tax under subparagraphs 1., 2., or 3. of this subsection, the department shall determine from the lease and such other information as may be available, that portion of the total rental charge which is exempt from the tax imposed by this section.

(c) For the exercise of such privilege a tax is levied in the amount equal to four per cent of and on the total rent charged for such real property by the person charging or collecting the rental.

(d) Where the rental of any such real property is paid by way of property, goods, wares, merchandise, services or other thing of value, the tax shall be at the rate of four per cent of the value of the property, services or other things of value.

(2)(a) The tenant actually occupying, using or entitled to the use of any property the rental from which is subject to taxation under this section shall pay the tax to his immediate landlord or other person granting the right to such tenant to occupy or use such real property.

(b) It is the further intent of this legislature that only one tax be collected on the rental payable for the occupancy or use of any such property and that the tax so collected shall not be pyramided by a progression of transactions and further that the amount of the tax due the state shall not be decreased by any such progression of transactions.

(3) The tax imposed by this section shall be in addition to the total amount of the rental and shall be charged by the lessor or person receiving the rent in and by a rental arrangement with the lessee or person paying the rental and shall be due and payable at the time of the receipt of such rental payment by the lessor or other person who receives said rental or payment. The owner, lessor or person receiving the rent shall remit the tax to the department at the times and in the manner hereinafter provided for dealers to remit taxes under this chapter. The same duties imposed by this chapter upon dealers in tangible personal property respecting the collection and remission of the tax, the making of returns, the keeping of books, records and accounts

and the compliance with the rules and regulations of the department in the administration of this chapter shall apply to and be binding upon all persons who manage any leases or operate real property, hotels, apartment houses, rooming houses, tourist and trailer camps, and to all persons who collect or receive such rents on behalf of such owner or lessor taxable under this chapter.

(4) The tax imposed by this section shall constitute a lien on the property of the lessee of any real estate in the same manner as, and shall be collectible as are liens authorized and imposed by §§713.68 and 713.69.

History.—§6, ch. 69-222; §§21, 35, ch. 69-106; §3, ch. 71-986.
*Note.—As amended, paragraphs (a) and (b) of subsection (1) are effective March 1, 1972.

**212.08 Sales, rental, storage, use tax; specified exemptions.**—The sale at retail, the rental, the use, the consumption, the distribution and the storage to be used or consumed in this state, of the following tangible personal property, are hereby specifically exempt from the tax imposed by this chapter.

(1) EXEMPTIONS; GENERAL GROCERIES.—There shall be exempt from the tax imposed by this chapter foods and drinks for human consumption and candy, but only when the price at which said candy is sold is twenty-five cents or less. Unless the exemption provided by subsection (7)(b) for school lunches pertains, none of such items of food and drink shall mean:

(a) Foods and drinks served, prepared, or sold in or by restaurants, drugstores, lunch counters, cafeterias, hotels, or other like places of business or by any business or place required by law to be licensed by the division of hotels and restaurants of the department of business regulation;

(b) Foods and drinks sold ready for immediate consumption from *vending machines, pushcarts, motor vehicles, or any other form of vehicle;

(c) Soft drinks; or

(d) Foods cooked and prepared on the seller's premises and sold ready for immediate consumption either on or off the premises.

(2) EXEMPTIONS, MEDICAL.—There shall be exempt from the tax imposed by this chapter medicine compounded in a retail establishment by a pharmacist licensed by the state according to an individual prescription or prescriptions written by a practitioner of the healing arts licensed by the state, and common household remedies recommended and generally sold for the relief of pain, ailments, distress or disorders of the human body, according to a list prescribed and approved by the division of health of the department of health and rehabilitative services, which said list shall be certified to the department of revenue from time to time and be included in the rules promulgated by the department; artificial eyes and limbs, eyeglasses, dentures, hearing aids, crutches, prosthetic and orthopedic appliances

and funerals. Funeral directors shall pay tax on all tangible personal property used by them in their business. This subsection shall be strictly construed and enforced.

(3) EXEMPTIONS, PARTIAL; CERTAIN FARM EQUIPMENT.—There shall be taxable at the rate of three percent the sale, use, consumption, or storage for use in this state of self-propelled or power-drawn farm equipment used exclusively by a farmer on a farm owned, leased, or sharecropped by him in plowing, planting, cultivating, or harvesting crops. The rental of self-propelled or power-drawn farm equipment shall be taxed at the rate of four percent.

(4) EXEMPTIONS, ITEMS BEARING OTHER EXCISE TAXES, ETC.—Also exempt are water (not exempting mineral water or carbonated water); all fuels used by a public or private utility, including municipal corporations and rural electric cooperative associations, in the generation of electric power or energy for sale; and motor fuels and special fuels on which a tax is imposed by chapter 206. All other fuels are taxable, except that those used to transport persons or property in interstate or foreign commerce are taxable only to the extent provided herein. The basis of the tax shall be the ratio of intrastate mileage to interstate or foreign mileage traveled by the carrier, during the previous fiscal year of the carrier, such ratio to be determined at the close of the carrier's fiscal year. This ratio shall be applied each month to the total purchases made in this state by the carrier of gasoline and other fuels to establish that portion of the total used and consumed in intrastate movement and subject to tax under this chapter. Alcoholic beverages and malt beverages are not exempt. The terms "alcoholic beverages" and "malt beverages" as used in this subsection shall have the same meaning ascribed to them in §561.01(3) and (7), respectively. It is determined by the legislature that the classification of alcoholic beverages made in this subsection for the purpose of extending the tax imposed by this chapter is reasonable and just, and it is intended that such tax be separate from, and in addition to, any other tax imposed on alcoholic beverages.

(5) EXEMPTIONS; ACCOUNT OF USE.—There shall be exempt from the tax imposed by this chapter nets designed and used exclusively by commercial fisheries; feeds for raising poultry and livestock on farms and for feeding dairy cows; fertilizers, insecticides and fungicides used for application on crops or groves; portable containers used for processing farm products; field and garden seeds; nursery stock, seedlings, cuttings or other propagative material purchased for growing on or growing stock; cloth, plastic, and other similar materials used for shade, mulch, protection from frost or insects on a farm; provided that such exemption shall not be allowed unless the purchaser or lessee signs a certifi-

cate stating that the item to be exempted is for the exclusive use designated herein.

(6) EXEMPTIONS; POLITICAL SUBDIVISIONS, COMMUNICATIONS.—There shall also be exempt from the tax imposed by this chapter sales made to the United States government, the state, or any county, municipality or political subdivision of this state; provided this exemption shall not include sales of tangible personal property made to contractors employed either directly or as agents of any such government or political subdivision thereof when such tangible personal property goes into or becomes a part of public works owned by such government or political subdivision thereof, except public works in progress or for which bonds or revenue certificates have been validated on or before August 1, 1959; and further provided this exemption shall not include sales, rental, use, consumption, or storage for use in any political subdivision or municipality in this state of machines and equipment and parts and accessories therefor used in the generation, transmission, or distribution of electrical energy by systems owned and operated by a political subdivision in this state except sales, rental, use, consumption or storage for which bonds or revenue certificates are validated on or before January 1, 1973, for transmission or distribution expansion. Likewise exempt are newspapers, film rentals, when an admission is charged for viewing such film, and charges for services rendered by radio and television stations, including line charges, talent fees or license fees and charges for films, video tapes, and transcriptions used in producing radio or television broadcasts.

(7) MISCELLANEOUS EXEMPTIONS.—

(a) *Religious, charitable and educational.*—There shall be exempt from the tax imposed by this chapter articles of tangible personal property sold or leased direct to or by churches or sold or leased to, nonprofit religious, nonprofit educational, or nonprofit charitable institutions and used by such institutions in carrying on their customary nonprofit religious, nonprofit educational, or nonprofit charitable activities, including church cemeteries.

(b) *School books and school lunches.*—This exemption shall apply to school books used in regularly prescribed courses of study, and school lunches served to students, in public, parochial or nonprofit schools operated for and attended by pupils of grades one through twelve. School books and food sold or served at junior colleges and other institutions of higher learning are taxable.

(c) *Restrictive definitions.*—The provisions of this section authorizing exemptions from tax shall be strictly defined, limited and applied in each category as follows:

1. Religious institutions shall mean churches and established physical places for worship in this state at which nonprofit religious services and activities are regularly conducted and carried on.

2. Educational institutions shall mean state tax supported or parochial, church and nonprofit private schools, colleges or universities conducting regular classes and courses of study required for accreditation by or membership in the southern association of colleges and secondary schools, department of education or the Florida council of independent schools. Nonprofit libraries, art galleries and museums open to the public are defined as educational institutions and eligible for exemption.

3. Charitable institutions shall mean only nonprofit corporations operating physical facilities in Florida at which are provided charitable services, a reasonable percentage of which shall be without cost to those unable to pay.

(d) *Hospital meals and rooms.*—Also exempt from payment of the tax imposed by this chapter on rentals and meals are patients and inmates of any hospital or other physical plant or facility designed and operated primarily for the care of persons who are ill, aged, infirm, mentally or physically incapacitated or otherwise dependent on special care or attention.

(e) *Professional services.*—

1. Also exempted are professional, insurance or personal service transactions which involve sales as inconsequential elements for which no separate charges are made.

2. The above exempted personal service transactions do not exempt the sale of information services involving the furnishing of printed, mimeographed, multigraphed matter or matter duplicating written or printed matter in any other manner, other than professional services and services of employees, agents or other persons acting in a representative or fiduciary capacity or information services furnished to newspapers and radio and television stations. Information services shall mean and include the services of collecting, compiling or analyzing information of any kind or nature and furnishing reports thereof to other persons.

(f) *Magazines.*—There shall likewise be exempt from the tax imposed by this chapter subscriptions to magazines entered as second class mail sold for an annual or longer period of time.

(g) *Volunteer fire departments.*—Also exempt are fire fighting and rescue service equipment and supplies purchased by volunteer fire departments, duly chartered under the Florida Statutes as corporations not for profit.

(h) *Guide dogs for the blind.*—Also exempt are the sale or rental of guide dogs for the blind, commonly referred to as "seeing-eye dogs," and the sale of food or other items for said guide dogs or for consumption or use by such dogs.

**(i) Also exempt from payment of the tax imposed by this chapter are sales of utilities to residential households in this state by utility companies who pay the gross receipts tax imposed under §203.01.

(8) PARTIAL EXEMPTIONS, VESSELS ENGAGED IN INTERSTATE OR FOREIGN COMMERCE.—All vessels and parts thereof used to transport persons or property in interstate or foreign commerce shall be subject to the taxes imposed in this chapter only to the extent provided herein. The basis of the tax shall be the ratio of intrastate mileage to interstate or foreign mileage traveled by the carrier during the previous fiscal year. The ratio would be determined at the close of the carrier's fiscal year. This ratio applied to the total purchases by the carriers of vessels and parts thereof each month to establish that portion of the total used and consumed in intrastate movement and subject to tax at the applicable rate. Vessels and parts thereof used to transport persons or property in interstate and foreign commerce are hereby determined to be susceptible to a distinct and separate classification for taxation under the provisions of this chapter.

(9) PARTIAL EXEMPTIONS, VEHICLES ENGAGED IN INTERSTATE OR FOREIGN COMMERCE.—Vehicles and parts thereof used to transport persons or property in interstate or foreign commerce are subject to tax imposed in this chapter only to the extent provided herein. The basis of the tax shall be the ratio of intrastate mileage to interstate or foreign mileage traveled by the carrier during the previous fiscal year of the carrier, such ratio to be determined at the close of the carrier's fiscal year. This ratio shall be applied each month to the total purchases by the carriers of vehicles and parts thereof which are used in Florida to establish that portion of the total used and consumed in intrastate movement and subject to tax under this chapter.

(10) No transactions shall be exempt from the tax imposed by this chapter except those expressly exempted herein. Except for §423.02, all special or general laws granting tax exemptions, to the extent they may be inconsistent or in conflict with this chapter, including but not limited to the following designated laws, shall yield to and be superseded by the provisions of this subsection: §§153.76, 183.14, 184.17, 258.14, 315.11, 323.15(6), 340.20, 348.122, 348.65, 348.762, 349.13, 374.132, 616.07, 623.09, 637.131, 637.151, 637.291, and 637.311 and the following Laws of Florida, acts of the year indicated: §31, ch. 30843, 1955; §19, ch. 30845, 1955; §12, ch. 30927, 1955; §8, ch. 31179, 1955; §15, ch. 31263, 1955; §13, ch. 31343, 1955; §16, ch. 59-1653; §13, ch. 59-1356; §12, ch. 61-2261; §19, ch. 61-2754; §10, ch. 61-2686; §11, ch. 63-1643; §11, ch. 65-1274; §16, ch. 67-1446; and §10, ch. 67-1681.

History.—§8, ch. 26319, 1949; §§1, 2, ch. 26323, 1949; §9, ch. 26871, 1951; §1, ch. 28082, 1953; §§7, 33, ch. 29615, 1955; §§6-8, ch. 29883, 1955; §1, ch. 57-76; §1, ch. 57-398; §1, ch. 57-821; §1, ch. 57-1968; §1, ch. 57-1971; §1, ch. 59-287; §§1, 2, ch. 59-402; §§1, 2, ch. 59-448; §1, ch. 61-464; §2, ch. 61-276; §1, ch. 61-274; §7, ch. 63-253; §§5, 6, ch. 63-526; §1, ch. 63-565; §6, ch. 65-190; §1, ch. 65-358; §§7-9, ch. 65-329; §1, ch. 65-331; §5, ch. 65-371; §2, ch. 65-420; §4, ch. 67-180; §§8-12, 15, ch. 68-27; §1, ch. 69-99; §§15, 16, 19, 21, 24, 35, ch. 69-106;

§§12-16, 19, ch. 69-222; §§2, 3, ch. 70-206; §2, ch. 70-373; §7, ch. 71-360; §1, ch. 71-985.
*Note.—The tax on vending machines takes effect October 1, 1971.
**Note.—Effective March 1, 1972.

---

## CHAPTER 213

## STATE REVENUE LAWS; GENERALLY

### PART II
### MULTISTATE TAX COMPACT

213.15 Multistate tax compact.

**213.15 Multistate tax compact.**—[Articles III and IV of compact repealed by §1, ch. 71-980.]

---

## CHAPTER 214
## ADMINISTRATION OF DESIGNATED NONPROPERTY TAXES

### PART IV
### APPORTIONMENT

214.71 Apportionment; general method.

**214.71 Apportionment; general method.**—Except as otherwise provided in §§214.72 and 214.73, the base upon which any tax made applicable to this chapter shall be apportioned shall be determined by multiplying same by a fraction the numerator of which is the sum of the property factor, the payroll factor, and the sales factor and the denominator of which is three. In the event any of the factors described in subsections (1), (2), or (3) has a denominator which is zero or is determined by the department to be insignificant, the denominator of the apportionment fraction shall be reduced by the number of such factors.

(1) The property factor is a fraction the numerator of which is the average value of the taxpayer's real and tangible personal property owned or rented and used in this state during the taxable year or period and the denominator of which is the average value of such property owned or rented and used everywhere.

(a) Real and tangible personal property owned by the taxpayer shall be valued at original cost. Real and tangible personal property rented by the taxpayer shall be valued at eight times the net annual rental rate paid by the taxpayer less any annual rental rate received from subrentals.

(b) The average value of real and tangible personal property shall be determined by averaging the value at the beginning and the end of the taxable year or period, unless the department determines that an averaging of monthly values during the taxable year or period is reasonably required to reflect properly the average value of the taxpayer's real and tangible personal property.

(2) The payroll factor is a fraction the numerator of which is the total amount paid in this state during the taxable year or period by the taxpayer for compensation and the denominator of which is the total compensation paid everywhere during the taxable year or period.

(a) The term "compensation" shall mean wages, salaries, commissions, and any other form of remuneration paid to employees for personal services.

(b) Compensation is paid in this state if:

1. The employee's service is performed entirely within the state; or
2. The employee's service is performed both within and without the state, but the service performed without the state is incidental to the employee's service within the state; or
3. Some of the employee's service is performed in the state and
   a. The base of operations or, if there is no base of operations, the place from which the service is directed or controlled is in the state, or
   b. The base of operations or the place from which the service is directed or controlled is not in any state in which some part of the service is performed and the employee's residence is in this state.

(3) The sales factor is a fraction the numerator of which is the total sales of the taxpayer in this state during the taxable year or period and the denominator of which is the total sales of the taxpayer everywhere during the taxable year or period.

*(a) Sales of tangible personal property are in this state if the property is delivered or shipped to a purchaser within this state, regardless of the f.o.b. point or other conditions of the sale.

(b) Sales of a financial organization, including, but not limited to, banking and savings institutions, investment companies, real estate investment trusts, and brokerage companies, shall be in this state if derived from:

1. Fees, commissions, or other compensation for financial services rendered within this state;
2. Gross profits from trading in stocks, bonds, or other securities managed within this state;
3. Interest and dividends received within this state;
4. Interest charged to customers at places of business maintained within this state for carrying debit balances of margin accounts, without deduction of any costs incurred in carrying such accounts; and
5. Any other gross income resulting from the operation as a financial organization with this state.

(c) In computing the amounts referred to in this subsection, any amount received by a member of an affiliated group (determined under §1504(a) of the Internal Revenue Code, but without reference to whether any such corporation is an "includable corporation" under §1504(b) of the Internal Revenue Code) from another member of such group shall be included only to the extent such amount exceeds expenses of the recipient directly related thereto.

History.—§19, ch. 71-359; §2, ch. 71-980.
*Note.—Paragraph (a), as amended, effective January 1, 1972.

## CHAPTER 220

## INCOME TAX CODE

PART I TITLE; DECLARATIONS OF INTENT; DEFINITIONS (§§220.01-220.03)

PART II TAX IMPOSED; APPORTIONMENT (§§220.11-220.15)

PART III RETURNS; DECLARATIONS; RECORDS (§§220.21-220.242)

PART IV PAYMENTS (§§220.31-220.34)

PART V ACCOUNTING (§§220.41-220.44)

PART VI MISCELLANEOUS (§§220.51-220.53)

## PART I

## TITLE; DECLARATIONS OF INTENT; DEFINITIONS

220.01 Short title.
220.02 Legislative intent.
220.03 Definitions.

**220.01 Short title.**—This chapter shall be known and may be cited as the "Florida Income Tax Code."

History.—§1, ch. 71-984.

**220.02 Legislative intent.—**

(1) It is the intent of the legislature in enacting this code to impose a tax upon all corporations, organizations, associations, and other artificial entities which derive from this state or from any other jurisdiction permanent and inherent attributes not inherent in or avail-

able to natural persons, such as perpetual life, transferable ownership represented by shares or certificates, and limited liability for all owners. It is the intent of the legislature to subject such corporations and other entities to taxation hereunder for the privilege of conducting business, deriving income, or existing within the state. This code is not intended to tax, and shall not be construed so as to tax, natural persons who engage in a trade or business or profession in this state under their own or any fictitious name, whether individually as proprietorships or in partnerships with others, estates of decedents or incompetents, or testamentary trusts. However, corporations or other taxable entities which are or which become partners with one or more natural persons shall not, merely by reason of being a partner, exclude from their net income subject to tax their respective share of partnership net income. This statement of intent shall be given preeminent consideration in any construction or interpretation of this code in order to avoid any conflict between this code and the mandate in art. VII, §5 of the state constitution that no income tax shall be levied upon natural persons who are residents and citizens of this state.

(2) It is the intent of the legislature that the tax levied by this code shall be construed to be an excise or privilege tax measured by net income, and that said tax shall not be deemed or construed to be a property tax or a tax on property or a tax measured by the value of property for any purpose.

(3) It is the intent of the legislature that the income tax imposed by this code shall utilize, to the greatest extent possible, concepts of law which have been developed in connection with the income tax laws of the United States, in order to:

(a) Minimize the expenses of the department of revenue and difficulties in administering this code;

(b) Minimize the costs and difficulties of taxpayer compliance; and

(c) Maximize, for both revenue and statistical purposes, the sharing of information between the state and the federal government.

(4) It is the intent of the legislature that the tax imposed by this code shall be prospective in effect only. Consistent with this intention and the intent expressed in subsection (3), it is hereby declared to be the intent of the legislature that:

(a) "Income," for purposes of this code, including gains from the sale, exchange, or other disposition of property, shall be deemed to be created for Florida income tax purposes at such time as said income is realized for federal income tax purposes;

(b) No accretion of value, no accrual of gain, and no acquisition of a right to receive or accrue income which has occurred or been generated prior to November 2, 1971 shall be deemed to be "property," or an interest in property, for any purpose under this code; and

(c) All income realized for federal income tax purposes after November 2, 1971 shall be subject to taxation in full by this state and shall be taxed in the manner and to the extent provided in this code.

History.—§1, ch. 71-984.

**220.03  Definitions.—**
(1) SPECIFIC TERMS.—When used in this code, and when not otherwise distinctly expressed or manifestly incompatible with the intent thereof, the following terms shall have the following meanings:

(a) "Affiliated group of corporations" means two or more corporations which constitute an affiliated group of corporations as defined in section 1504(a) of the Internal Revenue Code.

(b) "Corporation" includes all domestic corporations; foreign corporations qualified to do business in this state or actually doing business in this state; joint-stock companies; common law declarations of trust, under chapter 609; corporations not for profit, under chapter 617; agricultural cooperative marketing associations, under chapter 618; professional service corporations, under chapter 621; foreign unincorporated associations, under chapter 622; private school corporations, under chapter 623; foreign corporations not for profit which are carrying on their activities in this state; and all other organizations, associations, legal entities, and artificial persons which are created by or pursuant to the statutes of this state, the United States, or any other state, territory, possession, or jurisdiction. The term "corporation" shall not include proprietorships, even if using a fictitious name; partnerships of any type, as such; state or public fairs or expositions, under chapters 615 and 616; estates of decedents or incompetents; testamentary trusts; or private trusts.

(c) "Department" means the department of revenue of this state.

(d) "Director" means the executive director of the department of revenue and, when there has been an appropriate delegation of authority, his delegate.

(e) "Earned," "accrued," "paid," and "incurred" shall be construed according to the method of accounting upon the basis of which a taxpayer's income is computed under this code.

(f) "Fiscal year" means an accounting period of 12 months or less ending on the last day of any month other than December or, in the case of a taxpayer with an annual accounting period of 52-53 weeks under subsection 441(f) of the Internal Revenue Code, the period determined under that subsection.

(g) "Includes" and "including," when used in a definition contained in this code, shall not be deemed to exclude other things otherwise within the meaning of the term defined.

(h) "Internal Revenue Code" means the United States Internal Revenue Code of 1954 as amended and in effect on November 2, 1971, except as provided in subsection (3).

(i) "Partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, including limited partnerships; and the term "partner" includes a member having a capital or a profits interest in a partnership.

(j) "Regulations" includes rules promulgated, and forms prescribed, by the department.

(k) "Returns" includes declarations of estimated tax required under this code.

(l) "State," when applied to a jurisdiction other than Florida, means any state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, or any political subdivision of any of the foregoing.

(m) "Taxable year" means the calendar or fiscal year upon the basis of which net income is computed under this code, including, in the case of a return made for a fractional part of a year, the period for which such return is made.

(n) "Taxpayer" means any corporation subject to the tax imposed by this code, and shall include all corporations for which a consolidated return is filed under §220.131.

(2) DEFINITIONAL RULES.—When used in this code and neither otherwise distinctly expressed nor manifestly incompatible with the intent thereof:

(a) The word "corporation" or "taxpayer" shall be deemed to include the words "and its successors and assigns" as if these words, or words of similar import, were expressed;

(b) Any term used in any section of this code with respect to the application of, or in connection with, the provisions of any other section of this code shall have the same meaning as in such other section; and

(c) Any term used in this code shall have the same meaning as when used in a comparable context in the Internal Revenue Code and other statutes of the United States relating to federal income taxes, as such code and statutes are in effect on November 2, 1971. However, if subsection (3) is implemented, the meaning of any term shall be taken at the time the term is applied under this code.

(3) FUTURE FEDERAL AMENDMENTS.— On or after January 1, 1972, when expressly authorized by law, any amendment to the Internal Revenue Code shall be given effect under this code in such manner and for such periods as are prescribed in the Internal Revenue Code, to the same extent as if such amendment had been adopted by the legislature of this state. However, any such amendment shall have effect under this code only to the extent that the amended provision of the Internal Revenue Code shall be taken into account in the computation of net income subject to tax hereunder.

History.—§1, ch. 71-984.

## PART II

## TAX IMPOSED, APPORTIONMENT

220.11 Tax imposed.
220.12 Net income defined.
220.13 Adjusted federal income defined.
220.131 Adjusted federal income; affiliated groups.
220.14 Exemption.
220.15 Apportionment of adjusted federal income.

**220.11 Tax imposed.—**
(1) A tax measured by net income is hereby imposed on every taxpayer for each taxable year commencing on or after January 1, 1972, and for each taxable year which begins before and ends after January 1, 1972, for the privilege of conducting business, earning or receiving income in this state, or being a resident or citizen of this state. Such tax shall be in addition to all other occupation, excise, privilege, and property taxes imposed by this state or by any political subdivision thereof, including any municipality or other district, jurisdiction, or authority of this state.

(2) The tax imposed by this section shall be an amount equal to 5 percent of the taxpayer's net income for the taxable year.

History.—§1, ch. 71-984.

**220.12 Net income defined.—**
(1) For purposes of this code, a taxpayer's net income for a taxable year which commences on or after January 1, 1972 shall be that share of its adjusted federal income for such year which is apportioned to this state under §220.15, less the exemption allowed by §220.14.

(2) For purposes of this code, a taxpayer's net income for a taxable year which begins before and ends after January 1, 1972 shall be that amount which bears the same ratio to the taxpayer's share of adjusted federal income which is apportioned to this state for the entire year as the number of days in such year after December 31, 1971 bears to the total number of days in such year, less a like proportion of the exemption allowed by §220.14, unless the taxpayer elects to compute net income for such taxable year in the manner and under the conditions provided in subsection (3).

(3)(a) If the taxpayer so elects, in the case of a taxable year beginning before and ending after January 1, 1972, there shall be taken into account in computing adjusted federal income, before apportionment, only those items earned, received, paid, incurred, or accrued after December 31, 1971, and the exemption provided by §220.14 shall be limited to that amount which bears the same ratio to the total exemption allowable under such section, determined without regard to this subsection, as the number of days in such year after December 31, 1971 bears to the total number of days in such year.

(b) The election provided by this subsection shall be made not later than the due date, including any extensions thereof, for filing taxpayer's return for the taxable year, in such manner as the department may by regulation prescribe. However, no such election shall be valid unless the director has given his written approval at the time of such filing or unless the director fails to object to said election in writing within 30 days after such filing.

(c) The method of computing adjusted federal income under this subsection shall be considered extraordinary and shall only be allowed by the director in special situations where the taxpayer has demonstrated that the method for determining net income which is prescribed in subsection (2) will not reasonably reflect that portion of the taxpayer's income attributable to the period after December 31, 1971.

History.—§1, ch. 71-984.

**220.13 Adjusted federal income defined.—**
(1) "Adjusted federal income" shall mean an amount equal to the taxpayer's taxable income as defined in subsection (2), or said taxable income of more than one taxpayer as provided in §220.131, for the taxable year, adjusted as follows:

(a) *Additions.*—There shall be added to such taxable income:

1. The amount of income tax paid or accrued as a liability to this state under this code which is deductible from gross income in the computation of taxable income for the taxable year;

2. The amount of interest which is excluded from taxable income under paragraph 103(a)(1) of the Internal Revenue Code and which is not derived from obligations of the state or any of its political subdivisions;

3. In the case of a regulated investment company or real estate investment trust, an amount equal to the excess of the net long-term capital gain for the taxable year over the amount of the capital gain dividends attributable to the taxable year.

(b) *Subtractions.—*

1. In computing the net operating loss deduction allowable for federal income tax purposes under section 172 of the Internal Revenue Code for the taxable year, the net capital loss allowable for federal income tax purposes under section 1212 of the Internal Revenue Code for the taxable year, the excess charitable contribution deduction allowable for federal income tax purposes under section 170 (d)(2) of the Internal Revenue Code for the taxable year, and the excess contributions deductions allowable for federal income tax purposes under section 404 of the Internal Revenue Code for the taxable year, there shall be subtracted from taxable income, in order to arrive at adjusted federal income, such amounts as reflect the following limitations:

a. No deduction shall be allowed for net operating losses, net capital losses, and excess contribution deductions under sections 170(d)(2) and 404 of the Internal Revenue Code which are carried forward from taxable years ending prior to January 1, 1972; and

b. The net operating loss, net capital loss, and excess contributions deductions under sections 170(d)(2) and 404 of the Internal Revenue Code, respectively, allowable for any taxable year beginning before and ending after January 1, 1972 shall be limited to an amount which bears the same ratio to the taxpayer's net operating loss, net capital loss, and excess contributions deductions under sections 170(d) (2) and 404 of the Internal Revenue Code, respectively, for the entire taxable year as the number of days in such year after December 31, 1971 bears to the total number of days in such year, unless the taxpayer elects to account separately for income under subsection 220.12 (3), in which case the net operating loss, net capital loss, and excess contributions deductions under sections 170(d)(2) and 404 of the Internal Revenue Code, respectively, allowable for such year shall be determined on the basis of the items actually earned, received, paid, incurred, or accrued after December 31, 1971; and

c. A net operating loss and a capital loss shall never be carried back as a deduction to a prior taxable year, but all deductions attributable to such losses shall be deemed net operating loss carryovers and capital loss carryovers, respectively, and treated in the same manner, to the same extent, and for the same time periods as are prescribed for such carryovers in section 172 and section 1212, respectively, of the Internal Revenue Code.

2. There shall be subtracted from such taxable income any amount included therein:

a. Under section 78 or section 951 of the Internal Revenue Code;

b. Which was derived from sales outside the United States, and from sources outside the United States as interest, as a royalty, or as compensation for technical or other services; and

c. Which was received as a dividend from a corporation which neither transacts any substantial portion of its business in the United States nor regularly maintains any substantial portion of its assets within the United States.

However, as to any amount subtracted under this subparagraph, there shall be added to such taxable income all expenses deducted on the taxpayer's return for the taxable year which are attributable, directly or indirectly, to such subtracted amount.

3. There shall be subtracted from such taxable income all amounts included therein which are derived from stocks, bonds, treasury notes, and other obligations of the United States.

(c) *Installment sales.—*

1. Unless there has been an election under subparagraph 2., any taxpayer which returns any portion of its income for federal income tax

purposes under section 453 of the Internal Revenue Code, whether or not as a dealer, shall file its return under this code, and shall compute its adjusted taxable income, including income derived from transactions treated for federal tax purposes as installment sales, in accordance with the regular method by which the taxpayer accounts, under section 446(c) of the Internal Revenue Code, for transactions which are not installment sales. In preparing its return under this code, the taxpayer shall adjust taxable income, as defined in subsection (2), by excluding therefrom all installment sale income reported in the taxable year with respect to income realized from installment sales prior to January 1, 1972 and by including therein the full amount of all income realized from installment sales, under an accrual method of accounting, on or after said date. However, for a taxable year which begins before and ends after January 1, 1972, the ratio set forth in subsection 220.12 (2) shall not be applied to the taxpayer's apportioned share of installment sale income in computing net income.

2. Any taxpayer which has elected for federal income tax purposes to report any portion of its income on the installment basis under section 453 of the Internal Revenue Code may elect so to return income from installment sales for purposes of this code. However, the election provided by this subparagraph shall only be allowed if:

a. The election is made not later than the due date, including any extensions thereof, for filing the taxpayer's return under this code, in such manner as the department may prescribe; and

b. The taxpayer consents in writing, at the time of its election, to the filing of its return without the adjustments to taxable income which are described in subparagraph 1.

3. If the taxpayer is a dealer or otherwise returns a portion of its income under section 453 of the Internal Revenue Code, an election under subparagraph 2. must be made for the taxpayer's first taxable year under this code in which a portion of its income is so returned for federal tax purposes, and said election shall apply to all subsequent taxable years for which installment sale treatment is elected for federal income tax purposes, unless the department consents in writing to the revocation of such election prior to the first taxable year for which such revocation would apply.

4. If an election is made under subparagraph 2., then, in lieu of returning the entire amount of installment sale income returned for federal income tax purposes, the taxpayer may include in income for each taxable year under this code only the amount of income which is specified in subparagraph 5., in which event the taxpayer shall also add to taxable income, as defined in subsection (2), all expenses deducted on its federal return for the taxable year with respect to installment sale income excluded from Florida net income under this provision, including collection costs and the expenses attributable to servicing sales contracts.

5. The amount to be included in taxable income under subparagraph 4. shall be limited to the sum of the following amounts:

a. An amount equal to 100 percent of the income derived from installment sale transactions consummated on or after January 1, 1972;

b. An amount equal to 70 percent of the income returned for federal income tax purposes in the taxable year which was derived from installment sale transactions consummated prior to January 1, 1972 and after December 31, 1970;

c. An amount equal to 50 percent of the income returned for federal income tax purposes in the taxable year which was derived from installment sale transactions consummated prior to January 1, 1971 and after December 31, 1968;

d. An amount equal to 25 percent of the income returned for federal income tax purposes in the taxable year which was derived from installment sale transactions consummated prior to January 1, 1969 and after December 31, 1966; and

e. An amount equal to 10 percent of the income returned for federal income tax purposes in the taxable year which was derived from installment sale transactions consummated prior to January 1, 1967.

6. The department may by regulation prescribe the methods or procedures for computing the amounts included and excluded from taxable income under subparagraphs 4. and 5.

(2) For purposes of this section, a taxpayer's taxable income for the taxable year shall mean taxable income as defined in section 63 of the Internal Revenue Code and properly reportable for federal income tax purposes for the taxable year, but subject to the limitations set forth in paragraph (1)(b) with respect to the deductions provided by sections 172 (relating to net operating losses), 170(d)(2) (relating to excess charitable contributions), 404(a)(1)(D) (relating to excess pension trust contributions), 404(a)(3) (A) and (B) (to the extent relating to excess stock bonus and profit-sharing trust contributions), 404(d) (relating to excess contributions under the 1939 code) and 1212 (relating to capital losses) of the Internal Revenue Code, except that, subject to the same limitations:

(a) "Taxable income," in the case of a life insurance company subject to the tax imposed by section 802 of the Internal Revenue Code, shall mean life insurance company taxable income; however, the amount of said income to be taken into account for purposes of this code shall never exceed, cumulatively, the excess of amounts determined under paragraph 802(b)(3) of the Internal Revenue Code as of the close of the taxpayer's taxable year over the amount determined under said paragraph as of December 31, 1971;

(b) "Taxable income," in the case of a mutual insurance company subject to the tax imposed by section 821(a) or (c) of the Internal

Revenue Code, shall mean mutual insurance company taxable income or taxable investment income, as the case may be;

(c) "Taxable income," in the case of an insurance company subject to the tax imposed by section 831(a) of the Internal Revenue Code, shall mean insurance company taxable income;

(d) "Taxable income," in the case of a regulated investment company subject to the tax imposed by section 852 of the Internal Revenue Code, shall mean investment company taxable income;

(e) "Taxable income," in the case of a real estate investment trust subject to the tax imposed by section 857 of the Internal Revenue Code, shall mean real estate investment trust taxable income;

(f) "Taxable income," in the case of a corporation which is a member of an affiliated group of corporations filing a consolidated income tax return for the taxable year for federal income tax purposes, shall mean taxable income of such corporation for federal income tax purposes as if such corporation had filed a separate federal income tax return for the taxable year and each preceding taxable year for which it was a member of an affiliated group, unless a consolidated return for the taxpayer and others is required or elected under §220.131;

(g) "Taxable income," in the case of a cooperative corporation or association, shall mean the taxable income of such organization determined in accordance with the provisions of section 1381 through 1398 of the Internal Revenue Code;

(h) "Taxable income," in the case of an organization which is exempt from the federal income tax by reason of section 501(a) of the Internal Revenue Code, shall mean its unrelated business taxable income as determined under section 512 of the Internal Revenue Code; and

(i) "Taxable income," in the case of a corporation for which there is in effect for the taxable year an election under section 1372 of the Internal Revenue Code, shall mean the amount of income subject to tax at the corporate level under paragraph 1372(b)(1) of the Internal Revenue Code for each taxable year commencing prior to July 1, 1973, and taxable income for such a corporation for each taxable year commencing on or after July 1, 1973 shall mean taxable income as defined in section 63 of the Internal Revenue Code, determined without regard to the provisions of subchapter S of said code.

History.—§1, ch. 71-984.

**220.131 Adjusted federal income; affiliated groups.—**
(1) Subject to subsection (5), any corporation subject to tax under this code which is the parent company of an affiliated group of corporations may elect, not later than the due date for filing its return for the taxable year, including any extensions thereof, to consolidate its taxable income with that of all other members of the group subject to tax under this code and to return such consolidated taxable income hereunder, in which case all such other members must consent thereto in such manner as the department may by regulation prescribe. Any Florida parent company of an affiliated group of corporations may elect to consolidate its taxable income with all other members of the affiliated group, even though some of its members are not subject to tax under this code, provided:

(a) Each member of the group consents to such filing by specific written authorization at the time the consolidated return is filed;

(b) The affiliated group so filing under this code has filed a consolidated return for federal income tax purposes for the same taxable year; and

(c) The affiliated group so filing under this code is composed of the identical component members as have consolidated their taxable incomes in said federal return.

(2) Subject to subsection (5), the director may require a consolidated return for those members of an affiliated group of corporations which are subject to tax and which would be eligible to elect to consolidate their incomes under subsection (1), if the filing of separate returns for such corporations would improperly reflect the taxable incomes of said corporations or of said group.

(3) The filing of a consolidated return for any taxable year shall require the filing of consolidated returns for all subsequent taxable years so long as the filing taxpayers remain members of the affiliated group or, in the case of a group having component members not subject to tax under this code, so long as a consolidated return is filed by such group for federal income tax purposes, unless the director consents to the filing of separate returns.

(4) The computation of consolidated taxable income for the members of an affiliated group of corporations subject to tax hereunder shall be made in the same manner and under the same procedures, including all intercompany adjustments and eliminations, as are required for consolidating the incomes of affiliated corporations for the taxable year for federal income tax purposes in accordance with section 1502 of the Internal Revenue Code, and the amount shown as consolidated taxable income shall be the amount subject to tax under this code.

(5) No taxpayer may apportion adjusted federal income under §214.72 as a member of an affiliated group which files a consolidated return under this section on the basis of apportionment factors described in §214.71, and no

taxpayer may apportion under §214.71 as a member of an affiliated group which files a consolidated return on the basis of an apportionment factor described in §214.72, but no taxpayer shall be barred from filing as a member of an affiliated group if it apportions adjusted federal income in the same manner as the parent company and all other filing members of the group.

History.—§1, ch. 71-984.

### 220.14 Exemption.—

(1) In computing a taxpayer's liability for tax under this code, there shall be exempt from the tax $5,000 of net income as defined in §220.12 or such lesser amount as will, without increasing the taxpayer's federal income tax liability, provide the state with an amount under this code which is equal to the maximum federal income tax credit which may be available from time to time under federal law.

(2) In the case of a taxable year for a period of less than 12 months, the exemption allowed by this section shall be prorated on the basis of the number of days in such year to 365.

(3) Only one exemption shall be allowed to taxpayers filing a consolidated return under this code.

(4) Notwithstanding any other provision of this code, not more than one exemption under this section shall be allowed to the Florida members of a controlled group of corporations, as defined in section 1563 of the Internal Revenue Code with respect to taxable years ending on or after December 31, 1970, filing separate returns under this code. The exemption described in this section shall be divided equally among such Florida members of the group, unless all of such members consent, at such time and in such manner as the department shall by regulation prescribe, to an apportionment plan providing for an unequal allocation of such exemption.

History.—§1, ch. 71-984.

### 220.15 Apportionment of adjusted federal income.—

Adjusted federal income as defined in §220.13 shall be apportioned to this state in accordance with part IV of chapter 214, and for the purpose of applying said part to this code:

(1) The term "sales" in paragraph 214.71 (3)(a) shall mean all gross receipts of the taxpayer except interest, dividends, rents, royalties, and gross receipts from the sale, exchange, maturity, redemption, or other disposition of securities; except that:

(a) Rental income shall be included in the term "sales" whenever a significant portion of the taxpayer's business consists of leasing or renting tangible personal property;

(b) Royalty income shall be included in the term "sales" whenever a significant portion of the taxpayer's business consists of dealing in or with the production, exploration, or development of minerals; and

(2) The term "financial organization" in paragraph 214.71(3)(b) shall include any bank, trust company, savings bank, industrial bank, land bank, safe deposit company, private banker, savings and loan association, credit union, cooperative bank, small loan company, sales finance company, or investment company; and

(3) The term "everywhere" in part IV of chapter 214, which is used in the computation of apportionment factor denominators, shall mean "in all other states of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, or any political subdivision of the foregoing," and

(4) In lieu of the equally weighted three factor apportionment fraction based on property, payroll, and sales which is described in §214.71, there shall be used for purposes of the tax imposed by this code an apportionment fraction composed of a sales factor representing 50 percent of the fraction, a property factor representing 25 percent of this fraction, and a payroll factor representing 25 percent of the fraction. However, upon application in accordance with paragraph (a), any taxpayer shall be entitled to a refund of tax, in an amount determined under paragraph (b), if it can establish that the aggregate amount of its net income subject to tax under this code and in all other states for the taxable year exceeds 100 percent of the taxpayer's taxable income, as determined for federal income tax purposes, for the taxable year.

(a) Any taxpayer eligible for a refund under this subsection shall make application therefor in accordance with procedures set forth in part I of chapter 214. All applications for refund under this subsection shall be accompanied by a copy of the taxpayer's federal income tax return for the taxable year, copies of every return filed by the taxpayer in the states in which it has conducted business for the taxable year, and verification in the form of cancelled checks or other receipts of the taxpayer's payments of the amounts shown to be due on the several returns filed with the refund application.

(b) The refund to which any taxpayer shall be entitled under this subsection shall be equal to 5 percent of the lesser of:

1. The excess of the amount subject to tax for the taxable year under this code over the amount which would have been subject to tax if the taxpayer had computed net income for purposes of this code on the basis of the apportionment fraction described in §214.71; or

2. The excess of the aggregate amount of net income subject to tax in Florida and in all other states for the taxable year over the amount of federal taxable income for the taxable year.

(c) For purposes of this subsection, the terms "net income subject to tax" and "amount subject to tax" shall mean the amount against which a rate or rates are applied in determining

the taxpayer's dollar liability for tax in any jurisdiction.

History.—§1, ch. 71-984.

## PART III

## RETURNS, DECLARATIONS, RECORDS

220.21 Returns and records; regulations.
220.22 Returns; filing requirement.
220.221 Returns; signing and verification.
220.222 Returns; time and place for filing.
220.23 Federal returns.
220.24 Declaration of estimated tax.
220.241 Declaration; time for filing.
220.242 Declaration as return.

**220.21 Returns and records; regulations.—**
Every taxpayer liable for the tax imposed by this code shall keep such records, render such statements, make such returns and notices, and comply with such rules and regulations, as the department may from time to time prescribe. The director may require any taxpayer or class of taxpayers, by notice or by regulation, to make such returns and notices, render such statements, and keep such records as the director deems necessary to determine whether such taxpayer or taxpayers are liable for tax under this code.

History.—§1, ch. 71-984.

**220.22 Returns; filing requirement.—**
(1) A return with respect to the tax imposed by this code shall be made by every taxpayer for each taxable year in which such taxpayer either is liable for tax under this code or is required to make a federal income tax return, regardless of whether such taxpayer is liable for tax under this code.

(2) Every Florida partnership having any partner subject to tax under this code, shall make an information return setting forth:

(a) All items of income, gain, loss, and deduction;

(b) The names and addresses of all partners subject to tax hereunder who would be entitled to share in the net income of the partnership if distributed;

(c) The amount and proportion of the distributive share of each partner-taxpayer; and

(d) Such other pertinent information as the department may by form or regulation prescribe.

(3) Whenever a receiver, trustee in bankruptcy, or assignee, by order of law or otherwise, has possession of or holds title to all or substantially all of the property or business of a taxpayer, whether or not such property or business is being operated, such receiver, trustee, or assignee shall make the returns and notices required of such taxpayer.

History.—§1, ch. 71-984.

**220.221 Returns; signing and verification.—**
(1) A return or notice required of a taxpayer shall be signed by an officer duly authorized so to act or, in the case of a return or notice made by a fiduciary under subsection 220.22(3), by the fiduciary. The fact that an officer or fiduciary has signed a return or notice shall be prima facie evidence that the individual was authorized to sign such document on behalf of the taxpayer.

(2) A return or notice for a partnership shall be signed by any one of the general partners, and the fact that a partner has signed a return or notice shall be prima facie evidence that such partner was authorized to sign such document on behalf of the partnership.

(3) Each return or notice required to be filed under this code shall be verified by a written declaration that it is made under the penalties of perjury, and if prepared by someone other than the taxpayer the return shall also contain a declaration by the preparer that it was prepared on the basis of all information of which the preparer had knowledge.

History.—§1, ch. 71-984.

**220.222 Returns; time and place for filing.—**
(1) Returns required by this code shall be filed with the office of the department in Leon County or at such other place as the department may by regulation prescribe. All returns shall be filed on or before the first day of the fourth month following the close of the taxable year, unless under subsection (2) one or more extensions of time, not to exceed 6 months in the aggregate, are granted for such filing.

(2)(a) When a taxpayer has been granted an extension or extensions of time within which to file its federal income tax return for any taxable year, and if the requirements of §220.32 are met, the filing of a copy of such extension or extensions with the department shall automatically extend the due date of the return required under this code until 15 days after the expiration of the federal extension or until the expiration of 6 months from the original due date, whichever first occurs.

(b) The department may grant an extension or extensions of time for the filing of any return required under this code upon receiving a prior written request therefor if good cause for an extension is shown. However, the aggregate extensions of time under paragraphs (a) and (b) shall not exceed 6 months. No extension granted under this paragraph shall be valid unless the taxpayer complies with the requirements of §220.32

History.—§1, ch. 71-984

**220.23 Federal returns.—**
(1) Any taxpayer required to make a return for a taxable year under this code may, at any time that a deficiency could be assessed or a refund claimed under this code in respect of any item reported or properly reportable on such return or any amendment thereof, be required to furnish to the department a true and correct copy of any return which may pertain to such item and which was filed by such taxpayer under the provisions of the Internal Revenue Code.

(2) In the event the taxable income, any item of income or deduction, or the income tax liability reported in a federal income tax return of any taxpayer for any taxable year is adjusted by amendment of such return or as a result of any other recomputation or redetermination of federal taxable income or loss, if such adjustment would affect any item or items entering into the computation of such taxpayer's net income subject to tax for any taxable year under this code, the following special rules shall apply:

(a) The taxpayer shall notify the department of such adjustment by filing either an amended return or such other report as the department may by regulation prescribe, which return or report:

1. Shall show the taxpayer's name, address, and employer identification number; the adjustments; the taxpayer's revised net income subject to tax and revised tax liability under this code; and such other information as the department may by regulation prescribe;

2. Shall be signed by a person required to sign the original return or by a duly authorized representative; and

3. Shall be filed not later than 60 days after such adjustment has been agreed to or finally determined for federal income tax purposes, or after any federal income tax deficiency or refund, abatement, or credit resulting therefrom has been assessed, paid, or collected, whichever shall first occur.

(b) If the amended return or other report filed with the department concedes the accuracy of a federal change or correction, any deficiency in tax under this code resulting therefrom shall be deemed assessed on the date of filing such amended return or report, and such assessment shall be timely, notwithstanding any other provision contained in part I of chapter 214.

(c) In any case where notification of an adjustment is required under paragraph (a), then notwithstanding any other provision contained in part I of chapter 214:

1. A notice of deficiency may be issued at any time within 2 years after the date such notification is given; or

2. If a taxpayer either fails to notify the department or fails to report a change or correction which is treated in the same manner as if it were a deficiency for federal income tax purposes, a notice of deficiency may be issued at any time;

3. In either case, the amount of any proposed assessment set forth in such notice shall be limited to the amount of any deficiency resulting under this code from recomputation of the taxpayer's income for the taxable year after giving effect only to the item or items reflected in the adjustment.

(d) In any case when notification of an adjustment is required by paragraph (a), a claim for refund may be filed within 2 years after the date on which such notification was due, regardless of whether such notice was given, notwithstanding any other provision contained in part I of chapter 214. However, the amount recoverable pursuant to such a claim shall be limited to the amount of any overpayment resulting under this code from recomputation of the taxpayer's income for the taxable year after giving effect only to the item or items reflected in the adjustment required to be reported.

History.—§1, ch. 71-984.

**220.24 Declaration of estimated tax.—**
(1) Every taxpayer shall make a declaration of estimated tax for the taxable year, in such form as the department shall prescribe, if the amount payable as estimated tax can reasonably be expected to be more than $2,500. The term "estimated tax" shall mean the amount which the taxpayer estimates to be his tax under this code for the taxable year or, in the case of a taxable year of less than 12 months, an amount of tax determined in accordance with regulations prescribed by the department.

(2) A taxpayer may amend a declaration, under regulations prescribed by the department.

History.—§1, ch. 71-984.

**220.241 Declaration; time for filing.—**
A declaration of estimated tax under this code shall be filed on or before the first day of the fifth month of each taxable year, except that if the minimum tax requirement of subsection 220.24(1) is first met:

(1) After the third month and before the sixth month of the taxable year, the declaration shall be filed on or before the first day of the seventh month;

(2) After the fifth month and before the ninth month of the taxable year, the declaration shall be filed on or before the first day of the tenth month; or

(3) After the eighth month and before the twelfth month of the taxable year, the declaration shall be filed for the taxable year on or before the first day of the succeeding taxable year.

History.—§1. ch. 71-984.

**220.242 Declaration as return.—**All of the provisions of this part and of §214.21, relating to confidentiality, shall be applicable with respect to declarations of estimated tax unless manifestly inconsistent therewith. However, the declaration required of a preparer other than the taxpayer under subsection (3) of §220.22 shall not be required with respect to declarations of estimated tax.

History.—§1. ch. 71-984.

## PART IV

## PAYMENTS

220.31   Payments; due date.
220.32   Payments of tentative tax.
220.33   Payments of estimated tax.
220.34   Special rules relating to estimated tax.

**220.31 Payments; due date.—**

(1) Every taxpayer required to file a return under this code or a notification under subsection 220.23(2) shall, without assessment, notice, or demand, pay any tax due thereon to the department at the place fixed for filing, including payment to such depository institutions throughout the state as the department may by regulation designate, on or before the date fixed for filing such return, determined without regard to any extension of time for filing the return, or notification, pursuant to regulations prescribed by the department.

(2) Except as to estimated tax payments under §220.33, the payment required under this section shall be the balance of tax remaining due after giving effect to the following:

(a) Any amount of tentative tax or estimated tax paid by a taxpayer for a taxable year pursuant to §220.32 or §220.33 shall be deemed to have been paid on account of the tax imposed by this code for such taxable year; and

(b) Any amount of a tax overpayment which is credited against the taxpayer's liability for the taxable year under §214.13 shall be deemed to have been paid on account of the tax imposed by this code for such taxable year.

History.—§1, ch. 71-984.

**220.32 Payments of tentative tax.—**

(1) In connection with any extension of the time for filing a return under subsection 220.222(2), the taxpayer shall file a tentative tax return and pay, on or before the date prescribed by law for the filing of such return, determined without regard to any extensions of time for such filing, an amount estimated to be the balance of its proper tax for the taxable year after giving effect to any estimated tax payments under §220.33 and any tax credit under §214.13.

(2) The department shall by regulation prescribe the manner and form for filing tentative returns.

(3) Interest on any amount of tax due and unpaid during the period of any extension shall be payable as provided in §214.43.

History.—§1, ch. 71-984.

**220.33 Payments of estimated tax.—**A taxpayer required to file a declaration of estimated tax pursuant to §220.24 shall pay such estimated tax as follows:

(1) If the declaration is required to be filed on or before the first day of the fifth month of the taxable year, the estimated tax shall be paid in four equal installments. The first installment shall be paid at the time of the required filing of the declaration; the second and third installments shall be paid on or before the first day of the seventh and tenth months of the taxable year, respectively; and the fourth installment shall be paid on or before the first day of the next taxable year.

(2) If the declaration is required to be filed on or before the first day of the seventh month of the taxable year, the estimated tax shall be paid in three equal installments. The first installment shall be paid at the time of required filing of the declaration; the second installment shall be paid on or before the first day of the tenth month of the taxable year; and the third installment shall be paid on or before the first day of the next taxable year.

(3) If the declaration is required to be filed on or before the first day of the tenth month of the taxable year, the estimated tax shall be paid in two equal installments: at the time of required filing of the declaration for such taxable year and on or before the first day of the next taxable year, respectively.

(4) If the declaration is required to be filed on or before the first day of the succeeding taxable year, the estimated tax shall be paid in full at the time of such required filing.

(5) If the declaration is filed after the time prescribed in §220.241 due to the grant of an extension of time for filing, subsections (1) through (4) of this section shall not apply, and there shall be paid at the time of such filing all installments of estimated tax which would have been payable on or before such time if the declaration had been filed within the time prescribed in §220.241 and without regard to the extension, and the remaining installments shall be paid at the time at which, and in the amounts in which, they would have been payable if the declaration had been so filed.

(6) If an amended declaration is filed, the remaining installments, if any, shall be ratably increased or decreased, as the case may be, to reflect the increase or decrease in the estimated tax occasioned by such amendment.

(7) The application of this section to taxable years of less than 12 months shall be in accordance with regulations prescribed by the department.

History.—§1, ch. 71-984.

**220.34 Special rules relating to estimated tax.—**

(1) Any amount paid as estimated tax shall be deemed assessed upon the due date for the taxpayer's return for the taxable year, determined without regard to any extensions of time for filing such return.

(2) No interest or penalty shall be due or paid with respect to a failure to pay estimated taxes except the following:

(a) Except as provided in paragraph (d), the taxpayer shall be liable for interest at the rate of 6 percent per year and for a penalty in an amount determined at the rate of 10 percent per year upon the amount of any underpayment of estimated tax determined under this subsection.

(b) For purposes of this subsection, the amount of any underpayment of estimated tax shall be the excess of:

1. The amount of the installment which would be required to be paid if the estimated tax were equal to 80 percent of the tax shown on the return for the taxable year or, if no

return were filed, 80 percent of the tax for such year, over

2. The amount, if any, of the installment paid on or before the last date prescribed for payment.

(c) The period of the underpayment for which interest and penalties shall apply shall commence on the date the installment was required to be paid, determined without regard to any extensions of time, and shall terminate on the earlier of the following dates:

1. The first day of the fourth month following the close of the taxable year; or

2. With respect to any portion of the underpayment, the date on which such portion is paid.

For purposes of this paragraph, a payment of estimated tax on any installment date shall be considered a payment of any previous underpayment only to the extent such payment exceeds the amount of the installment determined under subparagraph (b)1. for such installment date.

(d) No penalty or interest for underpayment of any installment of estimated tax shall be imposed if the total amount of all such payments made on or before the last date prescribed for the payment of such installment equals or exceeds the amount which would have been required to be paid on or before such date if the estimated tax were the lesser of:

1. An amount equal to the tax computed at the rates applicable to the taxable year, but otherwise on the basis of the facts shown on the return for, and the law applicable to, the preceding taxable year; or

2. An amount equal to 80 percent of the tax finally due for the taxable year; or

3. An amount equal to the tax shown on the taxpayer's return for the preceding taxable year, if a return showing a liability for tax was filed by the taxpayer for the preceding taxable year and such preceding year was a taxable year of 12 months.

(e) For purposes of paragraphs (b) and (d), the term "tax" shall mean the excess of the tax imposed by this code over all amounts properly credited against such tax for the taxable year.

(f) The application of this subsection to taxable years of less than 12 months shall be in accordance with regulations prescribed by the department.

(g) The provisions of this subsection shall not apply with respect to any taxable year beginning before January 1, 1972.

(3) The department may provide by regulation for a credit against estimated taxes for any taxable year of any amount determined by the taxpayer or by the department to be an overpayment of the tax imposed by this code for a preceding taxable year.

History.—§1, ch. 71-984.

## PART V

## ACCOUNTING

220.41   Taxable year.
220.42   Methods of accounting.
220.43   Reference to federal determinations.
220.44   Adjustments.

**220.41   Taxable year.—**

(1) For purposes of the tax imposed by this code and the returns required to be filed, the taxable year of a taxpayer shall be the same as the taxable year of such taxpayer for federal income tax purposes.

(2) If the taxable year of a taxpayer is changed for federal income tax purposes, the taxable year of such taxpayer for purposes of this code shall be similarly changed.

(3) Notwithstanding the provisions of subsections (1) and (2), if the department terminates the taxable year of a taxpayer under the provisions of chapter 214 relating to jeopardy assessments, the tax shall be computed for the period determined by such action.

History.—§1, ch. 71-984.

**220.42   Methods of accounting.—**

(1) For purposes of this code, a taxpayer's method of accounting shall be the same as such taxpayer's method of accounting for federal income tax purposes. If no method of accounting has been regularly used by a taxpayer, net income for purposes of this code shall be computed by such method as in the opinion of the department fairly reflects income.

(2) If a taxpayer's method of accounting is changed for federal income tax purposes, the taxpayer's method of accounting for purposes of this code shall be similarly changed.

History.—§1, ch. 71-984.

**220.43   Reference to federal determinations.—**

(1) To the extent not inconsistent with the provisions of this code or forms or regulations prescribed by the department, each taxpayer making a return under this code shall take into account the items of income, deduction, and exclusion on such return in the same manner and amounts as reflected in such taxpayer's federal income tax return for the same taxable year.

(2) A final determination under the Internal Revenue Code adjusting any item or items of income, deduction, or exclusion for any taxable year shall be prima facie correct for purposes of this code to the extent such item or items enter into the determination of net income under this code.

(3) If there has been implementing legislation under subsection 220.03(3), and to the extent required in regulations prescribed by the department, any taxpayer making a return under this code may be required to indicate the item or items of income, deduction, and exclusion which would enter into the determination of income if this code were amended to incorporate the Internal Revenue Code as amended and in effect for such taxable year.

History.—§1, ch. 71-984.

**220.44 Adjustments.**—If it appears to the director that any agreement, understanding, or arrangement exists between any taxpayers, or between any taxpayer and any other person, which causes any taxpayer's net income subject to tax to be reflected improperly or inaccurately, the director may adjust any item or items of income, deduction, or exclusion, or any factor. taken into account in apportioning income to this state, to the extent necessary clearly to reflect the net income of such taxpayer.

History.—§1, ch. 71-984.

## PART VI

### MISCELLANEOUS

220.51   Promulgation of rules and regulations.
220.52   Arrangements and captions.
220.53   Adoption of chapter 214.

**220.51 Promulgation of rules and regulations.**—In accordance with the Administrative Procedure Act, chapter 120, the department is authorized to make, promulgate, and enforce such reasonable rules and regulations, and to prescribe such forms relating to the administration and enforcement of the provisions of this code, as it may deem appropriate, including:

(1) Rules for initial implementation of this code and for taxpayers' transitional taxable years commencing before and ending after January 1, 1972;

(2) Rules or regulations to clarify whether certain groups, organizations, or associations formed under the laws of this state or any other state, country, or jurisdiction shall be deemed "taxpayers" for the purposes of this code, in accordance with the legislative declarations of intent in §220.02; and

(3) Regulations relating to consolidated reporting for affiliated groups of corporations, in order to provide for an equitable and just administration of this code with respect to multicorporate taxpayers.

History.—§1, ch. 71-984.

**220.52 Arrangement and captions.**—No inference, implication, or presumption of legislative construction shall be drawn or made by reason of the location or grouping of any particular sections or provisions of this code, nor shall any caption be given any legal effect.

History.—§1, ch. 71-984.

**220.53 Adoption of chapter 214.**—The tax imposed by this chapter is hereby made subject to chapter 214, as that chapter is modified by §220.15 and by paragraphs 220.23(2)(c) and (d).

History.—§1, ch. 71-984.

## CHAPTER 253

### INTERNAL IMPROVEMENT TRUST FUND

253.015 Limitation on expenditure of trust fund.

**253.015 Limitation on expenditure of trust fund.**—Other provisions of law to the contrary notwithstanding, effective January 1, 1972 and thereafter, all revenues and receipts accruing to the board of trustees for the benefit of the internal improvement trust fund shall be available for appropriation by the legislature solely and exclusively for the acquisition of land and the incidental expenses related thereto. Effective January 1, 1972, the uncommitted fund balance of the internal improvement trust fund as of that date shall be expended or loaned only upon specific legislative appropriation or authorization.

History.—§2, ch. 71-981.

## CHAPTER 316

### STATE UNIFORM TRAFFIC CONTROL

316.006 Jurisdiction.
316.007 Provisions uniform throughtout state.
316.008 Powers of local authorities.

**\*316.006 Jurisdiction.**—Jurisdiction to control traffic is vested as follows:

(1) STATE.—The department of transportation shall have all original jurisdiction over all state roads throughout this state, including those within the grounds of all state institutions and the boundaries of all dedicated state parks, and may place and maintain such traffic control devices which conform to its manual and specifications upon all such highways as it shall deem necessary to indicate and to carry out the provisions of this chapter or to regulate, warn, or guide traffic.

(2) MUNICIPALITIES.—Chartered municipalities shall have original jurisdiction over all streets and highways located within their boundaries, except state roads, and may place and maintain such traffic control devices which conform to the manual and specifications of the department of transportation upon all streets and highways under their original jurisdiction as they shall deem necessary to indicate and to carry out the provisions of this chapter or to regulate, warn, or guide traffic. This subsection shall not limit those counties which have the charter powers to provide and regulate arterial, toll, and other roads, bridges, tunnels, and related facilities from the proper exercise of those powers by the placement and maintenance of traffic-control devices which conform to

the manual and specifications of the department of transportation on streets and highways located within municipal boundaries.

(3) COUNTIES.—Counties shall have original jurisdiction over all streets and highways located within their boundaries, except all state roads and those streets and highways specified in subsection (2), and may place and maintain such traffic control devices which conform to the manual and specifications of the department of transportation upon all streets and highways under their original jurisdiction as they shall deem necessary to indicate and to carry out the provisions of this chapter or to regulate, warn, or guide traffic.

History.—§1, ch. 71-135; §1, ch. 71-982.
*Note.—Effective January 1, 1972.
Note.—See former §§186.02, 317.012, 317.021 and 317.031.

**\*316.007 Provisions uniform throughout state.**—The provisions of this chapter shall be applicable and uniform throughout this state and in all political subdivisions and municipalities therein, and no local authority shall enact or enforce any ordinance on a matter covered by this chapter unless expressly authorized. However, this section shall not prevent any local authority from enacting an ordinance when such enactment is necessary to vest jurisdiction of violation of this chapter in the local court.

History.—§1, ch. 71-135; §2, ch. 71-982.
*Note.—Effective January 1, 1972.

**\*316.008 Powers of local authorities.**—

(1) The provisions of this chapter shall not be deemed to prevent local authorities, with respect to streets and highways under their jurisdiction and within the reasonable exercise of the police power, from:

(a) Regulating or prohibiting stopping, standing, or parking;

(b) Regulating traffic by means of police officers or official traffic control devices;

(c) Regulating or prohibiting processions or assemblages on the streets or highways, including all state or federal highways lying within their boundaries;

(d) Designating particular highways or roadways for use by traffic moving in one direction;

(e) Establishing speed limits for vehicles in public parks;

(f) Designating any street as a through street or designating any intersection as a stop or yield intersection;

(g) Restricting the use of streets;

(h) Regulating the operation of bicycles;

(i) Regulating or prohibiting the turning of vehicles or specified types of vehicles;

(j) Altering or establishing speed limits within the provisions of this chapter;

(k) Requiring written accident reports;

(l) Designating no-passing zones;

(m) Prohibiting or regulating the use of con-trolled access roadways by any class or kind of traffic;

(n) Prohibiting or regulating the use of heavily traveled streets by any class or kind of traffic found to be incompatible with the normal and safe movement of traffic;

(o) Designating hazardous railroad grade-crossings in conformity to criteria promulgated by the department of transportation;

(p) Designating and regulating traffic on play streets;

(q) Prohibiting pedestrians from crossing a roadway in a business district or any designated highway except on a crosswalk;

(r) Regulating pedestrian crossings at unmarked crosswalks;

(s) Regulating persons upon skates, coasters, and other toy vehicles;

(t) Adopting and enforcing such temporary or experimental regulations as may be necessary to cover emergencies or special conditions.

(2) The municipality, through its duly authorized officers, shall have nonexclusive jurisdiction over the prosecution, trial, adjudication, and punishment of violations of this chapter when a violation occurs within the municipality and the person so charged is charged by a municipal police officer. The disposition of such matters in the municipality shall be in accordance with that municipality's charter. This subsection shall not limit those counties which have the charter power to provide and regulate arterial, toll, and other roads, bridges, tunnels, and related facilities from the proper exercise of those powers pertaining to the consolidation and unification of a traffic court system within said counties.

(3) No local authority shall erect or maintain any official traffic control device at any location so as to regulate the traffic on any state road unless approval in writing has first been obtained from the department of transportation.

History.—§1, ch. 71-135; §3, ch. 71-982.
*Note.—Effective January 1, 1972.

---

## CHAPTER 32:

## MOTOR CARRIERS; FREIGHT-FORWARDING ACT

### PART I
### MOTOR CARRIERS

323.15  Road tax; advance deposits; lien for taxes; enforcement of lien; records; statements, etc.

**323.15 Road tax; advance deposits; lien for taxes; enforcement of lien; records; statements, etc.—**

(1) There shall be collected by July 1 of

each year from every motor carrier for each motor vehicle controlled by such motor carrier which travels over the public highways of this state, a road tax as follows:

(a) Fifteen dollars for each truck or tractor, regardless of the number of axles, which operates exclusively within twenty-five miles of its place of domicile; and fifteen dollars for each truck with two axles wherever it operates.

(b) Fifty dollars for each truck with three axles.

(c) One hundred dollars for each truck with four axles.

(d) One hundred dollars for each tractor except those controlled by carriers whose authority from the commission is limited to the transportation of household goods or mobile homes, for which the road tax shall be forty dollars; provided, however, in those instances where a carrier domiciled in Florida on or north of U. S. highway 90 and operating exclusively on or north of said highway in interstate commerce only, the road tax on each tractor so operated by said carrier shall be ten dollars.

(e) Fifty dollars for each tractor controlled by holders of only a permit issued pursuant to §323.05.

(f) Ten dollars for each truck or tractor controlled by a motor carrier holding a certificate of registration issued pursuant to §323.28, authorizing the operation in Florida of motor vehicles under exemptions provided by the interstate commerce act.

(g) Twenty-five dollars for each bus with a capacity of twelve passengers or less.

(h) Fifty dollars for each bus with a capacity of not more than twenty-one passengers.

(i) One hundred dollars for each bus with a capacity of more than twenty-one passengers.

(j) Five dollars for each motor vehicle leased to a motor carrier for not more than fifteen days pursuant to the rules and regulations of the commission.

(2) Motor carriers shall receive as evidence of payment of the road tax a plate which shall be displayed upon the vehicle for which the tax was paid. The plate is nontransferable from one vehicle to another except pursuant to the rules and regulations of the commission. However, if a vehicle is removed from service and replaced by another vehicle, a new plate will be issued at no fee pursuant to the rules and regulations of the commission.

(3) The road tax shall be applicable to all motor carriers required by this part to obtain a certificate or permit from the commission, whether or not said certificate or permit has been secured by said motor carrier.

(4) The road tax collected shall be only for the remaining portion of the year from when the motor vehicle is placed in service by the motor carrier as follows:

(a) If the annual tax is one hundred dollars and the motor vehicle is placed in service between July 1 and September 30, then one hundred dollars is to be paid; between October 1 and December 31, seventy-five dollars; between January 1 and March 31, fifty dollars; between April 1 and June 30, twenty-five dollars.

(b) If the annual tax is fifty dollars, and the motor vehicle is placed in service between July 1 and September 30, then fifty dollars is to be paid; between October 1 and December 31, thirty-seven dollars and fifty cents; between January 1 and March 31, twenty-five dollars; between April 1 and June 30, twelve dollars and fifty cents.

(c) If the annual tax is forty dollars, and the motor vehicle is placed in service between July 1 and September 30, then forty dollars is to be paid; between October 1 and December 31, thirty dollars; between January 1 and March 31, twenty dollars; between April 1 and June 30, ten dollars.

(d) If the annual tax is twenty-five dollars, and the motor vehicle is placed in service between July 1 and December 31, then twenty-five dollars is to be paid; between January 1 and June 30, twelve dollars and fifty cents.

(e) If the annual tax is fifteen dollars, and the motor vehicle is placed in service between July 1 and December 31, then fifteen dollars is to be paid; between January 1 and June 30, seven dollars and fifty cents.

(5) Pursuant to the rules and regulations of the commission, a motor carrier may lease vehicles to another motor carrier without the payment of additional road tax, provided that when the tax that has been paid on the vehicle is less than that required when the vehicle is controlled by the lessee, then the lessor may surrender his road tax plate and upon payment of the additional amount receive the required plate.

*(6) The road tax provided for in this section shall be in lieu of all other taxes and fees of every kind, character and description, state, county or municipal, including excise and license taxes levied or imposed against such motor carriers, or the operation of such business and facilities thereof, or their property, except ad valorem taxes levied upon the property other than motor vehicles of such motor carriers, the gasoline tax and motor vehicle fuel tax, the motor vehicle license tax now or hereafter provided for by law, the sales tax imposed by chapter 212, and the income tax imposed by chapter 220.

(7) The books and records of all motor carriers shall be at all times open to inspection of the commission or any agent by it appointed for such purpose. The commission shall keep a true and accurate list of all motor carriers to whom certificates shall be issued with the post office address of each.

History.—§16, ch. 14764, 1931; CGL 1936 Supp. 1335(151); §3, ch. 18026, 1937; §1, ch. 22834, 1945; §1, ch. 26663, 1951; §1, ch. 61-272; §1, ch. 63-279; §1, ch. 63-496; §1, ch. 65-337; §§1, 2, ch. 67-397; §2, ch. 71-984.
*Note.—Subsection (6), as amended, effective January 1, 1972.
cf.—§323.05 Permit to operate motor vehicles for hire.

## CHAPTER 339

## FLORIDA HIGHWAY CODE, SIXTH PART

### Financing; Miscellaneous

339.241 Florida junkyard control law.

**339.241 Florida junkyard control law.—**
(1) SHORT TITLE.—This section shall be known as the "Florida junkyard control law."
(2) DEFINITIONS.—Wherever used or referred to in this section, unless a different meaning clearly appears from the context:
(a) "Automobile graveyard" means any establishment or place of business which is maintained, used, or operated for storing, keeping, buying, or selling wrecked, scrapped, ruined, or dismantled motor vehicles or motor vehicle parts.
(b) "Junk," "junkyard," and "scrap metal processing facility" means the same as described in paragraphs 205.371 (1) (a), (b), and (e).
(c) "Areas zoned for industrial use" means all areas zoned for industrial use by municipal or county governmental units within the state or an unzoned industrial area as defined by the department and approved by the secretary of transportation. Such areas must be based upon the existence of at least one industrial activity other than the junkyard or scrap metal processing plant.
(d) "Distance from edge of right-of-way" means the distance presently defined in subsection (g), section 136, title 23, United States Code.
(e) "Fence" means an enclosure so constructed or planted and maintained as to obscure the junkyard from ordinary view to those persons passing upon the highways in this state.
(f) "Interstate highway" means the system presently defined in subsection (e), section 103, title 23, United States Code.
(g) "Federal aid primary highway" means any highway within that portion of the state highway system as included and maintained under chapter 335, including extensions of such system within municipalities, which has been approved by the secretary of transportation pursuant to subsection (b), section 103, title 23, United States Code.
(h) "Person" means any individual, firm, agency, company, association, partnership, business trust, joint stock company, or corporation.
(i) "Department" means the department of transportation of the state.
(3) RESTRICTIONS AS TO LOCATION.—No junk, junkyard, automobile graveyard, or scrap metal processing facility shall be operated or maintained within 1,000 feet of the nearest edge of the right-of-way of any interstate or primary highway, except the following:
(a) Junkyards which are screened by natural objects, plantings, fences or other appropriate means so as not to be visible from the main traveled way of the highway or otherwise removed from sight.
(b) Junkyards or scrap metal processing facilities which are located in areas which are zoned for industrial use.
(c) Junkyards or scrap metal processing facilities which are not visible from the main traveled way of any interstate or primary highway.

Any junkyard in existence on December 8, 1971 which the secretary determines cannot be screened because of topography and elevation shall not be required under this section to be removed, relocated, or disposed of until federal funds are available.
(4) REQUIREMENTS AS TO FENCES; RULES AND REGULATIONS; EXPENDITURE OF FUNDS.—
(a) A fence constructed under the provisions of this section shall be kept in good order and repair, and any advertisement thereon shall be regulated by applicable state law.
(b) The department shall have the power to promulgate rules and regulations governing the location, construction, plantings, and materials of said fence, living or otherwise.
(c) The department is authorized to spend such funds as are necessary to obtain federal-aid funds for the purposes described in this subsection.
(5) EMINENT DOMAIN.—The power of eminent domain is vested in the department to condemn such interests in land as the department shall determine are required for the purposes of screening, relocation, removal, or disposal of junkyards and scrap metal processing facilities. Such condemnation proceedings shall be maintained in the name of the department under the procedure defined and set forth in chapters 73 and 74. Such relocation, removal, or disposal, for which compensation shall be paid, shall be restricted to those projects wherein federal participation is available.
(6) ENFORCEMENT.—It is the function and duty of the department to administer and enforce the provisions of this section. In addition to the power of eminent domain, negotiation, and compensation, the department or any public official may apply to the circuit court or other court of competent jurisdiction of the county in which said junkyard or scrap metal processing facility may be located for an injunction to abate such nuisance.
(7) PENALTY.—Any person violating any provision of this section shall be subject to fine of not less than $50 or more than $200. Each day during any portion of which such violation occurs constitutes a continuing separate offense.

History.—§§1-6, ch. 71-338; §§1-7, ch. 71-972.

C

**Highlighted:** 104752 (1)

*http://aixtcp.cpa.state.tx.us/opendocs/open32/201108230h.html*

View Original Page
First Match ▶

**Texas Comptroller of Public Accounts STAR System**

201108230H

SOAH DOCKET NO.  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.13
CPA HEARING NO.  104,752

RE:  *************
TAXPAYER NO.:  *************
AUDIT OFFICE:  *************
AUDIT PERIOD:  January 1, 2009 THROUGH December 31, 2009

Franchise Tax/RFD

BEFORE THE COMPTROLLER
OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS

SUSAN COMBS
Texas Comptroller of Public Accounts

JAMES ARBOGAST
Representing Tax Division

*************
Representing Claimant

SOAH DOCKET NO.  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.13
CPA HEARING NO.  104,753

RE:  *************
TAXPAYER NO.:  *************
AUDIT OFFICE:  *************
AUDIT PERIOD:  January 1, 2008 THROUGH December 31, 2008

Franchise Tax/RFD

BEFORE THE COMPTROLLER
OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS

SUSAN COMBS
Texas Comptroller of Public Accounts

JAMES ARBOGAST
Representing Tax Division

*************
Representing Claimant


COMPTROLLER'S DECISION

************* (Claimant) filed amended Texas Franchise Tax Reports for the 2008
and 2009 report years claiming a refund on franchise tax paid in error.
Claimant filed the amended reports using the three-factor apportionment method
under the Multistate Tax Compact (MTC), rather than the single-factor
apportionment method permitted under the Texas Franchise Tax Act, which was
used in filing its original franchise tax reports.  The Texas Comptroller of
Public Accounts (Comptroller) denied the refund claims on the grounds that
Chapter 141 of the Texas Tax Code (TEX. TAX CODE ANN. Section 141.001 –
141.006), which adopted the MTC, does not apply to the Texas franchise tax.
Claimant requested a refund hearing, contending that the current version of the
franchise tax, which is based on a taxable entity's taxable margin, is an
income tax and therefore subject to the MTC.  Comptroller Staff (Staff) asserts
that the Texas Franchise Tax Act requires use of the single gross receipts
factor mandated by TEX. TAX CODE ANN. (Tax Code) Section 171.106, which does
not provide for an alternative apportionment method.  In his Proposal for
Decision (PFD), the Administrative Law Judge (ALJ) concludes that Claimant may
not elect the MTC three-factor apportionment formula and is required to use the
single-factor method, and therefore recommends that the refund claims be
denied.

I.  PROCEDURAL HISTORY, NOTICE & JURISDICTION

On April 5, 2011, Staff referred the cases to the State Office of
Administrative Hearings (SOAH) for hearings based on the parties' written
submissions.  The parties subsequently requested that the cases be joined for
purposes of conducting the hearing and issuing a PFD. The ALJ issued an order
granting the joinder.  The Comptroller was represented by Assistant General
Counsel James Arbogast.  Claimant was represented by *************, Claimant's
Vice President of Finances.  ALJ Peter Brooks closed the record on June 15,
2011.  There are no issues of notice or jurisdiction in this proceeding.
Therefore, these matters are set out in the Findings of Fact and Conclusions of
Law without further discussion here.

II.  REASONS FOR DECISION

A.  Evidence Presented

Claimant provided the Amended Texas Franchise Tax Reports for report year 2008.
Staff filed for each hearing the 60-day Letter, the refund denial letter, and
the refund audit plan.  Staff also submitted the pleadings filed by the parties
while these matters were pending before the Comptroller.  The documents have
been admitted into the record without objection.

B.  Adjustments

Staff has not agreed to any adjustments.

C.  ALJ's Analysis

Resolution of the issue presented by these contested cases turns on whether Claimant is required to use the single gross receipts factor in apportioning a taxable entity's margin to Texas as provided for under Tax Code Section 171.106(a) or may elect to use the alternate three-factor apportionment authorized under Article IV the MTC.  The ALJ concludes that Claimant was required to use the single-factor method and therefore finds that Staff did not err in denying the refund claims.

Tax Code Section 171.106(a) provides for a taxable entity's margin to be apportioned as follows:

Except as provided by this section, a taxable entity's margin is apportioned to this state to determine the amount of tax imposed under Section 171.002 by multiplying the margin by a fraction, the numerator of which is the taxable entity's gross receipts from business done in this state, as determined under Section 171.103, and the denominator of which is the taxable entity's gross receipts from its entire business, as determined under Section 171.105.

The exceptions provided for in Tax Code Section 171.106, which do not apply to Claimant, still require a single factor in apportioning the taxable entity's margin to Texas.  The rules adopted by the Comptroller in implementing Tax Code Section 171.106 apply the statutory directive without any modification.  SEE 34 TEX. ADMIN. CODE Section 3.591(c), which tracks Section 171.106(a) and directs that a "taxable entity's margin is apportioned to this state to determine the amount of franchise tax due by multiplying the taxable entity's margin by a fraction, the numerator of which is the taxable entity's gross receipts from business done in this state and the denominator of which is the taxable entity's gross receipts from its entire business."  The rule was effective January 1, 2008, and applied to Claimant's 2008 and 2009 franchise tax reports. The Comptroller clearly did not contemplate that an alternative method was available for apportioning a taxable entity's margin. This is further reflected in the Frequently Asked Questions (FAQ) that were issued to advise taxable entities in filing their Texas Franchise Tax Reports.  In FAQ 2 issued under the topic heading Apportionment, the Comptroller advised taxable entities that there were no changes to how receipts are apportioned:

The apportionment factor is generally the same as under previous law; however, the throw-back provisions were repealed. Also see exceptions for Texas gross receipts for transactions between members of a combined group under TTC 171.1055. [ENDNOTE: (1)]

This advice was subsequently reaffirmed in a more detailed policy statement that was adopted and issued in 2010 as State Tax Automated Research System (STAR) Accession No. 201007003L (July 1, 2010).  The policy statement addresses the question whether a taxable entity may elect to use the MTC's three-factor apportionment formula and explicitly provides that taxable entities are required to use the single-factor apportionment factor:

Use of the Multistate Tax Compact (MTC) Apportionment Formula is Prohibited for Texas Franchise Tax:

The Texas franchise tax is apportioned to Texas using a single-factor apportionment formula based on gross receipts as specifically provided in Texas Tax Code Section 171.105. The apportionment provision in Texas Tax Code Chapter 141, related to the Multistate Tax Compact (MTC), does not apply to the revised Texas franchise tax and entities may not elect to use the MTC's three -factor apportionment formula in lieu of the formula specified in Texas Tax Code Chapter 171.

This policy statement was added to the Apportionment FAQs as FAQ 3 on January 26, 2011.

The Comptroller's determination that the single-factor apportionment continues to apply unchanged to the franchise tax, even after the extensive revisions adopted in 2006 by the Legislature (HB 3), [ENDNOTE: (2)] is also reflected in the Legislature's own assessment of the proposed changes.  In the House Research Organization's Bill Analysis, the proposed apportionment provisions are described as applying a single gross receipts factor, and no reference is made directly or indirectly to the three-factor formula available under the MTC. [ENDNOTE: (3)]

Claimant's contention that it could elect to use the MTC's three-factor formula relies principally on the fact that TEX. TAX CODE ANN. Section 171.112(g), which provided that Chapter 141 did not apply to Chapter 171 (i.e., Franchise Tax), was repealed by HB 3, and not reenacted by the Legislature.  Claimant argues that, as the specific bar against applying the MTC to the Franchise Tax Act was repealed, the MTC's three-factor formula may be used in apportioning its margin to Texas.  However, notwithstanding the absence of the repealed statutory prohibition, the specific and unqualified requirement in Tax Code Section 171.106(a) to use a single-factor formula, buttressed by the Comptroller's rule and policy statements, is more than sufficient to preclude a taxable entity from electing to use the MTC three-factor formula.

The Comptroller's interpretation of the revised Franchise Tax Act is entitled to due deference as the agency entrusted with implementing the statute, as long as its statutory construction is reasonable and does not contradict the plain language of the statute.  SEE TENNESSEE GAS PIPELINE CO. V. RYLANDER, 80 S.W.3d 200, 203 (Tex. App.--Austin 2002, pet. denied).  The Comptroller's interpretation as stated in both its rules and policy statements is consistent with the plain language of Section 171.106 and with the intent of the Legislature.  Moreover, Article IV of the MTC was adopted by the 60th Legislature in Tax Code Section 141.001, effective June 13, 1967.  Section 141.001 has not been reenacted or amended since its adoption.  In contrast, the single-factor sales formula has survived numerous amendments, most recently the 2006 adoption of a franchise tax based on a taxable margin, which lends further weight to the Comptroller's position that no substantive changes to the single-factor apportionment provisions were intended with the latest changes.  As noted by Staff the specific rule in Tax Code Section 171.106(a) addressing apportionment controls over the general provisions of Tax Code Section 141.001.

In summary, the ALJ concludes that Claimant was required to follow the single-factor apportionment formula under Section 171.106, and therefore its amended franchise tax reports and the attendant refund claims were properly

rejected by Staff.

III. FINDINGS OF FACT

1. ************* (Claimant) filed amended Texas Franchise Tax Reports for the 2008 and 2009 report years claiming a refund on franchise tax paid in error.

2. Claimant filed the amended reports using the three-factor apportionment method under the Multistate Tax Compact (MTC). TEX. TAX CODE ANN. Section 141.001.

3. Claimant had used the single-factor apportionment method set out in TEX. TAX CODE ANN. Section 171.106(a) in filing its original franchise tax reports.

4. The Texas Comptroller of Public Accounts (Comptroller) denied the refund claims on the grounds that Chapter 141 of the Texas Tax Code (TEX. TAX CODE ANN. SectionSection141.001 – 141.006), which adopted the MTC, does not apply to the Texas franchise tax.

5. Claimant requested a refund hearing contesting the denial.

6. On April 5, 2011, Comptroller Staff (Staff) referred the cases to the State Office of Administrative Hearings (SOAH) for hearings based on the parties' written submissions.

7. Staff issued Notices of Hearing by Written Submission. The Notices of Hearing contained a statement of the nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and a short, plain statement of the matters asserted.

8. The parties subsequently requested that the cases be joined for purposes of conducting the hearing and issuing a proposal for decision. The Administrative Law Judge (ALJ) issued an order granting the joinder.

9. ALJ Peter Brooks closed the record on June 15, 2011.

IV. CONCLUSIONS OF LAW

1. The Comptroller has jurisdiction over this matter pursuant to TEX. TAX CODE ANN. ch. 111.

2. SOAH has jurisdiction over matters related to the hearing in this matter, including the authority to issue a proposal for decision with findings of fact and conclusions of law pursuant to TEX. GOV'T CODE ANN. ch. 2003.

3. The Comptroller provided proper and timely notice of the hearing pursuant to TEX. GOV'T CODE ANN. ch. 2001.

4. TEX. TAX CODE ANN. Section 171.106(a) provides for a taxable entity's margin to be apportioned by multiplying the margin by a fraction, the numerator of which is the taxable entity's gross receipts from business done in this state, as determined under Section 171.103, and the denominator of which is the taxable entity's gross receipts from its entire business, as determined under Section 171.105.

5.  Rule 3.591, 34 TEX. ADMIN. CODE Section 3.591(c), tracks Section 171.106(a) and directs that a "taxable entity's margin is apportioned to this state to determine the amount of franchise tax due by multiplying the taxable entity's margin by a fraction, the numerator of which is the taxable entity's gross receipts from business done in this state and the denominator of which is the taxable entity's gross receipts from its entire business."  The rule was effective January 1, 2008, and applied to Claimant's 2008 and 2009 franchise tax reports.

6.  In Frequently Asked Question (FAQ) 2 that was issued to advise taxable entities in filing their Texas Franchise Tax Reports, the Comptroller advised taxable entities that there were no changes to how receipts are apportioned. SEE,  http://www.window.state.tx.us/taxinfo/franchise/faq_apport.html#apport3.

7.  The Comptroller issued and adopted a policy statement affirming that taxable entities were to use the single-factor apportionment formula and not the MTC's three-factor formula.  State Tax Automated Research System (STAR) Accession No. 201007003L (July 1, 2010).  This policy statement was also added to the Apportionment FAQs as FAQ 3.

8.  The House Research Organization's Bill Analysis of the proposed apportionment provisions are described as applying a single gross receipts factor, and no reference is made directly or indirectly to the three-factor formula available under the MTC.  SEE, http://www.legis.state.tx.us/BillLookup/Text.aspx?LegSess=793&Bill=HB3#.

9.  TEX. TAX CODE ANN. Section 171.112(g), which provided that TEX. TAX CODE ANN. ch. 141 did not apply to TEX. TAX CODE ANN. ch.  171 (i.e., the Texas franchise tax), was repealed in 2006 by the Legislature, and not reenacted. Tex. H.B. 3, 79th Leg., 3rd C. S. (2006).

10.  The Comptroller's interpretation of the revised Franchise Tax Act is due deference as the agency entrusted with implementing the statute, as long as its statutory construction is reasonable and does not contradict the plain language of the statute.  SEE TENNESSEE GAS PIPELINE CO. V. RYLANDER, 80 S.W.3d 200, 203 (Tex. App.--Austin 2002, pet. denied).  The Comptroller's interpretation as stated in both its rules and policy statements is consistent with the plain language of Section 171.106 and with the intent of the Legislature.

11.  Based on the foregoing Findings of Fact and Conclusions of Law, Claimant was required to use the single gross receipts factor in apportioning its margin to Texas, and consequently the amended reports and attendant refund claims were properly rejected by Staff.

Hearing Nos. **104752** and 104753

ORDER OF THE COMPTROLLER


On June 16, 2011, the State Office of Administrative Hearings' (SOAH) Administrative Law Judge (ALJ), Peter Brooks, issued a Proposal for Decision in the above referenced matter.  The parties were given fifteen days from the date of the Decision to file exceptions with SOAH.  No exceptions were filed, and the Comptroller has determined that the ALJ's Proposal for Decision, except for

minor changes to correct typographical or clerical errors, should be adopted as written.

The above Decision is approved and adopted in all respects.  This Decision becomes final twenty days after the date Claimant receives notice of this Decision.  If either party desires a rehearing, that party must file a motion for rehearing, which must state the grounds for rehearing, no later than twenty days after the date Claimant receives notice of this Decision.  Notice of this Decision is presumed to occur on the third day after the date of this Decision.

Signed on this 18th day of August 2011.


SUSAN COMBS
Texas Comptroller of Public Accounts

by: Martin A. Hubert
Deputy Comptroller

ENDNOTE(S)
(1)  See,
http://www.window.state.tx.us/taxinfo/franchise/faq_apport.html#apport3.
(2)  Tex. H.B. 3, 79th Leg., 3rd C. S. (2006).
(3)  http://www.legis.state.tx.us/BillLookup/Text.aspx?LegSess=793&Bill=HB3#.


ACCESSION NUMBER: 201108230H
SUPERSEDED: N
DOCUMENT TYPE: H
DATE: 08/18/2011
TAX TYPE: FRANCHISE

**D**

INGRAM MICRO, INC. & SUBSIDIARIES,

      Plaintiff,

**OPINION AND ORDER**

v

Case No. 11-000035-MT

DEPARTMENT OF TREASURY,

Hon. Michael J. Talbot

      Defendant.

This matter comes before the Court pursuant to its sua sponte order issued to plaintiff Ingram Micro, Inc. to show cause why judgment should not be entered in favor of defendant Department of Treasury (Department) in light of the retroactive effect of 2014 PA 282 (PA 282). In addition, plaintiff has filed a motion for summary disposition pursuant to MCR 2.116(C)(10). The Court concludes that the Department is entitled to judgment as a matter of law and so DENIES plaintiff's motion and instead GRANTS summary disposition in favor of the Department pursuant to MCR 2.116(I)(2).

**INTRODUCTION**

This case is one of many cases currently pending in the Court of Claims involving taxpayers that have claimed refunds of tax under the Michigan Business Tax (MBT) Act, MCL 208.1101 *et seq.*, based on an election to utilize a three-factor apportionment formula under the

Multistate Tax Compact (Compact) provisions, MCL 205.581 *et seq*.[1]  The underlying premise

of these claims is that the elective three-factor apportionment provision of the Compact, as

adopted by 1969 PA 343, remained viable under the MBT Act, as enacted by 2007 PA 36.  Use

of the single-factor apportionment formula under the MBT Act, it is argued, is not mandated

because the Compact provisions, including the three-factor apportionment election provisions,

remain in effect.[2]

The validity of this argument was addressed on July 14, 2014, by the Michigan Supreme

Court in *Int'l Business Machines Corp v Dep't of Treasury*, 496 Mich 642; 852 NW 2d 865

("*IBM*").  Finding that the Legislature, in adopting the MBT Act, did not repeal by

implication the three-factor apportionment formula as set forth in MCL 205.581 *et seq*., the

Court concluded that the taxpayer was entitled to use the Compact's three-factor apportionment

formula in calculating its 2008 taxes.

On September 11, 2014, in response to *IBM*, the Legislature enacted PA 282, which

retroactively repealed the Compact provisions under MCL 205.581 *et seq*., to January 1, 2008,

and mandated the use of a single-factor apportionment formula for purposes of calculating MBT.

The Court now considers the retroactive application of PA 282.  Having considered the

arguments made in response to the Court's show cause order, and for the reasons stated below,

the Court concludes that PA 282 retroactively applies to this case, and all pending MBT refund

---

[1] Section 1 of 1969 PA 343, codified under MCL 205.581 *et seq*., includes the provisions of the Compact originally enacted by parties to the Compact (Member States).

[2] Taxpayers in some of these cases have also argued that the Compact provisions remain in effect with regard to the Income Tax Act, MCL 206.1 *et seq*.

actions filed in reliance on the Compact's elective, three-factor apportionment formula under the former MCL 205.581 *et seq*.

## BACKGROUND

**History of the Compact**

The Compact is an interstate tax agreement that was originally enacted in 1967 by the legislatures of seven states. The Compact was initially drafted out of concerns of state sovereignty in reaction to the introduction of federal legislation that sought to regulate various areas of state taxation.[3] The original purposes of the Compact included:

> (1) facilitating proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes; (2) promoting uniformity and compatibility in state tax systems; (3) facilitating taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration; and (4) avoiding duplicative taxation. [*US Steel Corp v Multistate Tax Comm*, 434 US 452, 456; 98 S Ct 799; 54 L Ed 2d 682 (1978).[4]]

Michigan adopted the Compact provisions, effective in 1970, through enactment of 1969 PA 343.

---

[3] The legislation, which was never enacted, was introduced in the wake of *Northwestern States Portland Cement Co v Minnesota*, 358 US 450; 79 S Ct 357; 3 L Ed 2d 421 (1959), which held that there is no Commerce Clause barrier to the imposition of a direct income tax on a foreign corporation carrying on interstate business within a taxing state.

[4] The Compact was never approved by Congress, but it was upheld against constitutional challenges in *US Steel*, 434 US 452.

**Apportionment Formulas under the Compact and the MBT Act**

The present case, and others like it, concern two alternative methods of apportioning income for purposes of calculating MBT. Under the MBT Act, created by 2007 PA 36,[5] income is apportioned by applying a single factor apportionment formula based solely on sales. MCL 208.1301(2). In contrast, under the Compact's election provision, income may be apportioned using an equally-weighted, three-factor apportionment formula based on sales, property and payroll. The potential effect of electing "out" of the MBT Act's single-factor apportionment methodology is a reduction of the overall apportionment percentage for companies that do not have significant property and payroll located in Michigan.

**Decision in *IBM***

In *IBM*, 496 Mich 642, the Supreme Court considered the issue of whether MBT taxpayers must use a single-factor apportionment formula as mandated by the MBT Act or whether MBT taxpayers may elect to apply a three-factor apportionment formula under the Compact. The parties were asked by the Court to brief four issues:

> (1) whether the plaintiff could elect to use the apportionment formula provided in the Multistate Tax Compact, MCL 205.581, in calculating its 2008 tax liability to the State of Michigan, or whether it was required to use the apportionment formula provided in the Michigan Business Tax Act, MCL 208.1101 *et seq*.; (2) whether § 301 of the Michigan Business Tax Act, MCL 208.1301, repealed by implication Article III(1) of the Multistate Tax Compact; (3) whether the Multistate Tax Compact constitutes a contract that cannot be unilaterally altered or amended by a member state; and (4) whether the modified gross receipts tax component of the Michigan Business Tax Act constitutes an income tax under the Multistate Tax Compact. [*Int'l Business Machines v Dep't of Treasury*, 494 Mich 874; 832 NW2d 388 (2013).]

---

[5] For a history of business taxation in Michigan, see *IBM*, 496 Mich at 648-650.

In its decision, the Court determined that for tax years 2008 through 2010,[6] the Legislature did not repeal by implication the three-factor apportionment formula as set forth in MCL 205.581 *et seq.*, and concluded that the taxpayer was entitled to use the Compact's three-factor apportionment formula in calculating its 2008 taxes. The Court also concluded that both the business income tax base and the modified gross receipts tax base of the MBT are "income taxes" within the meaning of the Compact. The Court did not reach the third issue of whether the Compact constitutes a contract.[7] On November 14, 2014, the Michigan Supreme Court denied reconsideration. *Int'l Business Machines v Dep't of Treasury*, ___Mich___; 855 NW2d 512 (2014).

**Retroactive Repeal of the Compact Provisions by PA 282**

On September 11, 2014, 2013 SB 156 (SB 156) was enacted into law as PA 282, amending the MBT Act and expressly repealing the Compact provisions, as codified under MCL 205.581 to MCL 205.589. The Legislature gave the Act retroactive effect by providing as follows:

> Enacting section 1. 1969 PA 343, MCL 205.581 to 205.589, is repealed retroactively and effective beginning January 1, 2008. It is the intent of the legislature that the repeal of 1969 PA 343, MCL 205.581 to 205.589, is to express the original intent of the legislature regarding the application of section 301 of the Michigan business tax act, 2007 PA 36, MCL 208.1301, and the intended effect

---

[6]The Legislature explicitly repealed the Compact apportionment provisions effective January 1, 2011, through enactment of 2011 PA 40.

[7] Thus, this Court is bound only by the Supreme Court's pre-PA 282 ruling that (1) the Compact's election provision under Article III(1) of the Compact was not implicitly repealed by enactment of the MBT Act in 2008, (2) the election provision properly applied to the modified gross receipts tax component of the MBT, and (3) IBM could elect to use the Compact's three-factor apportionment formula in calculating its 2008 MBT liability.

of that section to eliminate the election provision included within section 1 of 1969 PA 343, MCL 205.581, and that the 2011 amendatory act that amended section 1 of 1969 PA 343, MCL 205.581, was to further express the original intent of the legislature regarding the application of section 301 of the Michigan business tax act, 2007 PA 36, MCL 208.1301, and to clarify that the election provision included within section 1 of 1969 PA 343, MCL 205.581, is not available under the income tax act of 1967, 1967 PA 281, MCL 206.1 to 206.713.

PA 282 thus amended the MBT Act to express the "original intent" of the Legislature with regard to (1) the repeal of the Compact provisions, (2) application of the MBT Act's apportionment provision under MCL 208.1301, and (3) the intended effect of the Compact's election provision under MCL 205.581.[8] The effect of the amendments, as written, retroactively eliminates a taxpayer's ability to elect a three-factor apportionment formula in calculating tax liability under both the MBT Act and income tax act.

## PROCEDURAL SUMMARY

During the pertinent period, plaintiff was an out-of-state corporation with business activities in Michigan. Plaintiff, and other similar taxpayers, filed their MBT returns calculating tax by taking an election under Article III(1) of the Compact to apportion the MBT tax base using a three-factor apportionment formula. The returns reflected overpayments of tax, and taxpayers requested refunds of these amounts. The Department denied the refund claims, asserting that use of the three-factor apportionment was improper and that use of the single-factor apportionment was mandated by MCL 208.1301. In response, taxpayers paid the tax and filed actions in the Court of Claims.

---

[8] PA 282 also clarified that the Compact's election provision is not available under the income tax act of 1967, 1967 PA 281.

Pending the Supreme Court's resolution of *IBM*, this Court ordered this case and other similar cases held in abeyance. After the case was decided, the Court lifted its order holding the cases in abeyance and ordered the Department to brief the Court on why *IBM,* 496 Mich 642, should not control the disposition of these cases. After the Legislature enacted PA 282 that retroactively repealed the Compact provisions, the Court issued the show cause order concerning that legislation. Plaintiff also filed a motion for summary disposition. The Court now considers the arguments against retroactive application of PA 282.

**LEGAL ANALYSIS**

**I.**     **THE UNILATERAL REPEAL OF THE COMPACT PROVISIONS BY ENACTMENT OF PA 282 WAS A PERMISSIBLE EXERCISE OF THE LEGISLATURE'S SOVEREIGN AUTHORITY TO LEGISLATE**

The Court first considers whether the Legislature was authorized to unilaterally repeal the Compact provisions by enacting PA 282. This determination will depend on an analysis of (1) whether the Compact created a binding contract with Member States, (2) whether enactment of PA 282 impaired contractual obligations under the federal or state constitutional Contracts Clauses, and (3) under Michigan law, whether 1969 PA 343 could restrict subsequent legislatures from repealing the Compact provisions. For the following reasons, the Court concludes that the Legislature acted constitutionally and within its sovereign authority to legislate when it repealed the Compact provisions through enactment of PA 282.

**A.**     **THE COMPACT IS NOT A BINDING CONTRACT**

In evaluating whether repeal of the Compact by application of PA 282 unconstitutionally impairs a contract or whether a future legislature is bound to the provisions created by 1968 PA

343, there must first be a determination that a contract exists. See *IBM*, 496 Mich at 681 (MCCORMACK, J., dissenting).

**1.    The Compact Lacks the "Classic Indicia" of a Binding Interstate Compact under Federal Compact Law**

The United State Supreme Court has recognized that not all interstate compacts are binding contracts that restrict future legislatures. See *Northeast Bancorp, Inc v Bd of Governors*, 472 US 159; 105 S Ct 2545; 86 L Ed 2d 112 (1985). While a Congressionally-approved interstate compact has the force of federal law and is binding on Member States,[9] an interstate compact that has not been approved by Congress, such as the Compact here, can be either a *binding* interstate compact or merely an *advisory* compact.[10]

The test for distinguishing between an advisory compact and a binding interstate compact is set forth in *Northeast Bancorp*, as further explained in *Seattle Master Builders Ass'n v Pacific Northwest Electric Power*, 786 F2d 1359, 1363 (CA 9, 1986). The three "classic indicia" of a binding interstate compact are: (1) the establishment of a joint regulatory body, (2) the requirement of reciprocal action for effectiveness, and (3) the prohibition of unilateral modification or repeal. *Northeast Bancorp*, 472 US at 175; *Seattle Master Builders*, 786 F2d at 1363. Looking at the three indicia of a binding interstate compact, the Compact has none of these features and is more properly characterized as a non-binding advisory compact.

---

[9] The Compact Clause of the US Constitution, art I, §10, cl 3, provides, "No State shall, without the Consent of the Congress, . . . enter into any Agreement or Compact with another State . . . ."

[10] Advisory interstate compacts have no formal or regulatory enforcement mechanisms and are intended to study and make recommendations on interstate problems. Broun, et al, The Evolving Use and the Changing Role of Interstate Compacts: A Practitioner's Guide (2006), p 13.

### a.      The Compact did not establish a joint regulatory agency

A hallmark of an advisory compact, as opposed a binding contract, is that advisory compacts "cede no state sovereignty nor delegate any governing power to a compact-created agency."   Broun, et al, The Evolving Use and the Changing Role of Interstate Compacts: A Practitioner's Guide (2006), p 14.   When the Compact, through Article VI, established the Multistate Tax Commission (Commission),[11] no governing or regulatory powers were conferred. Enumerated in Article VI, the powers of the Commission are (1) to study state and local tax systems, (2) to develop and recommend proposals for greater uniformity, and (3) to compile information helpful to the states.[12]   None of these purposes is regulatory, and it in no way indicates a delegation of sovereign authority to tax.

The conclusion that the Compact did not cede state authority or governing power to the Commission was expressly acknowledged by the Court in *US Steel Corp*:

> [The Compact] does not purport to authorize the Member States to exercise any powers they could not exercise in its absence.  *Nor is there any delegation of sovereign power to the Commission; each State retains complete freedom to adopt or reject the rules and regulations of the Commission.* [Emphasis added.]  [*US Steel Corp*, 434 US at 473.]

In summary, the Compact, by its terms, does not create a regulatory body.

### b.      The Compact does not require reciprocal action

There is nothing reciprocal about the Compact's provisions.  Each member state operates its respective tax systems independently from the tax systems of other Member States, and the

---

[11] MCL 205.581, Art VI.

[12] *Id*. at Art VI(3).

determination of tax in one state is generally independent of the determination in another state. With respect to apportionment formulas, in particular, Articles III(1) and IV's application in one member state has no bearing on another state. And the functionality of one member state's apportionment methodology does not hinge on whether another member state's apportionment methodology is reciprocal in nature. As the Supreme Court recognized in *Moorman Mfg Co v Bair*, 437 US 267, 274; 98 S Ct 2340; 57 L Ed 2d 197 (1978), "the States have wide latitude in the selection of apportionment formulas." Consistent with *Moorman*, a Member State's decision to allow or eliminate a certain apportionment formula is unaffected by the choice of formula that another member state has made.

### c. The Compact allows unilateral withdrawal and modification

Under the express terms of the Compact, Member States are free to unilaterally withdraw at any time without notice to another member state. MCL 205.581, Art X(2) ("Any party state may withdraw from this compact by enacting a statute repealing the same.) See also *US Steel*, 434 US at 473 ("[E]ach State retains complete freedom to adopt or reject the rules and regulations of the Commission.") Thus unilateral *withdrawal* is clearly permitted under the Compact.

Whether unilateral *modification* is permitted under the Compact is less clear and is not directly addressed under the Compact. However, three factors lead to a conclusion that Member States did not intend to restrict their ability to vary terms of the Compact. First, as pointed out recently by the United States Supreme Court, "States rarely relinquish their sovereign powers, so when they do we would expect a clear indication of such devolution, not inscrutable silence." *Tarrant Regional Water Dist v Herrmann*, ___ US ___; 133 S Ct 2120, 2133; 186 L Ed 2d 153

-10-

(2013). Because there is no such "clear indication" under the terms of the Compact that states are prevented from asserting their sovereign powers to legislate and vary the Compact's terms, it is reasonable to conclude that the parties were free to unilaterally amend the Compact provisions, including Articles III(1) and IV.

Second, language in the Compact that it "shall be liberally construed as to effectuate the purposes thereof," supports an interpretation that flexibility in administering Compact provisions was contemplated. MCL 205.581, Art XII.

Third, the Member States' course of performance shows that unilateral amendments to or withdrawals from the Compact have long been accepted. As pointed out by the dissent in *IBM*, 496 Mich at 681-682, "[M]ember [S]tates did *not* view strict adherence to Articles III and IV as a binding contractual obligation, as Compact members have deviated without objection from other members."[13] Moreover,

> "It bears emphasizing that Compact members have not only refrained from bringing legal action against one another for deviating from Articles III and IV, they have endorsed the Commissioner's interpretation of the Compact: in the *Gillette* [*Co v Franchise Tax Bd*, 151 Cal Rptr 3d 106; 291 P3d 327 (2013)] litigation, all of the member states jointly filed an amicus brief urging the Supreme Court of California to reject the lower court's construction of the Compact as a binding contract. [*IBM*, 496 Mich at 682 n 7 (MCCORMACK, J., dissenting).]

---

[13] As summarized in Hellerstein & Hellerstein, State Taxation (2014), the course of performance of states with regard to the Compact provisions generally, and the elective apportionment provisions specifically, shows that unilateral repeal and modifications to the Compact provisions have been widespread.

Because the Compact fails to create a regulatory body, contemplates no reciprocal actions, and contains no bar to unilateral deviations or repeal, the Court concludes that none of the "classic indicia" of a binding compact exist. Rather than a binding interstate contract, it is more properly interpreted as an advisory compact that did not act to bind future legislatures.

### 2. The Compact is not a Binding Contract under Michigan Law

Because it was not congressionally-approved, the Compact is governed by state law. See *Doe v Young Marines of The Marine Corps League*, 277 Mich App 391, 399; 745 NW2d 168 (2007) (finding that Michigan courts are not bound to follow a federal court's interpretation of state law.) See also *McComb v Wambaugh*, 934 F2d 474, 479 (CA 3, 1991) (finding that because a non-Congressionally approved compact does not express federal law, it must be construed as state law.) Michigan law therefore governs the interpretation of the Compact.

In Michigan, there is a "strong presumption that statutes do not create contractual rights." *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 661; 698 NW2d 350 (2005). "In order for a statute to form the basis of a contract, the statutory language must be plain and susceptible of no other reasonable construction than that the Legislature intended to be bound to a contract." *Id.* at 662 (quotation marks and citation omitted). As noted in the dissent in *IBM*, "[t]his presumption is grounded in the principle that 'surrenders of legislative power are subject to strict limitations that have developed in order to protect the sovereign prerogatives of state governments.' " *IBM*, 496 Mich at 682 (MCCORMACK, J., dissenting), quoting *Studier*, 472 Mich at 661.

There are no words in the Compact, as adopted by the Legislature under 1969 PA 343, that indicate that the state intended to be bound to the Compact, and specifically to Article III(1).

-12-

Therefore, the presumption must be that the state did not surrender its legislative power to require use of a particular apportionment formula. Such interpretation comports with the Supreme Court's recognition of "the basic principle[] that the States have wide latitude in the selection of apportionment formulas . . . ." *Moorman*, 437 US at 274. This interpretation is also consistent with the Court's recent acknowledgment that states "do not easily cede their sovereign powers . . . ." *Tarrant*, 133 S Ct at 2132. Because there is no clear indication under MCL 205.581 that the state contracted away its ability to either select an apportionment formula that differs from the Compact, or to repeal the Compact altogether, the Court concludes that no contractual obligation was created by enactment of 1969 PA 343 that would prohibit the enactment of PA 282.[14]

## B. REPEAL OF THE COMPACT BY PA 282 DOES NOT VIOLATE THE CONTRACTS CLAUSES OF THE STATE OR FEDERAL CONSTITUTIONS

The United States Constitution provides, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." US Const, art I, § 10, cl 1. The Michigan Constitution provides: "No . . . law impairing the obligation of contract shall be enacted." Const 1963, art 1,

---

[14] Even if the Compact could somehow be construed as a binding contract under Michigan law, the Member States' course of performance supports a determination that Member States either waived or modified the Compact's terms under Articles III(1) and IV, or materially breached the terms under Articles III(1) and IV well before the repeal of the Compact provisions under PA 282. See n 12. In addition, as suggested in the dissenting opinion in *IBM*, taxpayers would have no standing to enforce the terms of any purported contract that was made with Member States.

> [I]t is not entirely clear to me why IBM has standing to enforce the Compact as a contract, given that IBM is neither a party to the Compact nor is it clear that they were intended as a third-party beneficiary. See *Schmalfeldt v North Pointe Ins Co*, 469 Mich 422; 670 NW2d 651 (2003); MCL 600.1405. In any event, because I conclude that no such contractual relationship was formed, I find it unnecessary to address this issue *sua sponte*. [*IBM* at 681 n 5 (McCORMACK, J., dissenting).]

-13-

§10. "Statutes are presumed to be constitutional, and courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich 295, 307; 806 NW2d 683 (2011) (citation and quotation marks omitted). In addition, " '[t]he presumption of constitutionality is especially strong' " when tax legislation is concerned. *Id.* at 308 (citation omitted).

As discussed earlier, the Compact creates no binding contract, and therefore the Legislature's repeal of the Compact by PA 282 does not impair an obligation of contract in violation of the Michigan or United States Constitutions.

**C.     BECAUSE LEGISLATURES CANNOT BIND SUBSEQUENT LEGISLATURES UNDER MICHIGAN LAW, 1969 PA 343 DOES NOT RESTRICT THE ABILITY OF A SUBSEQUENT LEGISLATURE TO CORRECT AN ERROR, EITHER PROSPECTIVELY OR RETROACTIVELY**

Generally, legislatures have the power to repeal legislation and are not bound by the acts of prior legislatures, so long as existing contractual obligations are not impaired. See, e.g., *Studier*, 472 Mich at 660; *LeRoux v Secretary of State*, 465 Mich 594, 615-616; 640 NW2d 849 (2002). See also *Atlas v Wayne Co Board of Auditors*, 281 Mich 596, 599; 275 NW 507 (1937) ("The power to amend and repeal legislation as well as to enact it is vested in the legislature, and the legislature cannot restrict or limit its right to exercise the power of legislation by prescribing modes of procedure for the repeal or amendment of statutes; nor may one legislature restrict or limit the power of its successors"). The principle that one legislature cannot bind a succeeding legislature is thus derived from the constitutional power of the Legislature to legislate. Const 1963, art 4, § 1. As discussed earlier, no contract was created by enactment of the Compact provisions. Thus, the Legislature's constitutional right to change, amend or repeal the law could not be restricted by enactment of 1969 PA 343. *Studier*, 472 Mich at 660. Therefore, the

-14-

Legislature, by enacting PA 282 to correct its drafting error contained in 2007 PA 36, acted within the scope of its legislative powers as vested in it by the Michigan Constitution.

Moreover, correcting the drafting errors from 2007 PA 36 by repeal of the Compact provisions through PA 282 is consistent with the intent of the Legislature in enacting 1969 PA 353. This is evidenced by the language of Article X of the Compact:

> Any party state may withdraw from this compact by enacting a statute repealing the same. No withdrawal shall affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal. [MCL 205.581, Art X(2).]

"When interpreting a statute, courts must ascertain the legislative intent that may reasonably be inferred from the words expressed in the statute." *Andrie Inc v Dep't of Treasury*, 496 Mich 161, 167; 853 NW2d 310 (2014) (quotation marks omitted). This requires the Court to consider "the plain meaning of the critical word or phrase as well as its placement and purpose in the statutory scheme." *Id*. (citations and quotation marks omitted).

It is clear from the language of Article X(2) that in 1969 the Legislature contemplated the possibility of future withdrawal from the Compact. Withdrawal from the Compact provisions by PA 282 is therefore consistent with the Legislature's intent. The Court rejects any argument that under Article X(2) repeal of the Compact can be prospective only. As made clear by the enacting provisions of PA 282, the repeal of the Compact provisions was intended to apply prospectively from January 1, 2008. Because it is this Court's duty to carry out the intent of the Legislature, repeal of the Compact provisions by PA 282 must be given effect.

**D.    CONCLUSION**

The Court concludes that the Compact did not create a binding contract with Member States, but it was merely an advisory compact. Because no contract was created under federal Compact or Michigan law, there was no impairment of contractual obligations and therefore no violations of the Contracts Clauses of the federal or state constitutions. Finally, inasmuch as there is no impairment of contractual obligations, the Legislature was free to amend or repeal 1969 PA 343. Thus this Court must give effect to and apply the intent of PA 282 as a valid expression of the Legislature's sovereign and constitutional authority to legislate.

**II.    THE RETROACTIVE APPLICATION OF PA 282 DOES NOT VIOLATE OTHER PROVISIONS OF THE STATE OR FEDERAL CONSTITUTIONS**

Other constitutional arguments against the retroactive application of PA 282 concern due process, separation of powers, the Commerce Clause, and the First Amendment's right to petition.[15] These arguments have no merit.

It is well settled that a tax act is not necessarily unconstitutional because it is retroactive. *Welch v Henry,* 305 US 134, 147; 59 S Ct 121; 83 L Ed 87 (1938). A statute is presumed constitutional unless there is a clear showing to the contrary. *Ammex, Inc v Dep't of Treasury*, 273 Mich App 623, 635; 732 NW 2d 116 (2007); *Gen Motors Corp v Dep't of Treasury*, 290

---

[15] Contracts Clause arguments are relevant in the context of whether a contract that was allegedly entered into vis-à-vis the adoption of the Compact, and for reasons discussed earlier, must fail. As to whether the retroactive application of a tax statute would generally implicate the Contracts Clauses of the Michigan or United States Constitutions, taxes are not considered contractual in nature, but are instead statutory. *Welch v Henry,* 305 US 134, 146; 59 S Ct 121; 83 L Ed 87 (1938). Any further discussion of whether PA 282 violates the Contracts Clauses is unnecessary.

Mich App 355, 369; 803 NW 2d 698 (2010). In addition, a taxing statute must be shown to "clearly and palpably violate the fundamental law before it will be declared unconstitutional." *Ammex*, 273 Mich App at 635-636 (citation and internal quotation marks omitted). For the following reasons, the presumption that PA 282 is constitutional remains intact.

## A. RETROACTIVE APPLICATION OF PA 382 DOES NOT VIOLATE DUE PROCESS

PA 282's retroactive application does not violate due process of law. First, taxpayers have no vested interests in tax laws, and therefore no valid claim that an interest in "life, liberty, or property" has been deprived by retroactive application of PA 282. Second, the Legislature had a legitimate purpose for giving retroactive effect to PA 282. And third, the period of retroactivity of PA 282 is rationally related to that purpose.

### 1. Taxpayers have No Vested Interests

"The due process clauses of the United States and Michigan Constitutions apply when government actions deprive a person of a liberty or property interest." *Edmond v Dep't of Corrections*, 143 Mich App 527, 533; 373 NW2d 168 (1985). To determine whether the Due Process Clause applies, courts look to the nature of the interest at stake. *Id*. A property interest must be a vested right to be protected under due process. *Detroit v Walker*, 445 Mich 682, 698-699; 520 NW2d 135 (1994).

In *United States v Carlton*, 512 US 26; 114 S Ct 2018; 129 L Ed 2d 222 (1994), the Supreme Court specifically rejected the argument that the taxpayer had a viable vested right in tax legislation. *Id.* at 33. It explained that "[t]ax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code." *Id*. The Michigan Court of Appeals has also made clear that a taxpayer "does not have a vested right in a tax statute or in the continuance of

-17-

any tax law." *Gen Motors Corp*, 290 Mich App at 371. See also *Walker*, 445 Mich at 703; *GMAC v Treasury Dep't*, 286 Mich App 365, 377-378; 781 NW2d 310 (2009). Similarly, no taxpayer has a vested right in a tax refund based on the continuation of the Compact election provisions, and any due process claim must fail.

### 2. The Legislature had a Legitimate Purpose for Giving Retroactive Effect to PA 282

Not only are taxpayers' rights not vested here, but there are no substantive due process violations implicated by the retroactive application of PA 282. The test for determining whether due process has been violated by retroactive tax legislation was set forth by the Supreme Court in *Carlton*, 512 US 26. Under *Carlton*, a statute's retroactive application satisfies due process if: (1) it is supported by a legitimate legislative purpose, and (2) it is rationally related to that legislative purpose. *Carlton*, 512 US at 30.

In enacting PA 282 and giving it retroactive effect, the Legislature had a legitimate purpose: to protect state revenues. The potential ramifications of not giving retroactive effect to PA 282 were made clear in the Senate Fiscal Agency's legislative analysis of SB 156:[16]

> The first enacting section of the bill would retroactively repeal the State's enactment of the Multistate Tax Compact, effective January 1, 2008. As a result, taxpayers filing under the MBT would not be allowed to use alternative apportionment calculations provided under the Compact when computing a

---

[16] Although legislative bill analyses are not official statements of legislative intent, they nonetheless can have probative value. See, e.g., *North Ottawa Community Hosp v Kieft*, 457 Mich 394, 406 n 12; 578 NW2d 267 (1998); *Nemeth v Abonmarche Dev, Inc*, 457 Mich 16, 27-29; 576 NW2d 641 (1998); *People v Grant*, 455 Mich 221, 240-241; 565 NW2d 389 (1997); *Travis v Dreis & Krump Mfg Co*, 453 Mich 149, 164-166, 551 NW2d 132 (1996) (opinion by BOYLE, J.).

> Michigan tax base. While the Department of Treasury has not allowed taxpayers to use these alternative calculations, the Michigan Supreme Court's recent decision in *IBM Corp. v Department of Treasury* may enable certain taxpayers to use these calculations, and the Department estimates that approximately $1.1 billion in refunds would be paid as a result. Because MBT revenue is directed to the General Fund, these refunds would reduce General Fund revenue, and *the bill would prevent a reduction in General Fund revenue of $1.1 billion.* [Senate Legislative Analysis, SB 156, September 10, 2014, p 5. (Emphasis added.)]

Furthermore, as was recognized by the Court in *Gen Motors*, 290 Mich App at 373, a legislature's purpose to "mend a leak in the public treasury or tax revenue" is legitimate. See also *Carlton*, 512 US at 32 (finding a legitimate governmental purpose where the Internal Revenue Code was retroactively amended for purposes of correcting a legislative error that would have "created a significant and unanticipated revenue loss.")

Here, PA 282 served the legitimate governmental purpose of fixing a legislative error and preventing the potential loss of over $1 billion of MBT revenues in the form of tax refunds from overpayments.

### 3. Retroactive Application of PA 282 is a Rational Means of Furthering this Legitimate Purpose

In addition to having a legitimate legislative purpose of preventing a catastrophic fiscal shortfall, the retroactive application of PA 282 is also a rational means of furthering this legitimate purpose. In *Gen Motors*, 290 Mich App at 375, the Court of Appeals found that whether a retroactive tax law met the rational means prong of *Carlton* includes a consideration of whether the retroactive period is "modest" as tested against the "totality of circumstances." In determining that a five-year look back period was a rational means of accomplishing the prevention of revenue loss*,* the Court looked to whether (1) the retroactive amendment created a "wholly new tax," (2) the taxpayer acted in reliance on an expectation its activity would not be

taxed, (3) how promptly the Legislature acted to correct the problem leading to loss in revenue, and (4) the period of time to which the amendment retrospectively applies.

Applying the "totality of circumstances" here, the retroactive application of PA 282 does not exceed the modest limitation of the Due Process Clause and is a rational means of accomplishing the Legislature's purpose of stemming revenue losses.

First, PA 282 does not reach back in time to assess a "wholly new tax" on long-concluded transactions, but rather it confirmed that single-factor apportionment under the MBT was mandatory and that an election to use a three-factor apportionment formula could not be made.

Second, as a matter of law, there can be no valid claim that an MBT taxpayer acted in reliance on an expectation that for the MBT its income would be apportioned by the three-factor apportionment provision. As the Supreme Court recognized in *Moorman*, 437 US 267, the states have wide latitude in the selection of an apportionment methodology. Moreover, it is also well established that a taxpayer does not have a vested right in a tax statute or in the continuance of any tax law. *Walker*, 445 Mich at 703; *Ludka v Dep't of Treasury*, 155 Mich App 250; 399 NW2d 490 (1986). And as *Carlton*, 512 US at 33, made clear, even where a taxpayer has detrimentally relied on a tax statute, this does not result in a constitutional violation:

> Although Carlton's reliance is uncontested—and the reading of the original statute on which he relied appears to have been correct—his *reliance alone is insufficient to establish a constitutional violation. Tax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code*. [Emphasis added.]

Because taxpayers do not, as a matter of law, have a reliance interest in any particular apportionment formula a state chooses in dividing the income of multistate taxpayer, this Court

-20-

rejects any assertion that a taxpayer would have changed its behavior or structured its affairs differently had it known that the Compact's elective provision was no longer available.

Third, the Legislature acted promptly in correcting its error. Not until July 14, 2014, when the Court decided *IBM*, was it made clear to the Legislature that 2007 PA 36 was defective. SB 156, H-1, which added the retroactive repeal of the Compact, provisions, was introduced on September 9, 2014, and was enacted into law on September 11, 2014.

Fourth, the period of time to which the amendment applies was modest, particularly in light of the time frames of other retroactive legislation that Michigan courts and those of other jurisdictions have held were within the modesty limits of the Due Process Clause. For example, in *Gen Motors*, 290 Mich App 355, the Court concluded that a five-year retroactive period (eleven years as applied to the specific taxpayer's tax years) was modest. In *GMAC*, 286 Mich App 365, the Court upheld a law with a seven-year retroactive period. See also *Enterprise Leasing Co v Arizona Dep't of Revenue*, 221 Ariz 123; 211 P3d 1 (Ariz Ct App, 2008) (six year period); *King v Campbell Co*, 217 SW3d 862 (Ky Ct App, 2006) (upholding 2005 legislation that denied refunds of taxes overpaid since 1986 under 2004 judicial decision); *Miller v Johnson Controls, Inc*, 296 SW3d 392 (Ky, 2009) (upholding 2000 legislation retroactively ratifying 1988 tax-agency policy that a 1994 judicial decision overruled); *Zaber v City of Dubuque*, 789 NW2d 634 (Iowa, 2010) (five-and-one-half years); *Licari v Comm'r*, 946 F2d 690 (CA 9, 1991) (four years); *Tate & Lyle, Inc v Comm'r of Internal Revenue*, 87 F3d 99 (CA 3, 1996) (six years); *Montana Rail Link, Inc v United States*, 76 F3d 991 (CA 9, 1996) (four years).

All of these factors lead to the conclusion that the Legislature's means of stemming the loss of revenues, by giving retroactive effect to PA 282, was a rational means of furthering a legitimate governmental purpose.

**B.     RETROACTIVE APPLICATION OF PA 282 DOES NOT VIOLATE PRINCIPLES OF SEPARATION OF POWERS**

In addition to being a rational means of achieving a legitimate purpose, PA 282 does not violate the principle of separation of powers under the Michigan Constitution.  The Separation of Powers Clause is set forth in Const 1963, art 3, § 2:

> The powers of government are divided into three branches; legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.[17]

With respect to retroactive legislation, the Legislature is permitted to retroactively change legislation, so long as it does not "not reverse a judicial decision or repeal a final judgment." *GMAC*, 286 Mich App at 380; *Romein v Gen Motors Corp*, 436 Mich 515, 536-537; 462 NW2d 555 (1990), aff'd 503 US 181; 112 S Ct 1105; 117 L Ed 2d 328 (1992).  See also *Wylie v City Comm'n of Grand Rapids*, 293 Mich 571; 292 NW 668 (1940).  Furthermore, a legislature is

---

[17] As expressly provided in the Constitution, the legislative power is vested in a senate and a house of representatives, Const 1963, art 4, § l; the executive power is vested in the governor, Const 1963, art 5, § l Sec. 1; and the judicial power is vested exclusively in the courts, Const 1963, art 6, § 1.  Pursuant to these powers, it is the legislature's duty to state what the law is, it is the judiciary's role to interpret this law, and it is and it is the executive branch's obligation to enforce the law as written and as interpreted by the judiciary.  1 Official Record, Constitutional Convention 1961, pp 601-602 ("[H]e who makes a law shall not enforce it, nor sit in judgment upon it; that he who enforces a law shall not make or change it nor shall he judge of its violation; and he who sits in judgment shall have neither made the law nor enforced it.")

entitled to correct its own mistakes though retroactive legislation. See *Gen Motors*, 290 Mich App at 373.

By enacting PA 282, the Legislature acted within its authority to legislate by correcting a mistake made clear to it by the Court in *IBM*. PA 282 did not purport to overturn the *IBM* decision, nor did it repeal the final judgment as it applied to the plaintiff. The Court's holding in *IBM* was limited to a finding that there was no *implicit* repeal of the Compact apportionment provisions through enactment of 2007 PA 36, and PA 282 does not conflict with or disturb this ruling. Through enactment of PA 282, the Legislature took steps to retroactively repeal the Compact provisions *explicitly,* clarifying its original intent in enacting the MBT. Such action did not impinge upon the judiciary's functions in violation of the separations of powers.

Although *IBM* left unresolved the issue of whether the retroactive repeal of the Compact provisions would be constitutional, both the majority and the concurring opinions suggest that an explicit, retroactive repeal of the Compact provisions, effective January 1, 2008, could have led to a different result.[18] Rather than deviating from the Court's opinion, PA 282's explicit, retroactive repeal of the Compact provisions is consistent with the language in *IBM* suggesting that retroactive repeal would be an appropriate legislative response to the challenges being made.

---

[18] Discussing 2011 PA 40, which retroactively repealed the Compact apportionment provisions effective January 1, 2011, the majority stated that "[t]here is no dispute that the Legislature specifically intended to retroactively repeal the Compact's election provision for taxpayers subject to the [MBT] beginning January 1, 2011. *The Legislature could have—but did not— extend this retroactive repeal to the start date of the* [*MBT*]." *IBM*, 496 Mich at 659. (Emphasis added.) See also concurring opinion of Justice Zahra, noting that "the [MBT's] exclusive apportionment method remains in conflict with the election provision of the Compact. *This conflict, in my view, is easily resolved because the Legislature in 2011 also expressly supplemented the Compact*." *Id*. at 669. (Emphasis added.)

The Legislature did not violate the separation of powers doctrine when it passed the retroactive amendments under PA 282.

## C.  PA 282 DOES NOT VIOLATE THE COMMERCE CLAUSE

PA 282 does not violate the Commerce Clause[19], which prohibits state laws that (1) facially discriminate against interstate commerce, (2) have a discriminatory effect, or (3) are enacted for a discriminatory purpose. *Caterpillar Inc v Dep't of Treasury*, 440 Mich 400, 422-425; 488 NW2d 182 (1992). Under the dormant Commerce Clause, states may not discriminate against interstate commerce by "unduly burden[ing] interstate commerce." *Quill Corp v North Dakota*, 504 US 298, 312; 112 S Ct 1904; 119 L Ed 2d 291 (1992) (citations omitted). PA 282 neither discriminates against, nor unduly burdens, interstate commerce.

First, PA 282 is not facially discriminatory. Facial discrimination requires an "explicit discriminatory design to the tax." *Amerada Hess Corp v Dir*, 490 US 66, 75; 109 S Ct 1617; 104 L Ed 2d 58 (1989). The text of PA 282 makes clear, on its face, that no taxpayer, regardless of location, can elect the three-factor apportionment.

Second, PA 282 has no discriminatory effect. The effect of PA 282 is that no taxpayer, whether in-state or out-of-state, can make an election to apply a three-factor apportionment for MBT purposes. As the United States Supreme Court made clear in *Moorman*, 437 US 267, requiring a single-factor apportionment formula does not have the effect of discriminating against an out-of-state taxpayer.

---

[19] US Const, art I, § 8, cl 3.

-24-

In addition, PA 282 was not enacted for a discriminatory purpose, but rather sought to clarify the original intent of the 2007 Legislature with respect to all taxpayers, both in-state and out-of-state. Any claims made that PA 282 violates the Commerce Clause of the United States Constitution must therefore fail.

## D.    PA 282 DOES NOT VIOLATE THE FIRST AMENDMENT PETITION CLAUSE

Neither does PA 282, by retroactively revoking taxpayers' right to petition the Department and appeal to a court for a refund of tax, violate their First Amendment right to petition the government.

The right of citizens to petition the government for redress of grievances is specifically guaranteed by the United States and Michigan Constitutions. US Const Amend I; Const 1963, art 1, § 3. This right is not unlimited, however, and "may be circumscribed to the extent necessary to achieve a valid state objective." *Jackson Co Ed Ass'n v Grass Lake Community Sch Bd of Ed*, 95 Mich App 635, 641-642; 291 NW2d 53 (1979).

The Supreme Court has long made clear that the First Amendment does not require the government to listen to individuals or to respond to individual grievances. In *Bi-Metallic Investment Co v State Bd of Equalization*, 239 US 441; 36 S Ct 141; 60 L Ed 372 (1915), the Court responded to a real estate owner's argument that it had no opportunity to be heard in opposition to a legislative tax valuation increase by stating:

> Where a rule of conduct applies to more than a few people it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. Generally statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. *Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.* [*Id*. at 445 (emphasis added).]

See also *Smith v Arkansas State Highway Employees*, *Local 1315*, 441 US 463, 464-465; 99 S Ct 1826; 60 L Ed 2d 360 (1979) (finding that the Arkansas Highway Commission did not have an affirmative obligation under the First Amendment "to listen, to respond or, in this context, to recognize the association and bargain with it.")

The Supreme Court's analysis in *Bi-Metallic Investment* applies here. There is no merit to any argument that the retroactive application of PA 282 violates a taxpayers's First Amendment right to petition the government. Taxpayers' First Amendment rights on matters of tax legislation—whether prospective or retroactive—are properly protected by taxpayers' power over those who "make the rule[s]"—that is, the Legislature. *Bi-Metallic Investment*, 239 US at 445. While the Court has an obligation, within jurisdictional limits, to respond to taxpayers' grievances with respect to individual overpayments of tax, it is under no constitutional obligation under the First Amendment to answer to taxpayers about general validity of the legislation itself. Thus application of PA 282 does not violate a taxpayer's First Amendment rights.

Moreover, to the extent that PA 282 may impact taxpayers' procedural rights of petitioning the court for a refund of tax, these rights are properly safeguarded under rights of due process, which "affirmatively require[s] the government to provide meaningful procedural opportunities in response to judicial petitions, far and above any required by the First Amendment standing alone." Andrews, *A Right of Access to Court Under the Petition Clause of the First Amendment: Defining the Right*, 60 Ohio St L J 557, 634 (1999). And as the Court has already discussed, plaintiff's constitutional rights of due process have been satisfied with respect to the application of PA 282.

**III.   THERE WERE NO PROCEDURAL VIOLATIONS THAT BAR APPLICATION OF PA 282**

**A.   THE TITLE-OBJECT CLAUSE OF THE MICHIGAN CONSTITUTION WAS NOT VIOLATED**

PA 282 satisfies the Title-Object Clause of the Michigan Constitution.  This clause states:

No bill shall be altered or amended on its passage through either house so as to change its original purpose as determined by its total content and not alone by its title.  [Const 1963, art 4, § 24.]

PA 282 is titled as follows:

AN ACT to amend 2007 PA 36, entitled "An act to meet deficiencies in state funds by providing for the imposition, levy, computation, collection, assessment, reporting, payment, and enforcement of taxes on certain commercial, business, and financial activities; to prescribe the powers and duties of public officers and state departments; to provide for the inspection of certain taxpayer records; to provide for interest and penalties; to provide exemptions, credits, and refunds; to provide for the disposition of funds; to provide for the interrelation of this act with other acts; and to make appropriations," by amending sections 111, 305, 403, and 433 (MCL 208.1111, 208.1305, 208.1403, and 208.1433), sections 111 and 305 as amended by 2012 PA 605, section 403 as amended by 2008 PA 434, and section 433 as amended by 2007 PA 215, and by adding section 508; and to repeal acts and parts of acts.

The three different challenges that may be brought against a statute on the basis of the Title-Object Clause are: (1) a multiple-object challenge, (2) a title-body challenge, and (3) a change of purpose challenge.  *Ray Twp v B & BS Gun Club*, 226 Mich App 724, 728; 575 NW2d 63 (1997); *HJ Tucker & Assoc, Inc v Allied Chucker & Engineering Co*, 234 Mich App 550, 556-557; 595 NW2d 176 (1999).  In assessing the validity of these challenges, the constitutional requirements under the Title-Object clause are to be construed reasonably.  *Mooahesh v Dep't of Treasury*, 195 Mich App 551, 563; 492 NW2d 246 (1992).  See also *Gen Motors Corp*, 290 Mich App at 388.

-27-

### 1.    Multiple-Object Challenge

With respect to the multiple-object challenge, the body of the law, as well as its title, must be examined to determine whether the act embraces more than one object or purpose. *Ray Twp*, 226 Mich App at 731.  The object of the legislation must be determined by examining the law as enacted, not as originally introduced.  *People v Kevorkian*, 447 Mich 436, 456; 527 NW2d 714 (1994).  A bill that is enacted into law may include all matters germane to its object, as well as all provisions that directly relate to, carry out, and implement the principal object. *City of Livonia v Dep't of Social Servs*, 423 Mich 466, 497; 378 NW2d 402 (1985).  "The purpose of the single-object rule is to avoid bringing into one bill diverse subjects that have no necessary connection."  *Mooahesh*, 195 Mich App at 564.

In determining whether PA 282 violated the single object rule, *Mooahesh* is instructive. *Mooahesh* involved a title-object challenge to 1988 PA 136, which (1) amended the Individual Income Tax Act to provide that lottery winnings are taxable, and (2) repealed a section from the Lottery Act that had previously exempted lottery winnings from taxation.[20]  The Court first determined that the general purpose of the act as found in the title ("to meet deficiencies in state

---

[20] The title of 1988 PA 516 provided, in pertinent part:

> An act to amend sections . . . of the Public Acts of 1967, entitled "An act to meet deficiencies in state funds by providing for the imposition, levy, computation, collection, assessment, and enforcement by lien and otherwise of taxes on or measured by net income; to prescribe the manner and time of making reports and paying the taxes, and the functions of public officers and others as to the taxes; to permit the inspection of the records of taxpayers; to provide for interest and penalties on unpaid taxes; to provide exemptions, credits and refunds of the taxes; to prescribe penalties for the violation of this act; to provide an appropriation; and to repeal certain acts and parts of acts. . . ." [Emphasis added.]

funds") was to raise revenues, and that "[a] statute may authorize the doing of all things that *are in furtherance of the general purpose of act* without violating the one-object limitation of art 4, § 24." *Mooahesh*, 195 Mich App at 564 (emphasis added). It further stated that "[t]he object of 'meet[ing] deficiencies in state funds' may reasonably be found to include the repeal of a tax exemption, even if that exemption does not appear in any act specifically devoted to taxation." *Mooahesh*, 195 Mich App at 566. In addition, acknowledging that "it might have been 'better draftsmanship,' to have provided for a separate amendment to the Lottery Act," the Court determined that "the inclusion of the repeal of the tax exemption provision in an act amending the income tax laws does not render the act in violation of the single-object requirement." *Id*. (internal citations omitted.)

Just as the statute considered in *Mooahesh* had as its general purpose the raising of revenues, so too was the general purpose of PA 282. And just as it might have been "better draftsmanship" to have provided for a separate amendment repealing § 34 of the Lottery Act, the Legislature in enacting PA 282 might have been better advised to repeal the Compact provisions in a separate act. But like the choice to amend the ITA and repeal a section of the Lottery Act in one act, the choice to include the repeal of the Compact and amend the MBT in one act is not a violation of the single-object requirement.[21]

---

[21] As repeated by the Court in *Mooahesh*, 195 Mich App at 564:

> There is . . . no constitutional requirement that the legislature do a tidy job in legislating. It is perfectly free to enact bits and pieces of legislation in separate acts or to tack them on to existing statutes even though some persons might think that the bits and pieces belong in a particular general statute covering the matter. The constitutional requirement is satisfied if the bits and pieces so enacted are embraced in the object expressed in the title of the amendatory act and the act

## 2.     Title-Body Challenge

With respect to a title-body challenge, the title of an act must express the general purpose or object of the act. *Ray Twp*, 226 Mich App at 728. " '[T]he title need not serve as an index of all that the act contains.' " *Midland Twp v Mich State Boundary Comm'n,* 401 Mich 641, 653; 259 NW 2d 326 (1977) (quoting *People v Milton*, 393 Mich 234, 246-247; 224 NW2d 266 (1974)). It is sufficient if the title " 'is a descriptive caption, directing attention to the subject matter which follows . . . or if it be expressive of the purpose and scope of the enactment.' " *Mooahesh*, 195 Mich App at 556-557, quoting *People ex rel Wayne Prosecuting Atty v Sill*, 310 Mich 570, 574; 17 NW2d 756 (1945). The test under a title-body challenge is whether the title "gives fair notice to the legislators and the public of the challenged provision." *H J Tucker & Assocs*, 234 Mich App at 559. "The notice aspect is violated where the subjects are so diverse in nature that they have no necessary connection." *Mooahesh*, 195 Mich App at 569.

Here, as discussed earlier, the Legislature's broad purpose of PA 282 was to raise revenue through the imposition of tax. The title adequately expressed this object and gave notice of this general purpose. To withstand scrutiny under Const 1963, art 4, § 24, it was not necessary for the Legislature to provide in the title "an index of all that the act contains," *Midland Twp*, 401 Mich at 653. In addition, the subjects within the title all had a nexus to the purpose of raising revenue and were not "so diverse in nature that they [had] no necessary connection" to this purpose. *Mooahesh,* 195 Mich App at 569. There was no violation of the title-body rule under PA 282.

---

being amended. [*Id.* quoting *Detroit Bd of Street R Comm'rs v Wayne Co*, 18 Mich App 614, 622-623; 171 NW2d 669 (1969).]

### 3. Change-of-Purpose Challenge

Finally, a change of purpose challenge to PA 282 on the ground that its purpose changed during passage through the Legislature, is tested as to whether "the change represents an amendment or extension of the basic purpose of the original, or the introduction of entirely new and different subject matter." *Anderson v Oakland Co Clerk*, 419 Mich 313, 328; 353 NW2d 448 (1984) (LEVIN, J., concurring) (internal quotation marks omitted). See also *Kevorkian*, 447 Mich at 461 ("[T]he test for determining if an amendment or substitute changes a purpose of the bill is whether the subject matter of the amendment or substitute is germane to the original purpose.")

Here, as discussed earlier, the general purpose of SB 156 as originally introduced was to raise revenues. This original purpose of SB 156 did not change under Substitute H-1, as introduced and later enrolled as PA 282.

As originally introduced, SB 156 amended the MBT by (1) allowing an adjustment to the modified gross receipts tax base for amounts attributable to the taxpayer pursuant to a discharge of indebtedness, (2) revising the calculation of the investment credit with respect to the recapture of revenue when property previously subject to the credit is sold, (3) revising the calculation of the credit for a taxpayer located and conducting business in a renaissance zone before December 1, 2002, and, (4) revising a provision concerning a dock sale, for purposes of apportionment. See Senate Legislative Analysis, SB 156, March 19, 2013. The original bill stated that the act was "curative and intended to clarify the original intent of the Legislature." *Id.* Substitute H-1, as enrolled as PA 282, retained the original proposed amendments, and added, in pertinent part, (1) a requirement that a taxpayer claim a refund in 2015 if as a result of the amendments, there

was an overpayment for a tax year between 2010 and 2014, and (2) a provision that the bill would retroactively repeal the Compact provisions under Public Act 343 of 1969 to January 1, 2008, and express legislative intent regarding the single-factor apportionment formula and the elimination of the Compact's election provision. See Senate Legislative Analysis, SB 156, September 10, 2014.

Substitute H-1, as enrolled as PA 282, was "an extension of the basic purpose of the original," rather than "the introduction of the entirely new and different subject matter" that would otherwise violate the change-of-purpose rule. *Anderson*, 419 Mich at 327. The general purpose of both the bill as originally enacted, and substitute H-1, as enrolled as PA 282, was also to raise revenues. Because the general purpose of the bills did not change or introduce new and different subject matter, a change-in-purpose challenge to PA 282 must fail.

In conclusion, given the presumption that PA 282 is constitutional, and in light of the fact that the Title-Object Clause is to be liberally construed, the Court concludes that PA 282 does not violate the Title-Object Clause of the Constitution.

## B. THE "FIVE-DAY RULE" UNDER THE MICHIGAN CONSTITUTION WAS NOT VIOLATED

The issue whether PA 282 violates the Title-Object Clause is integrally related to the "five-day rule" of art 4, § 26 of Const 1963 which states, in pertinent part, that no bill can be

passed until it has been printed or reproduced and in the possession of each house for at least five days.[22]  This rule was not violated by passage of PA 282.

Whether the five-day rule has been violated depends on whether (1) the bill was in the possession of both houses for five days, and (2) whether there has been a change in purpose. *Anderson*, 419 Mich at 339 (LEVIN, J., concurring).  Here, SB 156 was before both the House and Senate for at least 5 days.[23]  And as discussed earlier, SB 156 as finally passed served the original bill's general purpose of raising revenues.  The Court therefore concludes that enactment of PA 282 did not violate Const 1963, art 4, § 26.

## C.   THE TAX-TITLE CLAUSE OF THE MICHIGAN CONSTITUTION WAS NOT VIOLATED

PA 282 does not violate the "tax-title" clause of art 4, § 32 of the Michigan Constitution. That provision, also known as the "distinct-statement" clause, requires that "[e]very law which imposes, continues or revises a tax shall distinctly state the tax."  *Id*.  The purpose of this clause is " 'to prevent the Legislature from being deceived in regard to any measure for levying taxes, and from furnishing money that might by some indirection be used for objects not approved by the Legislature.' "  *Dawson v Sec of State*, 274 Mich App 723, 747; 739 NW2d 339 (2007). (Citation omitted.)

---

[22] As explained by the Court in *Anderson*, 419 Mich at 329-330, "The five-day rule and the change of purpose provision were contained in the same article and section of the Constitution of 1908.  Const 1908, art 5, § 22.  It is clear that the function of the change of purpose provision, both in the Constitution of 1908 and as modified in the Constitution of 1963, is to fulfill the command of the five-day rule."

[23] See 2013 Senate Journal 9; 2014 Senate Journal 61.

Both the title and the body of PA 282 make clear that the act related distinctly to tax, and there is no language within SB 156, enrolled as PA 282, that would have caused the Legislature to be "deceived in regard to any measure for levying taxes." *Dawson*, 274 Mich App at 747. There is no merit to any claim that PA 282 violates Const 1963, art 4, § 32.

## IV.    CONCLUSION

The passage of PA 282 is a valid, constitutional act by the Legislature that provided clarity to taxpayers as to the original intent of the MBT Act.[24]  It also prevented the significant fiscal harm to the state that would have resulted if taxpayers had been permitted to elect apportionment provisions under the Compact.   The Legislature's choice in PA 282 to retroactively repeal the Compact provisions was within the boundaries of the Michigan and United States Constitutions and stayed true to the Legislature's original intent to require single-factor apportionment under the MBT Act.  Application of PA 282 to the disposition of this case, and others like it, is appropriate;[25] failure to do so would otherwise provide taxpayers with a windfall that the Legislature did not mean to provide.  See Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation*, 73 Harv L Rev 692, 705 (1960).

---

[24] PA 282 also clarified that the Compact's election provision is not available under the Income Tax Act, MCL 206.1, *et seq*.

[25] Similar claims brought under the Income Tax Act, MCL 206.1, *et seq*., would likewise fail; PA 282 would apply and negate the basis for the plaintiff's claim.

IT IS HEREBY ORDERED that plaintiff's motion for summary disposition is DENIED, and summary disposition is GRANTED in favor of the Department pursuant to MCR 2.116(I)(2).

This order resolves the last pending claim and closes the case.

Dated:  December 19, 2014

_____
Hon. Michael J. Talbot
Chief Judge, Court of Claims

E

STATE OF MINNESOTA                                    TAX COURT

COUNTY OF RAMSEY                                      REGULAR DIVISION

---

Kimberly-Clark Corporation &
Subsidiaries,                                        **ORDER GRANTING THE**
                                                     **COMMISSIONER'S MOTION**
                        Appellants,                  **FOR SUMMARY JUDGMENT**

vs.                                                  File No.    8670-R

Commissioner of Revenue,                             Filed:  June 19, 2015

                        Appellee.

---

This matter came before the Minnesota Tax Court, sitting *en banc*, on the parties' cross-motions for summary judgment.

Walter A. Pickhardt, Faegre Baker Daniels LLP, Minneapolis, Minnesota, and Amy L. Silverstein and Edwin P. Antolin, Silverstein & Pomerantz LLP, San Francisco, California, represent appellants Kimberly-Clark Corporation and its subsidiaries.

Alan I. Gilbert, Minnesota Solicitor General, and Alethea M. Huyser, Assistant Minnesota Attorney General, represent appellee Commissioner of Revenue.

We grant the Commissioner's motion for summary judgment and deny Kimberly-Clark's motion.

The undersigned judges, upon all the files, records, and proceedings herein, now make the following:

## ORDER

1.      The Commissioner's motion for summary judgment is granted.

2.      Kimberly-Clark's motion for summary judgment is denied.

IT IS SO ORDERED. THIS IS A FINAL ORDER. LET JUDGMENT BE ENTERED ACCORDINGLY.

BY THE COURT,



_____
Bradford S. Delapena, Judge
MINNESOTA TAX COURT

_____
Thomas G. Haluska, Judge
MINNESOTA TAX COURT

DATED: June 19, 2015

## MEMORANDUM

### I.   FACTUAL BACKGROUND

Appellant Kimberly-Clark Corporation and its subsidiaries (collectively Kimberly) constitute a combined group for purposes of Minnesota's corporate franchise tax.[1] Kimberly-Clark Corporation is the reporting entity for the combined group.[2] Kimberly has done business in Minnesota since 1958 and has filed Minnesota tax returns since at least 1983.[3] During the tax years in issue (2007, 2008 and 2009), Kimberly engaged in a unitary, multi-state business.[4] This

---

[1] Stip. ¶¶ 1, 4.

[2] Stip. ¶ 5.

[3] Stip. ¶ 6.

[4] Stip. ¶ 9.

2

case concerns the computation of Minnesota corporate franchise tax liability for Kimberly's unitary business conducted partly within and partly without Minnesota.

Under the unitary-business / formula-apportionment method of deriving local taxable income, a state combines the total income of a unitary business, then uses an apportionment formula to allocate to itself a fair share of that combined income for tax purposes. As the United States Supreme Court has succinctly explained, this approach

> rejects geographical or transactional accounting, and instead calculates the local tax base by first defining the scope of the "unitary business" of which the taxed enterprise's activities in the taxing jurisdiction form one part, and then apportioning the total income of that "unitary business" between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation's activities within and without the jurisdiction.

*Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 165 (1983). Minnesota uses the unitary-business / formula-apportionment method to determine a unitary business' local tax base. *See Comm'r of Revenue v. Associated Dry Goods, Inc.*, 347 N.W.2d 36, 38 (Minn. 1984); Minn. Stat. § 290.191, subd. 1(a) (2014) ("[T]he net income from a trade or business carried on partly within and partly without this state must be apportioned to this state as provided in this section.").

It is undisputed that during the tax years in issue, multistate businesses could: (1) apportion income to Minnesota using the apportionment formula set forth in Minn. Stat. § 290.191; or (2) *petition* the Minnesota Commissioner of Revenue to permit the use of an alternative apportionment formula. *See* Minn. Stat. § 290.20, subd. 1 (2014) (providing for such petitions). The dispute in this case concerns whether, during the tax years in issue, multistate businesses *also* enjoyed a third option, namely, the unfettered right to use the apportionment formula contained in Articles III and IV of Minn. Stat. § 290.171 (Minnesota's version of the Multistate Tax Compact) between 1983 and its repeal in 1987. A proper explication of this dispute requires us to briefly explain the

3

emergence of the Multistate Tax Compact from a controversy over how states tax multistate businesses.

## A.    State Taxation of Multistate Businesses

In 1959, the United States Supreme Court held that a state could tax net income from the interstate operations of a foreign corporation whose only connections to the taxing state were the solicitation of sales within the state and the maintenance of a modest sales office. *Nw. States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 453-57, 472 (1959). Within seven months of the Supreme Court's decision, Congress passed Public Law No. 86-272, Title II, 73 Stat. 555 (1959), which barred states from imposing an income tax on a business whose only activity in the state was (1) soliciting orders or (2) using an independent contractor to make sales in the state.[5] Congress also established the Special Subcommittee on State Taxation of Interstate Commerce to

> make full and complete studies of all matters pertaining to the taxation by the States of income derived within the States from the conduct of business activities which are exclusively in furtherance of interstate commerce or which are a part of interstate commerce, for the purpose of recommending to the Congress proposed legislation providing uniform standards to be observed by the States in imposing income taxes on income so derived.[6]

In 1964, the Special Subcommittee (known as the Willis Committee) issued the first in a series of reports.[7] The subcommittee characterized the existing system as one "which calls upon tax administrators to enforce the unenforceable, and the taxpayer to comply with the uncompliable." [8] The subcommittee further found "inescapable" the conclusion "that the voluntary adoption by the States of any kind of uniform system [for taxing the income of multistate

---

[5] *See* Ex. J51 (H.R. Rep. No. 88-1480 (1964)), at 7-8.

[6] Ex. J51, at 8-9; *see* Pub. L. No. 86-272, Title II, 73 Stat. 555, 556 (1959).

[7] Ex. J51.

[8] Ex. J51, at 598.

4

businesses] is a slow and halting process, if not a virtual impossibility." [9] The subcommittee recommended that all corporate income be apportioned among the states by a two-factor formula based on property and payroll attributed to the state, with no provision for state-specific formulas.[10]

## B.    Development and Summary of the Multistate Tax Compact

Following the issuance of the Willis Report, the National Association of Tax Administrators convened a special meeting in January 1966 to both oppose pending federal legislation and "to suggest workable alternatives which would eliminate the need for the kind of congressional action embodied in" the federal legislation.[11] The text of the Multistate Tax Compact was released in December 1966 by the Council of State Governments.[12]

Article I of the Compact lists its purposes, including "[f]acilitat[ion of] proper determination of State and local tax liability of multistate taxpayers" and "[p]romot[ion of] uniformity or competibility [sic, compatibility] in significant components of tax systems." [13]

Article II sets out definitions of various terms used in the Compact, none of which need be recited here.[14]

Articles III and IV are at the center of the parties' dispute. Articles III and IV incorporate, almost verbatim, the Uniform Division of Income for Tax Purposes Act, a uniform act drafted by

---

[9] Ex. J51, at 133.

[10] Ex. J52, at KC1135, KC1144, KC1162 ("[N]o modifications should be permitted which involve the use of specific allocation or of factors other than those based on tangible property and payroll.").

[11] Ex. J36, at KC11434.

[12] Ex. J32.

[13] Ex. J32, at KC11505.

[14] Ex. J32, at KC11505-06.

the National Conference of Commissioners on Uniform State Laws in 1957.[15] Article III, section 1, allows a multistate taxpayer to "elect to apportion and allocate his income in the manner provided by the laws of such State ... without reference to this compact" or "in accordance with Article IV." [16] Article IV, in turn, provides for the apportionment of income by a three-factor, equally-weighted formula using sales, payroll, and property:

> All business income shall be apportioned to this State by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three.[17]

Article IV, sections 10, 13, and 15, define the three factors.[18] Under Article III, section 1, the taxpayer may elect which apportionment formula to use "without reference to the election made" in any other state.[19]

Article V, section 1, allows a credit against use tax on tangible personal property imposed in one state for use tax paid to another state with respect to the same property.[20] Article V, section 2 allows a seller to rely on an exemption certificate.[21]

Article VI establishes the Multistate Tax Commission, composed of one "member" from each "party State." [22] Article VI further requires that any action of the Commission be approved

---

[15] *See* Ex. J35, at KC11530 (explaining the history of the Uniform Division of Income for Tax Purposes Act).

[16] Ex. J32, at KC11506.

[17] Ex. J32, at KC11509.

[18] Ex. J32, at KC11509-10.

[19] Ex. J32, at KC11506.

[20] Ex. J32, at KC11510-11.

[21] Ex. J32, at KC11511.

[22] Ex. J32, at KC11511-12.

by a majority of members, requires the Commission to adopt bylaws, establishes the Commission's governing and financial structure, and enumerates the powers of the Commission.[23]

Article VII allows the Commission to "adopt uniform regulations for any phase of the administration" of income taxes.[24] It requires the Commission to submit such regulations "to the appropriate officials of all party States and subdivisions to which they might apply" and provides that each such state "shall consider any such regulation for adoption in accordance with its own laws and procedures." [25]

Article VIII allows any party state to ask the Commission to perform audits on its behalf and sets procedures for such audits.[26] Article VIII must be specifically adopted by a party state.[27]

Article IX provides for arbitration of "disputes concerning apportionments and allocations" by taxpayers "dissatisfied with the final administrative determination of the tax agency of the State" and establishes procedures for such arbitrations.[28]

Article X, also important to the parties' dispute, provides in section 1 that the Compact "shall enter into force when enacted into law by any seven States." [29] Article X, section 2, provides:

> Any party State may withdraw from this compact by enacting a statute repealing the same. No withdrawal shall affect any liability already incurred by or chargeable to a party State prior to the time of such withdrawal.[30]

---

[23] Ex. J32, at KC11511-12.

[24] Ex. J32, at KC11514.

[25] Ex. J32, at KC11514.

[26] Ex. J32, at KC11514-15.

[27] Ex. J32, at KC11514.

[28] Ex. J32, at KC11516.

[29] Ex. J32, at KC11517.

[30] Ex. J32, at KC11517.

Article XI states that "[n]othing in this compact shall be construed to," among other things, "[a]ffect the power of any State or subdivision thereof to fix rates of taxation, except that a party State shall be obligated to implement Article III [section] 2 of this compact."[31] Article III, section 2, allows a taxpayer whose only activity in a state consists of sales, and whose sales do not exceed $100,000 during the tax year, to "elect to report and pay any tax due on the basis of a percentage" of sales, and further requires the state to "adopt rates which shall produce a tax which reasonably approximates the tax otherwise due."[32]

Finally, Article XII of the Compact provides that it "shall be liberally construed so as to effectuate the purposes thereof."[33] It further provides that the provisions of the Compact "shall be severable."[34] If any portion of the Compact is declared unconstitutional, "the compact shall remain in full force and effect as to the remaining party States and in full force and effect as to the State affected as to all severable matters."[35]

By August 4, 1967, at least nine states (not including Minnesota) had enacted the Compact.[36]

## C.    Post-Adoption History

In 1972, Florida—one of the first states to adopt the Compact—repealed Articles III and IV. Act of December 16, 1971, ch. 71-980, § 1, 1971 Fla. Laws 51, 52 (Aff. of Pickhardt Ex. 1). At the same time, Florida provided by statute for the apportionment of income to Florida

---

[31] Ex. J32, at KC11518.

[32] Ex. J32, at KC11506-07.

[33] Ex. J32, at KC11518.

[34] Ex. J32, at KC11518.

[35] Ex. J32, at KC11518.

[36] Ex. J36, at KC11435.

based on a three-factor, equally-weighted formula using a "property" factor, a "payroll" factor, and a "sales" factor. § 2, 1971 Fla. Laws at 52. After these legislative actions, the Multistate Tax Commission determined that Florida remained "a regular member in good standing of the Multistate Tax Compact and the Multistate Tax Commission."[37]

In August 1972, U.S. Steel Corporation and three other multistate corporations brought suit on behalf of themselves and all other multistate taxpayers threatened with audits by the Multistate Tax Commission. *See U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 458 (1978). Plaintiffs sought two things: (1) declaratory judgment that the Multistate Tax Compact was invalid because (among other things), it had never received the consent of Congress under Article I, section 10, clause 3 of the United States Constitution; and (2) a permanent injunction barring the operation and enforcement of the Compact. *U.S. Steel Corp. v. Multistate Tax Comm'n*, 417 F. Supp. 795, 797 (S.D.N.Y. 1976). The district court granted the Commission's motion for summary judgment. *Id.* at 805.

Plaintiffs appealed to the United States Supreme Court. *U.S. Steel*, 434 U.S. 452. In its brief to the Court, the Multistate Tax Commission characterized itself as "only [] an advisory agency" whose "work product is not binding on anyone," and the Compact as consisting "solely of uniform laws, an advisory mechanism for the uniform interpretation and application of those laws, and an advisory mechanism for otherwise developing uniformity and compatibility in state and local taxation of multistate businesses."[38] In addition, the Commission wrote:

---

[37] Ex. J43, at MDOR 00015.

[38] Ex. J54, at MDOR 03904-05, 3909.

9

Under the Compact, the member states administer their own tax laws and do not delegate any of their authority to anyone. Each state, independent of the Compact, has the power to adopt uniform legislation, to audit Appellants' books and records on its individual account, to grant multistate taxpayers certain options in the determination of their tax liability, and to enter into reciprocal joint audit agreements with other states. By adoption of the Compact, each state has retained complete and absolute control over its own tax system.[39]

Noting that "[a]ny state is free to join or withdraw from the Compact at will," the Commission argued that "there is a serious question as to whether the Compact is an 'agreement or compact'" within the meaning of the Compact Clause or merely a reciprocal arrangement among the member states.[40]

The Supreme Court affirmed the district court, agreeing that the Compact was not invalid for lack of Congressional approval. *U.S. Steel*, 434 U.S. at 479. The Supreme Court also commented, in part:

This pact does not purport to authorize the member States to exercise any powers they could not exercise in its absence. Nor is there any delegation of sovereign power to the Commission; each State retains complete freedom to adopt or reject the rules and regulations of the Commission. Moreover, ... each State is free to withdraw at any time.

*Id.* at 473.

### D.     Minnesota's Adoption of the Compact

Against this backdrop, Minnesota enacted the Compact in 1983. Act of June 14, 1983, ch. 342, art. 16, § 1, 1983 Minn. Laws 2168, 2339-52 (codified as Minn. Stat. § 290.171). Minnesota did not, however, adopt certain portions of Article IV, specifically, section 4 (allocating "[r]ents and royalties from real or tangible personal property, capital gains, interest, dividends or patent or copyright royalties"), section 5 (allocating "[n]et rents and royalties from real property"),

---

[39] Ex. J54, at MDOR 03919-20.

[40] Ex. J54, at MDOR 03920-21.

10

section 6 (allocating "[c]apital gains and losses from sales of real property"), section 7 (allocating "[i]nterest and dividends"), and section 8 (allocating "[p]atent and copyright royalties").[41]

### E. Minnesota's Repeal of Articles III and IV

Four years after adopting the Compact, Minnesota amended its version of the Compact to eliminate Articles III and IV. Act of May 28, 1987, ch. 268, art. 1, § 74, 1987 Minn. Laws 1039, 1098-1112. At the same time, Minnesota amended its equally-weighted three-factor apportionment formula, placing greater weight on the sales factor and correspondingly lesser weight on the property and payroll factors. §§ 75, 127, 1987 Minn. Laws 1039, 1112-19, 1156 (codified at Minn. Stat. § 290.191).[42] In proposing these changes, the Minnesota Department of Revenue offered that doing so "would simplify the tax, improve predictability, improve conformity with other states, and transfer tax burdens away from in-state corporations." [43] Nothing in the Department's proposal, however, addressed the legal effect of repealing only articles III and IV. Even after repeal of Articles III and IV, Minnesota remained a member in good standing of the Commission.[44] Indeed, Minnesota's then-Commissioner of Revenue was vice-chair and chair of the Commission in 1988 and 1989, respectively.[45]

---

[41] *Compare* Ex. J44, art. IV, *with* Minn. Stat. § 290.171, art. IV (1984).

[42] Under Minn. Stat. § 290.191, subd. 2 (1987), as originally enacted, the apportionment formula assigned a weight of 70% to the proportion of the taxpayer's total sales made in Minnesota; a weight of 15% to the proportion of the taxpayer's total tangible property used in Minnesota; and a weight of 15% to the proportion of the taxpayer's total payroll either paid or incurred in Minnesota. *See* § 75, 1987 Minn. Laws at 1112-19. Over time, the weight given to sales increased; since 2013, no weight has been given to either the property or the payroll factor. *See* Minn. Stat. § 290.191, subd. 2(b) (2014) (setting out the percentages to be applied to each of the three factors starting with the 2007 taxable year).

[43] Ex. J47, at MDOR 03419.

[44] Stip. ¶¶ 23-24.

[45] Huddleston Aff. ¶ 11; Ex. J41, at 7 (Twenty-First Annual Report, Multistate Tax Commission).

## F.     Minnesota's Subsequent Withdrawal from the Compact

In 1993, California (which had adopted the Compact and its equally-weighted three-factor apportionment formula in 1974, *see Gillette Co. v. Franchise Tax Bd.*, 147 Cal. Rptr. 3d 603, 608 (Cal. Ct. App. 2012), *review granted and opinion superseded sub nom. Gillette v. Franchise Tax Bd.*, 291 P.3d 327 (Cal. 2013) (No. S206587) (citing former § 38001, Cal. Stats. 1974, ch. 93, § 3, p. 193)), amended its statutory apportionment formula to give double weight to the sales factor, and made the new apportionment formula mandatory "[n]ot withstanding" the provisions of the Compact, *Id.* at 610 (citing § 25128, subd. (a), Cal. Stats. 1993, ch. 946, § 1, p. 5441). In 2010, the Gillette Company and others sought refunds of California state income taxes totaling about $34 million, claiming that they could continue to use the Compact's equally-weighted three-factor apportionment formula. *Id.* at 606-07. The California Franchise Tax Board denied the requested refunds, but California's intermediate appellate court reversed. *Id.* at 619.[46]

In 2013, the Minnesota Department of Revenue recommended to the Legislature that Minnesota repeal Minn. Stat. § 290.171 in its entirety, citing the California court's decision in *Gillette*.[47] Although the Department indicated its "strong belie[f] that the legislature's repeal of Articles III and IV of the compact [in 1987] properly eliminated the option to use the Uniform Law to apportion income," the Department nevertheless recommended repeal of section 290.171

---

[46] Similar cases have been brought by other taxpayers in other states, with varying results. *See, e.g., Int'l Bus. Machs. Corp. v. Dep't of Treasury*, 852 N.W.2d 865, 870 (Mich.), *reh. denied* (Mich. 2014) (concluding that the taxpayer was entitled to use the Compact's three-factor apportionment formula for tax year 2008 because the Michigan Legislature's enactment of the Business Tax Act did not repeal the Compact's apportionment formula, even by implication); *Health Net, Inc. v. Dep't of Revenue*, No. TC 5127 (Or. T.C. filed Jan. 17, 2013) (appeal of denial of refund claim pending); *Graphic Packaging Corp. v. Combs*, No. D-1-GN-12-003038 (Travis Cnty. Dist. Ct. Jan. 15, 2014) (order dismissing without opinion a petition denying claim for refund based on three-factor apportionment formula), appeal granted.

[47] Ex. J53, at MDOR 02297.

"in its entirety to avoid even the possibility going forward of the State having to pay refunds on some previously filed returns or lose future tax revenue" if *Gillette* were affirmed by the California Supreme Court, and Minnesota courts likewise concluded that Minnesota taxpayers could still use the Compact's apportionment formula.[48] In 2013, Minnesota repealed section 290.171 in its entirety. Act of May 23, 2013, ch. 143, art. 13, § 24, 2013 Minn. Laws 2445, 2680.[49]

## II. PROCEDURAL BACKGROUND

Between 1989 and 2009, Kimberly and its subsidiaries determined their Minnesota taxable income using the non-equally-weighted apportionment formula found in Minn. Stat. § 290.191, subd. 2.[50]

In April 2013, Kimberly filed amended tax returns and claims for refund for the 2007, 2008, and 2009 tax years, using the equally-weighted formula found in Articles III and IV of the Compact.[51] According to Kimberly's amended returns, it is entitled to a total refund of $1,205,749 for those three years combined.[52] By order dated October 14, 2013, the Commissioner denied Kimberly's refund claims.[53]

---

[48] Ex. J53, at MDOR 02298.

[49] In 2013, Oregon, Utah, and the District of Columbia also eliminated articles III.1 and IV from their respective statutes. Walter Hellerstein, *State Taxation* ¶ 9.01 The State Statutory Framework Governing Division of Corporate Income (3rd ed. 2015). According to the Multistate Tax Commission, by 2013 only six of its members continued to require use of an equally weighted apportionment formula. Ex. J55, at MDOR 03475 & n.23 (Brief of *Amicus Curiae* Multistate Tax Comm'n filed in *Int'l Business Machines Corp. v. Dept. of Treasury of State of Michigan*).

[50] Stip. ¶ 11; *see* Exs. J11-28 (Minnesota corporate franchise tax returns for years 1989-2006), Ex. J4, at Sch. M4A (2007 Minnesota corporate franchise tax return), Ex. J6, at Sch. M4A (2008 Minnesota corporate franchise tax return), Ex. J8, at Sch. M4A (2009 Minnesota corporate franchise tax return).

[51] Stip. ¶¶ 14-15; Ex. J3 (amended return for tax year 2007), Ex. J5 (amended return for tax year 2008), Ex. J7 (amended return for tax year 2009).

[52] Stip. ¶¶ 14-15, 20; *see* Exs. J3, J5, J7.

[53] Stip. ¶ 18; Ex. J2.

13

Kimberly timely appealed the Commissioner's order to this court.[54] Kimberly's notice of appeal alleged, among other things, that "Minnesota's attempted elimination of Articles III and IV from the Compact was invalid as a unilateral modification of core provisions of a binding interstate compact and contract entered into between Minnesota and the other signatory states," and that "Minnesota's attempted elimination of Articles III and IV from the Compact" violated the Compact Clause of the United States Constitution and the Contract Clauses of both the United States and Minnesota Constitutions.[55]

Because the notice of appeal raised constitutional issues, the parties jointly moved to refer those issues to the district court for decision or transfer back to this court and proposed specific transfer language.[56] *See Erie Mining Co. v. Comm'r of Revenue*, 343 N.W.2d 261, 264 (Minn. 1984) (prescribing the procedure for giving the tax court subject matter jurisdiction over constitutional questions). On September 5, 2014, this court stayed further proceedings in the appeal and referred the constitutional issues, as framed by the parties, to the Ramsey County District Court for decision or transfer back to this court.[57] By order dated September 15, 2014, the

---

[54] Not. Appeal (filed Dec. 12, 2013). As part of the notice of appeal, Kimberly also appealed "the failure by the Commissioner of Revenue ... to allow or deny its claim for refund for the tax period ending December 31, 2010." Not. Appeal 1; *see* Minn. Stat. § 289A.50, subd. 7(d) (2014) (allowing the taxpayer to bring an action in the tax court if the commissioner fails to deny a claim for refund within six months of the filing of the claim). By stipulation filed on March 31, 2014, Kimberly dismissed its claims with respect to tax year 2010, without prejudice to either the right of the Commissioner to audit tax year 2010 or the right of Kimberly to appeal tax year 2010. Stip. Partial Dismissal Without Prejudice (filed March 31, 2014), ¶ 7.

[55] Not. Appeal ¶¶ 24-25.

[56] Joint Mot. Refer Issues District Ct. (filed Sept. 4, 2014). The parties framed the issue to be referred as follows: "Whether the Minnesota Legislature's repeal of the apportionment formula election codified in 1983 at Minn. Stat. § 290.171 (1983 Supp.) violated the Compact Clause of the United States Constitution and the Contract Clauses of the United States and Minnesota Constitution." Joint Mot. 1.

[57] Order (Sept. 5, 2014).

14

Ramsey County District Court transferred the constitutional issues, as framed by the parties, back to this court for decision.[58]

The parties filed their respective motions for summary judgment in October 2014.[59] As part of their cross-motions for summary judgment, the parties also filed a partial stipulation of facts and a joint exhibit list.[60] Briefs and supporting affidavits followed. The court heard oral argument on the parties' motions on March 19, 2015.[61]

## III. THE PARTIES' PRINCIPAL CONTENTIONS

Kimberly contends that the Compact is a binding contract among party States,[62] which requires Minnesota, among other things, both: (1) to furnish multistate taxpayers with an election

---

[58] Order of Transfer (Sept. 15, 2014).

[59] Kimberly's Not. Mot. Mot. Summ. J. (filed Oct. 21, 2014); Comm'r's Not. Mot. Mot. Summ. J. (filed Oct. 28, 2014).

[60] Partial Stip. Facts (filed Oct. 21, 2014); Joint Ex. List Stip. Regarding Admissibility of Exhibits (filed Oct. 21, 2014).

[61] On April 14, 2014, in preparation for a pretrial conference call, this matter was assigned to The Hon. Joanne H. Turner. On April 21, 2014, the Commissioner filed a notice of removal, requesting the removal of Judge Turner. See Minn. R. Civ. P. 63.03 (allowing "[a]ny party or attorney" to file a notice of removal of a judge within 10 days after the party receives notice of the identity of the assigned judge). On April 24, 2014, the matter was reassigned to The Hon. Bradford S. Delapena. Order (Apr. 24, 2014). On November 4, 2014, Judge Delapena moved to hear the parties' cross-motions en banc. See Minn. Stat. § 271.04, subd. 1 (2014) ("Upon petition by a party to a case, or upon a motion by a Tax Court judge, and approval by a majority of the Tax Court, a case may be tried before the entire Tax Court."). The motion was approved by unanimous decision. Order En Banc Consideration (Nov. 4, 2014). The Commissioner subsequently objected to en banc consideration on the ground of the previous notice of removal of Judge Turner and requested that the matter be heard by Judge Delapena alone. Appellee Comm'r Revenue's Objection Order En Banc Consideration & Mot. Reset Case (filed Nov. 18, 2018). The court (Judge Turner abstaining) overruled the Commissioner's objections and denied the Commissioner's motion to reassign the matter. Order Overruling Appellee's Objections En Banc Consideration Denying Mot. Re-Assign Case (Jan. 16, 2015).

[62] Kimberly's Mem. Supp. Summ. J. 1, 10, 22 n.7, 29-30; Kimberly's Reply Mem. Supp. Summ. J. 6-10.

to use the Compact's equally-weighted three-factor apportionment formula;[63] *and*, more importantly, (2) to refrain from exercising its sovereign power to eliminate the apportionment election unless and until it first withdraws from the Compact.[64] Although acknowledging that Article X, section 1, of the Minnesota Constitution provides, "[t]he power of taxation shall never be surrendered, suspended or contracted away," Kimberly asserts that—because enacting states may *re-acquire* full sovereignty over apportionment by completely withdrawing from the Compact—Minnesota's 1983 Compact enactment did not violate this constitutional prohibition.[65] And, although implicitly acknowledging that a State's contractual surrender of sovereign power *normally* must be stated in unmistakably clear language, Kimberly argues that this requirement is inapplicable to interstate compacts, the very purpose of which (according to Kimberly) is to surrender sovereign power.[66] So reasoning, Kimberly contends that Minnesota validly enacted the Compact in 1983, and thereby contractually obligated itself both to furnish the apportionment election *and* to refrain from using its sovereign power to repeal the election.[67]

The United States and Minnesota Constitutions separately prohibit the State from passing any law impairing the obligation of contracts, including its own.[68] Kimberly contends that

---

[63] Kimberly's Mem. Supp. Summ. J. 6-7.

[64] Kimberly's Mem. Supp. Summ. J. 10, 12, 16, 30; Kimberly's Rely Mem. Supp. Summ. J. 1-2, 4.

[65] Kimberly's Mem. Supp. Summ. J. 17, 26-28; Kimberly's Reply Mem. Supp. Summ. J. 7, 9.

[66] Kimberly's Mem. Supp. Summ. J. 17; Kimberly's Reply Mem. Supp. Summ. J. 5, 7; Tr. 100-01, 111.

[67] Kimberly's Mem. Supp. Summ. J. 1, 8, 28, 32; Kimberly's Reply Mem. Supp. Summ. J. 2.

[68] U.S. Const. art. I, § 10, cl. 1 states: "No state shall ... pass any ... law impairing the obligation of Contracts." Minn. Const. art. I, § 11 states: "No ... law impairing the obligation of contracts shall be passed."

16

Minnesota violated these constitutional prohibitions in 1987 by repealing Articles III and IV of the Compact, the sections furnishing the apportionment election. More specifically, Kimberly asserts that the Minnesota Legislature's 1987 exercise of sovereign power repealing the election both violated the terms of the Compact[69] and impaired the State's obligation under the Compact to furnish taxpayers the apportionment election.[70] Kimberly thus asserts that we must strike down the 1987 repeal as an unconstitutional legislative act, that we must recognize the continued vitality of Articles III and IV (notwithstanding the Legislature's purported repeal of those provisions), and that we must therefore allow Kimberly's refund claim based upon its invocation of the election.[71]

The Commissioner responds that, for numerous reasons, the Legislature's 1987 repeal of Articles III and IV was a valid legislative act that does not unlawfully impair the obligation of contracts. First, the Commissioner asserts that the Compact is actually a model law with only advisory effect.[72] Second, she contends that the State's purported entry into a contract obligating it to refrain from exercising sovereign taxing power to alter or repeal the apportionment election would be void *ab initio* as a violation of Minnesota Constitution Article X, section 1.[73] Third, the Commissioner argues that no Compact provision surrenders in unmistakable terms the State's sovereign power to alter or repeal the election and, again, that even unmistakably clear language

---

[69] Kimberly's Mem. Supp. Summ. J. 16-17, 32; Kimberly's Reply Mem. Supp. Summ. J. 2-6; Tr. 57. Although Kimberly insists that it alleges only impairment of contract (not breach of contract), it repeatedly asserts that the Legislature violated the terms of the Compact by repealing Articles III and IV.

[70] Kimberly's Mem. Supp. Summ. J. 30-35; Kimberly's Reply Mem. Supp. Summ. J. 13-15.

[71] Kimberly's Mem. Supp. Summ. J. 1, 10, 30, 34; Kimberly's Reply Mem. Supp. Summ. J. 2; Tr. 56-58, 60-61.

[72] Comm'r's Mem. Supp. Summ. J. 2, 4, 18, 32.

[73] Comm'r's Mem. Supp. Summ. J. 14, 15-16; Comm'r's Reply Mem. Supp. Summ. J 2-3.

purporting to do so would violate Article X, section 1.[74] Fourth, she contends that—even if the State had promised not to exercise its sovereign power to repeal the apportionment election— Kimberly could not enforce that contractual obligation because: (a) it was not a party to the contract, and lacks standing to enforce the obligation; (b) the 6-year statute of limitations for a contract-impairment claim based on a 1987 legislative act expired long ago; (c) Compact party States have waived enforcement of the particular obligation in question; and (d) enforcement is barred by the doctrine of laches.[75] Finally, the Commissioner argues that, even assuming the existence of both an enforceable contract right and a litigant who could demand its enforcement, Kimberly cannot demonstrate that the 1987 repeal substantially impaired the right.[76]

## IV. DECISIONAL STANDARDS

Kimberly asks us to rule as a matter of law that the Legislature's 1987 act of repealing Articles III and IV of the Compact violated the contract clauses of the United States and Minnesota Constitutions. The Commissioner asks us to rule as a matter of law that the 1987 repeal was a lawful and valid legislative act.

Summary judgment shall be rendered if the pleadings, the record in the case, and any supporting affidavits show that there is no genuine issue as to any material fact and that a party is entitled to judgment as a matter of law. Minn. R. Civ. P. 56.03; *DLH, Inc. v. Russ*, 566 N.W.2d 60, 69 (Minn. 1997). When, as here, parties file cross-motions for summary judgment, they tacitly agree that there are no genuine issues of material fact. *Am. Family Mut. Ins. Co. v. Thiem*, 503

---

[74] Comm'r's Mem. Supp. Summ. J. 14, 17-19; Comm'r's Reply Mem. Supp. Summ. J. 3-4, 7-8.

[75] Comm'r's Mem. Supp. Summ. J. 14, 22-27; Comm'r's Reply Mem. Supp. Summ. J. 10-12.

[76] Comm'r's Mem. Supp. Summ. J. 14, 27-30; Comm'r's Reply Mem. Supp. Summ. J. 12-13.

N.W.2d 789, 790 (Minn. 1993). Summary judgment is a suitable vehicle for addressing the application of law to undisputed facts. *See, e.g., Anderson v. Christopherson*, 816 N.W.2d 626, 630 (Minn. 2012); *A.J. Chromy Constr. Co. v. Commercial Mech. Serv., Inc.*, 260 N.W.2d 579, 581 (Minn. 1977); *Sauter v. Sauter*, 244 Minn. 482, 486, 70 N.W.2d 351, 354 (1955).

"It is well settled that acts of the legislature are presumed to be constitutional and will not be declared unconstitutional unless their invalidity appears clearly or unless it is shown beyond a reasonable doubt that they violate some constitutional provisions." *Minn. Energy & Econ. Dev. Auth. v. Printy*, 351 N.W.2d 319, 338 n.1 (Minn. 1984) (citation omitted) (internal quotation marks omitted). A court invokes every presumption "in favor of the constitutionality of an act of the legislature," *Contos v. Herbst*, 278 N.W.2d 732, 736 (Minn. 1979), including the presumption that "the legislature does not intend to violate the Constitution of the United States or of this state." Minn. Stat. § 645.17(3) (2014); *McLane Minn., Inc. v. Comm'r of Revenue*, 773 N.W.2d 289, 298 (Minn. 2009) (applying presumption). Courts exercise the power to declare a legislative act unconstitutional with extreme caution and only when absolutely necessary. *78th St. OwnerCo, LLC v. Cnty. of Hennepin*, 813 N.W.2d 409, 416 (Minn. 2012); *Dohs v. Holm*, 152 Minn. 529, 536, 189 N.W. 418, 421 (1922). The party challenging a legislative act carries the heavy burden of showing unconstitutionality beyond a reasonable doubt. *See, e.g., Singer v. Comm'r of Revenue*, 817 N.W.2d 670, 675 (Minn. 2012).[77]

---

[77] The Commissioner agrees that Kimberly is entitled to a refund in the requested amount if Kimberly was entitled to use the Compact's apportionment formula. Stip. ¶ 20. Likewise, Kimberly agrees that it is entitled to no refund if it was not so entitled. Stip. ¶ 21. Consequently, there are no disputed material facts in dispute and we can resolve this case by deciding the disputed legal issues.

## V. ANALYSIS

To determine whether the Legislature's 1987 repeal of Articles III and IV impaired Minnesota's obligations under the Compact, we must first determine what, if any, obligations were created by the Legislature's 1983 enactment of the Compact. This requires us to interpret the Compact.

### A. Interstate Compacts Generally

Interstate compacts are "negotiated agreements among member states that have the status of both contract and statutory law." Caroline N. Broun et al., *The Evolving Use and the Changing Role of Interstate Compacts* 2 (2006); *id.* at 128 (same); *see also Alabama v. N. Carolina*, 560 U.S. 330, 351 (2010); *Doe v. Pennsylvania Bd. of Prob. & Parole*, 513 F.3d 95, 105 (3d Cir. 2008) (emphasizing contractual nature of compacts). States enter compacts by enacting statutes containing model compact language. *See, e.g., Doe*, 513 F.3d at 105. The United States Supreme Court has thus characterized compacts as a legislative means "for adjusting interstate controversies" that "adapts to our Union of sovereign States the age-old treaty making power of independent sovereign nations." *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 104 (1938). Because interstate compacts can involve matters that concern states as sovereigns, compacts sometimes involve a partial surrender of sovereign power. *See, e.g., Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 314 (1990) (Brennan, J., concurring) ("[T]o achieve the practical advantages of coordinated planning and administration through the Port Authority, New York and New Jersey each has ceded partial control over the regulation and operation of transportation facilities in its own State since 1921 ...."); *Int'l Union of Operating Eng'rs, Local 542 v. Delaware River Joint Toll Bridge Comm'n*, 311 F.3d 273, 276 (3d Cir. 2002) ("By compacting together to form the Commission, New Jersey and Pennsylvania have each

surrendered a portion of their sovereignty over certain Delaware River bridge operations in order to better serve the regional interest.").

The Compact Clause of the United States Constitution provides: "No State shall, without the Consent of Congress, ... enter into any agreement or compact with another State ...." U.S. Const. art. I, § 10, cl. 3. Read literally, this provision "would require the States to obtain congressional approval before entering into any agreement among themselves, irrespective of form, subject, duration, or interest to the United States." *U.S. Steel*, 434 U.S. at 459. The United States Supreme Court, however, has rejected this literal interpretation, holding instead that the "application of the Compact Clause is limited to agreements that are directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States." *Id.* at 471 (internal quotation marks and citations omitted). Congressional consent is not required for interstate agreements that fall outside the scope of the Compact Clause as so interpreted. *Cuyler v. Adams*, 449 U.S. 433, 440 (1981).

Congressional consent is nevertheless significant: it "transforms an interstate compact ... into a law of the United States ...." *Cuyler*, 449 U.S. at 438. Consequently, the Supreme Court has held "that the construction of an interstate agreement sanctioned by Congress under the Compact Clause presents a federal question." *Id.* Where Congressional consent is neither given nor required, an interstate compact is construed as state law. *See, e.g., McComb v. Wambaugh*, 934 F.2d 474, 479 (3d Cir. 1991).

## B.    Interpretive Principles

Because compacts "have the status of both contract and statutory law," Broun et al., at 2, we set forth the governing principles for interpreting both statutes and contracts.

### 1.    Statutes

"The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2014). Legislative intent is determined "primarily from the language of the statute itself." *Brayton v. Pawlenty*, 781 N.W.2d 357, 363 (Minn. 2010) (quoting *Gleason v. Geary*, 214 Minn. 499, 516, 8 N.W.2d 808, 816 (1943)). Nevertheless, "[i]t is a cardinal rule of statutory construction that a particular provision of a statute cannot be read out of context but must be taken together with other related provisions to determine its meaning." *Kollodge v. F. & L. Appliances, Inc.*, 248 Minn. 357, 360, 80 N.W.2d 62, 64 (1956). Courts thus "read and construe a statute as a whole and must interpret each section in light of the surrounding sections to avoid conflicting interpretations," *Am. Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000), and to "harmonize and give effect to all its parts," *Van Asperen v. Darling Olds, Inc.*, 254 Minn. 62, 73-74, 93 N.W.2d 690, 698 (1958). Likewise, separate statutes in pari materia—those "relating to the same person or thing or having a common purpose"—are construed in light of one another. *Apple Valley Red–E–Mix, Inc. v. State*, 352 N.W.2d 402, 404 (Minn. 1984). Finally, it is presumed that "[i]n enacting statutes ... the legislature acts with full knowledge of existing law." *Goodyear Tire & Rubber Co. v. Dynamic Air, Inc.*, 702 N.W.2d 237, 244 (Minn. 2005).

"When the Legislature's intent is discernible from plain and unambiguous language, statutory construction is neither necessary nor permitted; and courts apply the statute's plain meaning." *State v. Jones*, 848 N.W.2d 528, 535 (Minn. 2014) (citing *Am. Tower, L.P. v. City of Grant*, 636 N.W.2d 309, 312 (Minn. 2001)). Statutory language is ambiguous if it is reasonably susceptible to more than one interpretation. *Christianson v. Henke*, 831 N.W.2d 532, 539 (Minn. 2013). Multiple parts of a statute may be read together to ascertain whether the statute is ambiguous. *Id.* at 537.

## 2. Contracts

Correspondingly, the primary goal of contract interpretation is "to ascertain and enforce the intent of the parties." *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 364 (Minn. 2009). In so doing, the court looks to the contract as a whole. *Savela v. City of Duluth*, 806 N.W.2d 793, 801 (Minn. 2011). The intent of the parties is not ascertained "by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the contract ... as a whole." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 324 (Minn. 2003) (quoting *Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 354 (Minn. 1979)) (alteration in original); *Country Club Oil Co. v. Lee*, 239 Minn. 148, 151-52, 58 N.W.2d 247, 249 (1953) (holding that "[a]s far as is reasonably possible [a contract] is to be construed so as to harmonize all of its parts.").

"Where there is a written instrument, the intent of the parties is determined from the plain language of the instrument itself." *Travertine Corp. v. Lexington–Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004). When a contract's language is clear and unambiguous, the court enforces the parties' agreement as expressed in the contract. *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 832 (Minn. 2012). A contract is ambiguous if its language is susceptible to two or more reasonable interpretations. *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 582 (Minn. 2010).

Contracting parties are presumed to know of laws that directly affect their rights. *Albrecht v. Sell*, 260 Minn. 566, 569-70, 110 N.W.2d 895, 897 (1961). Moreover, they are generally presumed to enter contracts "with reference to the existing rules and principles of law applicable to the subject matter." *Propp v. Johnson*, 211 Minn. 159, 163-64, 300 N.W. 615, 617 (1941).

Courts disfavor construing *government* contracts as relinquishing a state's sovereign powers, and have long held that any such relinquishment must be stated "in language and terms

too clear to admit of doubt." *State v. Great N. Ry. Co.*, 106 Minn. 303, 322, 119 N.W. 202, 205 (1908), *aff'd*, 216 U.S. 206 (1910). This clear-statement requirement is known as the unmistakability doctrine. *See generally United States v. Winstar Corp.*, 518 U.S. 839, 872 (1996); *State ex rel. Humphrey v. Philip Morris USA, Inc.*, 713 N.W.2d 350, 359-63 (Minn. 2006); *see also Tarrant Reg'l Water Dist. v. Herrmann*, 133 S. Ct. 2120, 2133 (2013) (applying clear-statement requirement to Congressionally approved interstate compact).

## C.   Compact Interpretation

Kimberly contends that Articles III and IV of the Compact unambiguously provide for the apportionment election and that, because section 290.171 enacts a multistate compact containing a withdrawal provision, the State bound itself to provide the election to multistate taxpayers unless and until it completely withdrew from the Compact.[78] Kimberly reasons that because the 1987 legislation repealing Articles III and IV was not a *complete* withdrawal, it violated the State's contractual obligation to provide the apportionment election until withdrawal, and was therefore unlawful as an impairment of that obligation.[79] The Commissioner acknowledges that Articles III and IV clearly provide for the apportionment election,[80] but asserts that the Compact is merely a model law with only advisory force.[81] In the alternative, she argues that even though Minnesota was obligated to provide the election *while Articles III and IV remained in force*, the State made no unmistakably clear promise not to amend or repeal it.[82] Reasoning that the State had no

---

[78] Kimberly's Mem. Supp. Summ. J. 7-10, 12, 24, 30; Kimberly's Reply Mem. Supp. Summ. J. 1-2, 4.

[79] Kimberly's Mem. Supp. Summ. J. 12, 29-30; Kimberly's Reply Mem. Supp. Summ. J. 2.

[80] Comm'r's Reply Mem. Supp. Summ. J. 7.

[81] Comm'r's Mem. Supp. Summ. J. 2, 4, 18, 32.

[82] Comm'r's Mem. Supp. Summ. J. 14, 15-16; Comm'r's Reply Mem. Supp. Summ. J. 2-3.

enforceable obligation not to amend the election, the Commissioner argues that the Legislature's 1987 repeal neither violated nor impaired a contractual obligation.[83]

### 1.    Binding Force

As a preliminary matter, we reject the Commissioner's claim that the Compact is actually a model law with only advisory effect.[84] Although *asserting* this position, the Commissioner never actually *argues* that the Compact creates no binding obligations—never identifies and applies criteria for determining the Compact's legal effect.    Instead, she argues more narrowly, for example, that "[t]he enactment of section 290.171 did not form a contract surrendering the Legislature's authority to modify or repeal Articles III and IV of the Statute." [85]    This ambiguous formulation can be read either:  (a) as arguing that no contract was formed, or (b) as conceding that a contract was formed, but asserting that it contained no provision prohibiting the repeal of Articles III and IV.[86]    Because the Commissioner never actually argues that the Legislature's enactment of section 290.171 did not form a binding contract, that argument is waived. *See, e.g., State v. Krosch*, 642 N.W.2d 713, 719 (Minn. 2002) (finding argument waived when a "brief contain[ed] no argument or citation to legal authority in support of the allegations").

---

[83] Comm'r's Mem. Supp. Summ. J. 21-22.

[84] Comm'r's Mem. Supp. Summ. J. 2, 4, 18, 32.

[85] Comm'r's Mem. Supp. Summ. J. 15.

[86] *See also* Comm'r's Mem. Supp. Summ. J. 16, 17, 18, 19, 20, 21, 31, 32 (making similarly qualified and therefore ambiguous assertions); Tr. 40-41, 86 (same).

Consequently, we assume (without deciding) that the Compact was a contract among Minnesota and the other States that adopted it and that the Compact created binding obligations.[87]

## 2. Unmistakability Doctrine

The rule of contract construction requiring that government contracts must be strictly construed against the relinquishment of sovereign powers is known as the "unmistakability doctrine." *Winstar*, 518 U.S. at 874 (plurality opinion); *Philip Morris*, 713 N.W.2d at 359.

### a. Rationale and Requirements

As the United States Supreme Court has explained, "sovereign power ... governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." *Winstar*, 518 U.S. at 872 (ellipsis in original) (internal quotation marks omitted) (quoting *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 52 (1986)). The doctrine recognizes that the Contracts Clause of the United States Constitution *can* limit the sovereign power of a State, but that this potential limitation can be problematic. *Id.* at 873-74. "Although [the Contracts] Clause made it possible for state legislatures to bind their successors by entering into contracts, it soon became apparent that such contracts could become a threat to the sovereign responsibilities of state governments." *Id.* at 874.

---

[87] The Michigan Court of Claims recently concluded that the Compact (as drafted in 1966, presented to the States in 1967, and enacted by Michigan in 1969) was an "advisory compact" rather than a binding interstate compact, because it lacked the three "classic indicia" of a binding compact. *See Ingram Micro, Inc. v. Dep't of Treasury*, No. 11-000035-MT, slip op. at 7-12 (Mich. Ct. Cl. Dec. 19, 2014), *appeal docketed*, No. 325507 (Mich. Ct. App. Jan. 9, 2015); *Yaskawa Am. Inc. v. Dep't of Treasury*, No. 11-000077-MT, slip op. at 7-11 (Mich. Ct. Cl. Dec. 19, 2014), *appeal docketed*, No. 325475 (Mich. Ct. App. Jan. 8, 2015). In contrast to binding compacts, advisory compacts "cede no state sovereignty nor delegate any governing power to a compact-created agency." Broun et al., at 14. The California Court of Appeals previously concluded that the Compact (as enacted by California in 1974) was a binding interstate compact that had all three "classic indicia" of such compacts. *Gillette*, 147 Cal. Rptr. 3d at 613-15. For the reasons we explain, we need not and do not reach the issue.

Courts thus developed the unmistakability doctrine in early Contracts Clause cases "to protect state regulatory powers." *Winstar*, 518 U.S. at 874; *Philip Morris*, 713 N.W.2d at 359-60.

> Under this rule that all public grants are strictly construed, we have insisted that nothing can be taken against the State by presumption or inference, and that neither the right of taxation, nor any other power of sovereignty, will be held ... to have been surrendered, unless such surrender has been expressed in terms too plain to be mistaken.

*Winstar*, 518 U.S. at 874-75 (alteration in original) (internal quotation marks and citations omitted). As a result of this plain-statement requirement,

> a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act (including an Act of Congress), nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power.

*Id.* at 878. When a contract provision implicates a State's sovereign power, the doctrine requires the State to make a clear "second promise" to refrain from using that sovereign power to alter the primary promise. *Id.* at 887 (commenting in a case where the doctrine did *not* apply, "[t]here being no need for an unmistakably clear 'second promise' not to change the capital requirements, it is sufficient that the Government undertook an obligation that it subsequently found itself unable to perform"). The doctrine serves "the dual purposes of limiting contractual incursions on a State's sovereign powers and of avoiding difficult constitutional questions about the extent of state authority to limit the subsequent exercise of legislative power." *Id.* at 875.

The unmistakability doctrine does not apply to all government contracts. *Winstar*, 518 U.S. at 871, 879-84; *Philip Morris*, 713 N.W.2d at 360-63. Its applicability to a particular claim "turns on whether enforcement of the contractual obligation alleged would block the exercise of a sovereign power of the Government." *Winstar*, 518 U.S. at 879.

27

> At one end of the spectrum are obligations to which the unmistakability doctrine always applies, that is, claims for enforcement of contractual obligations that could not be recognized without effectively limiting sovereign authority .... At the other end of the spectrum are ordinary contracts, such as humdrum supply contracts, where sovereign power is not compromised by enforcement of the promise made, and the unmistakability doctrine therefore never applies.

*Philip Morris*, 713 N.W.2d at 361 (citations and internal quotation marks omitted).

The Minnesota Supreme Court has long applied the unmistakability doctrine to resist construing contracts as abrogating the State's sovereign power. For example, before the passage in 1906 of Article X, section 1, of the Minnesota Constitution (providing that "[t]he power of taxation shall never be surrendered, suspended or contracted away"), it was settled law that the State could "by contract, irrevocably bind itself not to exercise, or may irrevocably limit the exercise of, its power of taxation." *State ex rel. Hahn v. Young*, 29 Minn. 474, 538, 9 N.W. 737, 747 (1881). Despite the State's then clear *authority* to abrogate its own power of taxation, the Minnesota Supreme Court nevertheless resisted finding that this authority had been exercised.

> The right of a state government ... by contract to limit its power of taxation, is a doctrine too firmly established to admit of discussion at this time.... The contract to be irrepealable, however, must clearly and conclusively appear. The power of taxation is a sovereign prerogative; its exercise is indispensable to the maintenance of the state and its institutions, and no inferences or presumptions arising from indefinite and uncertain language that it has relinquished, limited, or abandoned the right as to any particular person or corporation should be indulged by the court in support of an immunity not enjoyed by all taxpayers alike. *Therefore the contract is strictly to be construed, and must be in language and terms too clear to admit of doubt.*

*Great N. Ry.*, 106 Minn. at 322, 119 N.W. at 205 (emphasis added) (citations omitted). Thus, even when the Minnesota Constitution *permitted* surrender of the taxing power, the supreme court resisted construing contracts to effect that purpose. All ambiguity must be resolved in favor of reserving the State's sovereign power. *Id.* at 323; *see also Minneapolis Gas Co. v. Zimmerman*, 253 Minn. 164, 184, 91 N.W.2d 642, 656 (1958) ("[A]ll contracts made by the state are entered

28

into subject to the implied condition that they are ever subordinate to a reasonable and proper exercise of the state's inalienable police power.").

The Minnesota Supreme Court most recently applied the unmistakability doctrine to reject a claim by cigarette manufacturers that their 1998 settlement agreement with the State contractually prohibited the Legislature from subsequently imposing a health impact fee on cigarettes. *Philip Morris*, 713 N.W.2d at 353. The court ruled that imposition of the fee "does not violate the settlement agreement because the terms of the settlement agreement do not unmistakably relinquish the state legislature's sovereign authority to impose such an exaction on tobacco products." *Id.* Along the way, the court rejected the manufacturers' claim that the doctrine did not apply because the settlement agreement was a simple risk-shifting instrument that could be enforced without implicating sovereign power. *Id.* at 360-63. "[T]he very relief respondents seek requires the state either to exempt respondents from the exercise of the state's sovereign powers to tax and to regulate, or to surrender those powers with respect to the cigarette industry altogether." *Id.* at 361.

### b.    Applicability

We reject Kimberly's contention that the unmistakability doctrine does not apply to interstate compacts.[88] Indeed, a treatise addressing the modern use of interstate compacts indicates that they *exemplify* implementation of the unmistakability doctrine, rather than representing an exception to that doctrine: "Many compacts constitute an unmistakable surrendering of state

---

[88] Kimberly's Mem. Supp. Summ. J. 17; Tr. 51 ("The fact that this is a Compact, an interstate compact, ... that's the reason that the State can't repeal Articles 3 and 4. A compact does not need to say, you may not repeal this provision, or you may not repeal any provision. That's the premise of a compact.").

authority that is binding on subsequent state legislative action. Such compacts are, therefore, examples of the so-called 'unmistakability doctrine' at work." Broun et al., at 20.

Kimberly's assertion that the doctrine does not apply to interstate compacts is further belied by *Tarrant Regional Water District v. Herrmann*, adjudicating a dispute involving the Red River Compact, which allocates water rights within the Red River basin among the States of Oklahoma, Texas, Arkansas, and Louisiana. 133 S. Ct. 2120, 2125 (2013). Petitioner Tarrant Regional Water District, a Texas state agency responsible for providing water to north-central Texas, alleged that "it [wa]s entitled to acquire water under the Compact from within Oklahoma and that therefore the Compact pre-empt[ed] several Oklahoma statutes that restrict out-of-state diversions of water." *Id.* Specifically, Tarrant claimed that under a compact provision that did *not* mention state borders, it had "the right to cross state lines and divert water from Oklahoma located in [a particular] subbasin ...." *Id.* at 2129.

The Supreme Court commented that "[u]nraveling the meaning of [the contested provision's] silence with respect to state lines is the key to resolving whether the Compact pre-empts the Oklahoma water statutes." *Tarrant*, 133 S. Ct. at 2130. The Court concluded that problems with Tarrant's proposed textual interpretation "suggest that [the provision's] silence is ambiguous regarding cross-border rights under the Compact." *Id.* at 2132. The Court therefore turned "to other interpretive tools to shed light on the intent of the Compact's drafters." *Id.* The first of these tools was "the well-established principle that States do not easily cede their sovereign powers, including their control over waters within their own territories." *Id.*

The Court commented: "The background notion that a State does not easily cede its sovereignty has informed our interpretation of interstate compacts." *Tarrant*, 133 S. Ct. at 2133. In spite of this longstanding principle, Tarrant asked the Court "to infer from [the provision's]

30

silence regarding state borders that the signatory States ha[d] dispensed with the core state prerogative to control water within their own boundaries." *Id.* at 2132-33. The Court not only rejected this request, but concluded that a precisely contrary inference was warranted:

> [A]s the above demonstrates, States rarely relinquish their sovereign powers, so when they do we would expect a clear indication of such devolution, not inscrutable silence. We think that the better understanding of [the provision's] silence is that the parties drafted the Compact with this legal background in mind, and therefore did not intend to grant each other cross-border rights under the Compact.

*Tarrant*, 133 S. Ct. at 2133.

Based on the foregoing, we conclude that the unmistakability doctrine's clear-statement requirement applies to interstate compacts, and that compacts are drafted with this requirement in mind. *See Ingram*, No. 11-000035-MT, slip op. at 10-11 (applying *Tarrant* to the Multistate Tax Compact). Kimberly's effort to exempt compacts from the doctrine[89] is nothing more than an attempt to impermissibly shift the burden to the Commissioner to demonstrate that some provision of the Compact expressly *reserved* to the State its sovereign power. *See Winstar*, 518 U.S. at 878 (noting that "unmistakability [i]s needed for waiver [of sovereign power], not reservation").

We further conclude that the doctrine applies to Kimberly's Contract Clause claim in particular. Kimberly contends that the Legislature's 1987 repeal of the election unconstitutionally impaired the State's alleged obligation under the Compact to furnish taxpayers the election.[90] Kimberly thus asserts that we must strike down the 1987 repeal as an unconstitutional legislative act, recognize the continued vitality of Articles III and IV during the tax years at issue, and allow

---

[89] Tr. 103 ("[W]hen the Compact allows a state to deviate from [its] terms, it expressly says this provision is optional.").

[90] Kimberly's Mem. Supp. Summ. J. 30-35; Kimberly's Reply Mem. Supp. Summ. J. 13-15.

31

Kimberly to invoke the election for those tax years.[91] Plainly, Kimberly's requested relief "would block the exercise of a sovereign power of the [State]." *Winstar*, 518 U.S. at 879. First, it would retroactively block the Legislature's sovereign act of repealing the election. Second, it would prevent the Commissioner from enforcing existing Minnesota law, which does *not* include the election.[92]

### c. Analysis

The unmistakability doctrine requires that "a contract purporting to limit the state's right to tax in the future 'is to be strictly construed, and must be in language and terms too clear to admit of doubt.' " *Philip Morris*, 713 N.W.2d at 360 (internal quotation marks and citation omitted); *see also Winstar*, 518 U.S. at 875. Although Kimberly asserts that Articles III and IV provide for the apportionment election "[i]n unmistakable terms," [93] its written submissions do not identify any Compact provision satisfying the unmistakability doctrine. During oral argument, Kimberly again declined to identify any *particular* Compact provision satisfying the doctrine, and instead pointed to the document as a whole and to its status as an interstate compact.[94]

---

[91] Kimberly's Mem. Supp. Summ. J. 1, 10, 30, 34; Kimberly's Reply Mem. Supp. Summ. J. 2; Tr. 56-58, 60-61.

[92] The unmistakability doctrine's purpose of constitutional avoidance is doubly implicated in the present case. First, application of the doctrine may eliminate the need to address Kimberly's Contracts Clause claim that the 1983 Compact enactment limited the Legislature's subsequent authority to control apportionment. *See Winstar*, 518 U.S. at 875 (explaining that the doctrine was developed to avoid difficult constitutional questions concerning "the extent of state authority to limit the subsequent exercise of legislative power"). In this case, moreover, application may also eliminate the need to address an additional constitutional issue raised by the Commissioner: whether the 1983 enactment of the Compact violated Article X, section 1, of the Minnesota Constitution, which provides that "[t]he power of taxation shall never be surrendered, suspended or contracted away." Comm'r's Mem. Supp. Summ. J. 15-16, 21; Comm'r's Reply Mem. Supp. Summ. J. 2-3.

[93] Kimberly's Mem. Supp. Summ. J. 6; *id.* at 17 (arguing that "the Compact's terms are plain and unmistakable – they require that the election be provided to taxpayers").

[94] Tr. 100-04.

We have already rejected Kimberly's assertion that the unmistakability doctrine does not apply to interstate compacts. We now address Kimberly's apparent contention that the language of Articles III and IV prohibited Minnesota from revoking the apportionment election (unless it first completely withdrew from the Compact). Article III(1) provides that any qualifying taxpayer "may elect to apportion and allocate his income in the manner provided by the laws of such state ... without reference to this compact, or may elect to apportion and allocate in accordance with article IV." Minn. Stat. § 290.171, Art. III(1). Kimberly argues that this provision "requires party states to allow taxpayers to elect either the Compact Formula or a party state's own alternative State Formula" [95] and concludes on this basis that "[t]he election provision is not an option for party states." [96]

The Commissioner acknowledges the premise, but argues that it does not support Kimberly's conclusion: "There is no dispute that a taxpayer could use the election prior to the repeal of articles III and IV in 1987. The issue here is whether section 290.171 prohibited the legislature from repealing articles III and IV." [97] We agree with both the Commissioner's formulation of the issue and her assertion that nothing in the text of Articles III and IV constitutes a promise that Minnesota would not amend or repeal the election. Put another way, Articles III and IV clearly provide for the apportionment election, but do not contain a separate and distinct promise that the State would not alter or repeal the election. If the Compact contains such a separate promise, it must be located elsewhere.

---

[95] Kimberly's Mem. Supp. Summ. J. 16.

[96] Kimberly's Mem. Supp. Summ. J. 16.

[97] *See* Comm'r's Reply Mem. Supp. Summ. J. 7.

A treatise on interstate compacts contains an example of compact language clearly surrendering sovereign power against the background of the unmistakability doctrine:

> A perfect example of states ceding their sovereignty through an interstate compact can be found in Article XIV, Sections A and B of the Interstate Compact for Adult Offender Supervision. These two sections of the compact provide, in part, that (1) "[a]ll compacting States' laws conflicting with this Compact are superseded to the extent of the conflict;" and (2) "All lawful actions of the Interstate Commission, including all Rules and By-laws promulgated by the Interstate Commission, are binding upon the Compacting States."

Broun et al., at 22 (quoting Interstate Compact for Adult Offender Supervision (2002)).

As Kimberly acknowledges,[98] the Compact contains no language similarly stating that Minnesota laws conflicting with the Compact are superseded or that actions of the Multistate Tax Commission are binding upon Minnesota. The absence of such a provision "counts heavily" against Kimberly's interpretation that the Compact surrenders sovereign power. *See Tarrant*, 133 S. Ct. at 2133 (noting that many compacts "feature language that unambiguously permits signatory States to cross each other's borders to fulfill obligations under the compacts" and concluding that "[t]he absence of comparable language in the Red River Compact counts heavily against Tarrant's reading of it."). Although Article IX of the Compact, titled "Arbitration," provides in part that "[e]ach party state ... hereby consents to the arbitration as provided herein, *and agrees to be bound thereby*," Minn. Stat. § 290.171, Art. IX(3) (emphasis added), there is no similar language binding party States to other Compact provisions generally, or to Articles III and IV, in particular. Moreover, the United States Supreme Court has concluded that the Compact involves no "delegation of sovereign power to the [Multistate Tax] Commission." *U.S. Steel*, 434 U.S. at 453. No Compact provision in clear and unmistakable language bars Minnesota from amending or repealing the apportionment election.

---

[98] Tr. 100-04; *see also* Comm'r's Reply Mem. Supp. Summ. J. 3.

In response to a parallel invocation of the Compact election by IBM in Michigan, three dissenting Justices similarly concluded that the Compact created "no contractual obligation to strictly adhere to Articles III and IV." *Int'l Bus. Machines Corp. v. Dep't of Treasury*, 852 N.W.2d 865, 888 (Mich. 2014) (McCormack, J., dissenting). This conclusion rested, in large part, on "principles of state sovereignty." *Id.* Under Michigan law, as under Minnesota law, "surrenders of legislative power are subject to strict limitations that have developed in order to protect the sovereign prerogatives of state governments." *Id.* In the dissenters' view, "[t]he Compact's silence on the effect of a member state's ability to elect an exclusive apportionment formula indicates that Michigan did not contract away its right to do exactly that." *Id.*[99]

We agree with the Commissioner that although Articles III and IV unambiguously provide for the apportionment election,[100] no Compact provision contains or constitutes a separate clear and unmistakable promise that the State would not alter or repeal the election.[101] *See Ingram*, No. 11-000035-MT, slip op. at 10 (noting that although the Compact expressly permits unilateral withdrawal, "[w]hether unilateral *modification* is permitted under the Compact is less clear and is

---

[99] Because the *IBM* majority concluded that the Michigan Legislature had never repealed the Compact, *IBM*, 852 N.W.2d at 872-77, and accordingly that "the Compact's election provision remained in effect" for the tax years in issue, *id.* at 876, the majority had no occasion to consider whether the Compact contractually obligated Michigan not to alter the election.

[100] Comm'r's Reply Mem. Supp. Summ. J. 7.

[101] Comm'r's Mem. Supp. Summ. J. 18; Comm'r's Reply Mem. Supp. Summ. J. 3-4.

not directly addressed under the Compact."). Accordingly, we conclude that no Compact provision satisfies the unmistakability doctrine's clear-statement requirement.[102]

Kimberly implies in the alternative that a surrender of sovereignty can be *inferred* from the Compact's audit and withdrawal provisions.[103] We disagree.

The Compact's audit provision, Article VIII, "authorizes any member State ... to request that the Commission perform an audit on its behalf." *U.S. Steel*, 434 U.S. at 457. Article VIII, Section 3, in turn, authorizes the Commission "as the State's auditing agent, [to] seek compulsory process in aid of its auditing power in the courts of any State that has adopted Art. VIII." *Id.* It also provides that "[t]he provisions of this paragraph apply only to courts in a state that has adopted this article." Minn. Stat. § 290.171, Art. VIII(3).

Based on the foregoing language, Kimberly infers: (1) that States were free *not* to adopt Article VIII; and, by negative implication, (2) that they were therefore *required* to adopt the

_____

[102] In considering a California taxpayer's claim that the Compact (as adopted by California in 1974) prohibited the State from eliminating the apportionment election, the California Court of Appeals concluded that the Compact surrendered sovereign authority: "[S]ignatory states cede a level of sovereignty over matters covered in a compact .... Because the Compact is both a statute and a binding agreement among sovereign signatory states, *having entered into it, California could not, by subsequent legislation, unilaterally alter or amend its terms*." *Gillette*, 147 Cal. Rptr. 3d at 616 (citations omitted). The court found a contractual surrender of sovereign power, however, without applying the unmistakability doctrine's clear-statement requirement. *See, e.g., Standard Oil Co. of Cal. v. Johnson*, 76 P.2d 1184, 1189 (Cal. 1938) ("The taxing power of the state is never presumed to have been relinquished unless the language in which the surrender is made is clear and unmistakable.") (citation and internal quotation marks omitted); *Coso Energy Developers v. Cnty. of Inyo*, 19 Cal. Rptr. 3d 669, 685 (Cal. Ct. App. 2004) (applying doctrine). We note that *Gillette* was filed on October 2, 2012, approximately eight months before *Tarrant* reiterated that the clear-statement requirement applies to interstate compacts. *Tarrant*, 133 S. Ct. at 2133. In any event, applying the unmistakability doctrine, we conclude that the Compact does *not* surrender state sovereign power.

[103] Kimberly's Mem. Supp. Summ. J. 7-8, 17; Kimberly's Reply Mem. Supp. Summ. J. 7; Tr. 51, 103-04.

Compact's remaining articles.[104] Then, characterizing the remaining articles as "mandatory,"[105] Kimberly argues in substance that party States surrendered the sovereign authority to alter or repeal the mandatory provisions, including Articles III and IV.[106] There are several flaws in this reasoning.

First, other Compact language undermines Kimberly's initial inference that all Compact provisions other than Article VIII were mandatory. Article XI provides in part that nothing in the Compact shall be construed to "[a]ffect the power of any state ... to fix rates of taxation, except that a party state *shall be obligated to implement article III 2*." Minn. Stat. § 290.171, Art. XI(a) (emphasis added). If, as Kimberly asserts, all Compact provisions other than Article VIII were mandatory, then the emphasized passage *expressly* making Article III(2) mandatory would be superfluous. Moreover, by specifically mandating the implementation of Article III(2) *alone*, Article XI(a) suggests that all provisions other than Article III(2) were *optional*. Article VIII(3)

---

[104] Kimberly's Mem. Supp. Summ. J. 17; Tr. 51-52.

[105] Kimberly's Mem. Supp. Summ. J. 6-8, 15-17; Tr. 51-52, 108-09.

[106] Kimberly's Mem. Supp. Summ. J. 17. We say "argues in substance" because Kimberly avoids *directly* stating that Minnesota surrendered sovereign power to alter or repeal the election Instead, Kimberly asserts *generally* that "parties to an interstate compact cede some sovereignty." Kimberly's Reply Mem. Supp. Summ. J. 7; Tr. 101 (asserting that interstate compacts "cede some sovereign authority"). Then, invoking the notion of "mandatory" provisions, *see* Kimberly's Mem. Supp. Summ. J. 17 ("the Compact is express when it allows variations from its terms"), Kimberly finesses the sovereignty issue by asserting that Minnesota "simply obligated itself to comply with the Compact's terms until such time as it withdrew in accordance with the Compact." Kimberly's Mem. Supp. Summ. J. 17. Accordingly, what Kimberly means by a "mandatory" provision is one that the state may not alter or repeal. Thus, in substance, Kimberly argues that Minnesota lacked sovereign authority to alter or amend the legislation that established the apportionment election unless and until it completely withdrew from the Compact. As to Chief Judge Turner's concurrence, we are unaware of any principle that prohibits a court from critically evaluating a litigant's submissions and plainly stating the true import of its arguments. We trust that the careful reader, in particular, will perceive that this is precisely what we have done.

37

actually supports this interpretation, because it specifically contemplates that some party States might not adopt Article VIII.

In any event, there is a second, more fundamental, problem with Kimberly's reasoning. Even if Articles III and IV were "mandatory," this would establish only that party States had to adopt the articles and to honor the obligations stated therein *while those articles remained in force.* The question presented by the unmistakability doctrine, however, is *not* whether government contracts create binding obligations; the entire impetus for the doctrine arises from the assumption that they surely do, and can thus prevent the proper exercise of state regulatory powers. *Winstar,* 518 U.S. at 874-75. Specifically to avoid the difficult constitutional questions that arise *because* government contracts bind, *Id.* at 872, the doctrine also assumes that, "absent an unmistakable provision to the contrary, contractual arrangements, including those to which a sovereign itself is a party, remain subject to subsequent legislation by the sovereign," *Id.* at 877 (citation and internal quotation marks omitted). The determinative question for unmistakability purposes is thus whether the Compact includes a "second promise" clearly indicating that party states were surrendering the sovereign power generally assumed to govern all contracts. *Id.* Even if Articles III and IV are considered "mandatory," this does not *resolve* the unmistakability inquiry; to the contrary, it actually *triggers* that inquiry.

Finally, Kimberly's assertion that Article VIII satisfies the unmistakability doctrine fails on the merits. Section 3 provides simply that its provisions "apply only to courts in a state that has adopted this article." Minn. Stat. § 290.171, Art. VIII(3). This limitation upon the applicability of a single Compact provision is not a clear and unmistakable promise that party states are surrendering sovereign power. Nor can Kimberly's tenuous inference of surrender (as previously

38

summarized) satisfy the doctrine because "[n]othing can be taken against the State by presumption or inference." *Winstar*, 518 U.S. at 874 (citation and internal quotation marks omitted).

We likewise reject Kimberly's argument that the Compact's withdrawal provision, Article X(2), satisfies the unmistakability doctrine.[107] That section provides: "Any party state may withdraw from this compact by enacting a statute repealing the same. No withdrawal shall affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal." Minn. Stat. § 290.171, Art. X(2). Kimberly's argument—which again conflates whether the Compact is binding with whether it surrenders sovereign power—runs as follows: "The withdrawal provision supports the binding nature of the Compact.... Because parties to an interstate compact cede some sovereignty, a withdrawal provision allows a state to regain complete sovereignty. Many other compacts contain similar withdrawal provisions." [108] The Commissioner responds that the withdrawal provision is silent concerning whether Articles III and IV may be repealed.[109]

We conclude that the withdrawal provision does not satisfy the unmistakability doctrine. First, the withdrawal provision addresses how a party State may entirely withdraw from the agreement, not whether party States are surrendering sovereign power to legislate with respect to the Compact's subject matter. We thus agree with the Commissioner that Article X(2) is silent concerning the surrender of sovereignty. Second, some compacts containing withdrawal provisions *also* contain separate provisions expressly indicating that compact provisions prevail over conflicting state laws and that actions of the compact's commission are binding on party

---

[107] Kimberly's Reply Mem. Supp. Summ. J. 7; Tr. 7, 66, 104.

[108] Kimberly's Reply Mem. Supp. Summ. J. 7 (citation omitted).

[109] Comm'r's Reply Mem. Supp. Summ. J. 3-4; Tr. 21.

States. *See, e.g.*, Interstate Compact for Adult Offender Supervision, Art. XII(A) ("Withdrawal"), Art. XIV(A)-(B) ("Binding Effect of Compact and Other Laws"). The inclusion of such separate and express provisions demonstrates an understanding that the surrender of sovereignty cannot be accomplished by means of a standard withdrawal provision that is silent as to sovereignty. As the United States Supreme Court has noted, compacts are drafted against the legal background of the unmistakability doctrine's clear-statement requirement, and a surrender of state sovereignty will not be inferred from ambiguity or silence. *Tarrant*, 133 S. Ct. at 2133.

### d. Unmistakability Conclusion

The unmistakability doctrine applies only when "enforcement of the contractual obligation alleged would block the exercise of a sovereign power of the Government." *Winstar*, 518 U.S. at 879; *see also Philip Morris*, 713 N.W.2d at 361. The doctrine applies here because Kimberly: (1) asserts that the State contractually promised not to alter the apportionment election provided by Articles III and IV of the Compact; and (2) asks that we invalidate the 1987 repeal of Articles III and IV and allow it to invoke the election for the tax years at issue, remedies that would block the exercise of State sovereign power. Applying the doctrine, we conclude that no Compact provision constitutes a clear and unmistakable promise to refrain from using the State's sovereign power to alter the apportionment election provided by Articles III and IV.[110]

### 3. Silence as Ambiguity Concerning Surrender of Sovereign Power

Although application of the unmistakability doctrine reveals that the Legislature did not—by enacting the Compact—promise to refrain from using its sovereign power to alter the

---

[110] We have no occasion to consider or decide whether the doctrine would apply to other claims involving the Compact (which might neither implicate sovereign power in the first place nor request a remedy ultimately blocking the exercise of such a power).

apportionment election, consideration of both the Compact's history and of the party States' course of performance under the Compact furnishes an alternative route to the same conclusion.

As *Tarrant* indicates, interstate compacts are drafted against the legal background of the unmistakability doctrine's clear-statement requirement. *Tarrant*, 133 S. Ct. at 2133. Thus, absence from the Compact of a provision clearly surrendering sovereign power to alter the apportionment election renders the Compact ambiguous as to any such surrender. *See id.* at 2132 (ruling that contested provision's "silence is ambiguous regarding cross-border rights under the Compact"). Put another way, the absence of a clear surrender provision renders the Compact reasonably susceptible to an interpretation (a) that it surrenders sovereign power (leaving aside application of the unmistakability doctrine), or (b) that it does not. *Christianson*, 831 N.W.2d at 538-39 (stating standard for ambiguity of a statute); *Dykes*, 781 N.W.2d at 582 (stating standard for ambiguity of a contract).

"When a statutory provision is ambiguous, it is appropriate to turn to the canons of statutory construction to ascertain a statute's meaning." *State v. Leathers*, 799 N.W.2d 606, 611 (Minn. 2011). To determine legislative intent, a court also may "consider the legislative history of the act under consideration, the subject matter as a whole, the purpose of the legislation, and objects intended to be secured thereby." *Sevcik v. Comm'r of Taxation*, 257 Minn. 92, 103, 100 N.W.2d 678, 686–87 (1959); *see also* Minn. Stat. § 645.16(1)–(8) (2014) (setting out factors for statutory interpretation); *Oklahoma v. New Mexico*, 501 U.S. 221, 234-36 & n.5 (1991) (noting that extrinsic evidence of negotiating history may be used to interpret an ambiguous interstate compact).

Correspondingly, in construing ambiguous contract language, "resort may be had to extrinsic evidence." *Cut Price Super Markets v. Kingpin Foods, Inc.*, 256 Minn. 339, 354, 98

N.W.2d 257, 268 (1959). Pertinent extrinsic evidence includes the parties' course of performance. *See id.* at 354; 98 N.W.2d at 268; *see also* Restatement (Second) of Contracts § 202(5) (1981) ("Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade.").

### a.   Compact's Drafting History

The parties largely agree on the Compact's drafting history.[111] In 1959, the United States Supreme Court clarified its jurisprudence with respect to the power of States to tax interstate businesses, holding that "net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same." *Portland Cement*, 358 U.S. at 452. The Court thus affirmed state taxes on the net income of non-resident businesses whose only connection to the taxing state was the maintenance of a modest sales office and the solicitation of sales within the state. *Id.* at 453-57 (describing the taxed businesses' in-state facilities and activities).

As relevant here, *Portland Cement* engendered two Congressional responses. First, within seven months, Congress passed Public Law 86-272, which prohibited States from taxing the net income of interstate businesses whose sole activity in the taxing state was soliciting orders for the sale of tangible personal property. *See Heublein, Inc. v. S.C. Tax Comm'n*, 409 U.S. 275, 278-81 (1972).

---

[111] *See, e.g.*, Kimberly's Mem. Supp. Summ. J. 4-6; Comm'r's Mem. Supp. Summ. J. 4-5.

In this statute, Congress attempted to allay the apprehension of businessmen that "mere solicitation" would subject them to state taxation. Such apprehension arose because, as businessmen who sought relief from Congress viewed the situation, Northwestern States Portland Cement did not adequately specify what local activities were enough to create a "sufficient nexus" for the exercise of the State's power to tax. [The statute] was designed to define clearly a lower limit for the exercise of that power. Clarity that would remove uncertainty was Congress' primary goal.

*Id.* at 280.

Second, Congress "authorized a study for the purpose of recommending legislation establishing uniform standards to be observed by the States in taxing income of interstate businesses." *U.S. Steel*, 434 U.S. at 455. More specifically, Congress established "[a] special subcommittee (the Willis Committee)" which "reported five years later with specific recommendations for federal statutory solution to the interstate allocation problem." *Id.* at 487 (White, J., dissenting). The 1965 Willis Report criticized the variety and changeability of state apportionment formulas and made specific recommendations to increase the uniformity of state taxation of interstate businesses.[112] Shortly after the Report's publication, a bill was introduced in Congress to implement its recommendations. *See* H.R. 11798, 89th Cong., 2nd Sess. (1965). That bill, however, failed to become law. *U.S. Steel*, 434 U.S. at 455-56 & n.4.

Given this congressional activity in the wake of *Portland Cement*, States perceived a "growing likelihood that federal action will curtail seriously existing State and local taxing power if appropriate coordinated action is not taken very soon by the States." [113] Consequently, "[a] special meeting of the National Association of Tax Administrators was called in January 1966; that gathering was the genesis of the Multistate Tax Compact." *U.S. Steel*, 434 U.S. at 487 (White,

---

[112] Ex. J51, at 118-19, 1133-38 (H.R. Rep. No. 89-952 (1965)).

[113] Ex. J35, at KC11525.

43

J., dissenting). In its first annual report dated January 28, 1969, the Multistate Tax Commission stated:

> The origin and history of the Multistate Tax Compact are intimately related and bound up with the history of the states' struggle to save their fiscal and political independence from encroachments of certain federal legislation introduced in congress during the past three years. These were the Interstate Taxation Acts, better known as the Willis bills.[114]

A completed draft of the Compact "was presented to the states in January 1967."[115] The Compact became effective on August 4, 1967, after it was enacted into law by seven states.[116]

Again conflating the separate questions of whether the Compact is binding and whether its terms "remain[ed] subject to subsequent legislation' [sic] by the sovereign," *Winstar*, 518 U.S. at 877 (citation and internal quotation marks omitted)—Kimberly argues that "the Compact drafters intended the apportionment election to be mandatory and binding."[117] According to Kimberly:

> Variation in state apportionment formulas was a primary focus of the Congressional [Willis] report, and Congress was poised to impose a mandatory apportionment formula on all states. The election was a core element of the Compact in order to secure a base-line level of uniformity and thus critical for states to avoid federal imposition of a one-size-fits-all apportionment formula.[118]

In Kimberly's view, the Compact's drafting history is "compelling evidence" that "the election is not optional."[119]

We have no difficulty agreeing with Kimberly's general thesis: that through coordinated action, States sought to increase uniformity and thereby to reduce the perceived need in Congress

---

[114] Ex. J36, at KC11434.

[115] Ex. J36, at KC11435.

[116] Ex. J36, at KC11433.

[117] Kimberly's Mem. Supp. Summ. J. 21.

[118] Kimberly's Mem. Supp. Summ. J. 21-22 (citation omitted).

[119] Kimberly's Mem. Supp. Summ. J. 22.

for federal intervention. We question, however, whether the numerous State officials who either directly drafted the Compact, or cooperated in its drafting, would have considered an agreement surrendering the States' sovereign taxing powers as a viable means for achieving this purpose.

As the Commissioner observes, "Minnesota and at least 13 current or former Compact members have provisions in their state constitutions prohibiting the surrendering or contracting away of taxation authority." [120] Five of the eleven States represented at a June 15, 1967 meeting to organize the Multistate Tax Commission created by the Compact had such provisions in their state constitutions.[121] Sophisticated parties, in particular, are presumed to know the law. *Brekke v. THM Biomedical, Inc.*, 683 N.W.2d 771, 782-83 (Minn. 2004) (Gilbert, J., dissenting). In addition, the "settled law of the land at the time a contract is made become[s] part of it and must be read into it except where the contract discloses an intention to depart therefrom." *William Lindeke Land Co. v. Kalman*, 190 Minn. 601, 607, 252 N.W. 650, 653 (1934).

Considering that the Compact was developed "under the auspices of the Council of State Governments, with the cooperation of the National Association of Tax Administrators, the National Association of Attorneys General and the National Legislative Conference," [122] it is unreasonable to suppose that state constitutional limitations upon contracting away the taxing power were not raised and considered during the Compact's drafting. Put another way, it is unlikely that state tax administrators and attorneys general would have drafted an agreement: (1) that many States had questionable authority to enact; and (2) that, immediately upon enactment

---

[120] Comm'r's Mem. Supp. Summ. J. 16 n.12 (listing the other states as Alaska, Arkansas, California, Hawaii, Illinois, Michigan, Missouri, Montana, North Dakota, South Dakota, Texas, Washington, and Wyoming).

[121] Ex. J36, at KC11435 (Arkansas, Illinois, Missouri, Texas and Washington).

[122] Ex. J30, at KC11496.

45

in such states, would be subject to challenge on the ground that it had unlawfully contracted away the state's taxing power.[123] An agreement that was either void *ab initio* or ultimately unenforceable against approximately one third of all States would hardly have advanced the States' contemplated objective of appeasing Congress. Indeed, the States would likely have concluded that uniformity could better be achieved by creating an agreement that all States had clear authority to enact, even if some party States might later alter certain of the Compact's provisions or withdraw from the agreement altogether.

As an aside, we cannot agree with Kimberly's argument that the Compact *must* have deprived states of their power to alter the apportionment election, because only a mandatory election could be expected to stave off congressional intervention.[124] This argument makes little sense considering that Article X(2) of the Compact expressly permits party States to completely withdraw from the agreement at any time. Even if the States hoped federal intervention might be avoided if Congress perceived the Compact as a viable means of increasing state tax uniformity, they had no reason to believe that Congress would have considered alteration of the apportionment election as a greater threat to uniformity than complete withdrawal from the agreement. Either way, party States could avoid the election and defeat the uniformity at the heart of Congressional concern.

---

[123] Here, citing Minnesota Constitution Article X, section 1, the Commissioner argues both that the Legislature could not lawfully have enacted an agreement obligating the State to refrain from altering the apportionment election and that, if the Contract did create such an obligation, its enactment was void *ab initio*. Comm'r's Mem. Supp. Summ. J. 15-16; Comm'r's Reply Mem. Supp. Summ. J. 2-3.

[124] Kimberly's Mem. Supp. Summ. J. 21-22 & n.6.

### b.    Course of Performance Before Minnesota Enacted the Compact

We need not decide, however, whether the Compact as originally drafted in 1966 and enacted by numerous States in 1967 was intended to surrender party States' sovereign taxing powers. For the Minnesota Legislature did not enact the Compact until 1983, over fifteen years after it first became effective. By that time, party States operating under the Compact had clearly manifested their understanding that they retained sovereign authority to alter or eliminate the Compact's apportionment election.

When an interstate compact provision is ambiguous, courts may consider extrinsic evidence including the party States' course of performance. *Tarrant*, 133 S. Ct. at 2132, 2135. Course of performance refers to the actions of parties during performance of the contract at issue. *Cut Price Super Mkts.*, 256 Minn. at 354, 98 N.W.2d at 268. Evidence of course of performance is useful because it demonstrates the parties' practical construction of the terms of a contract, which is probative of their intent. *Cornell v. N.F.C. Eng'g Co.*, 274 Minn. 391, 395-96, 144 N.W.2d 369, 372 (1966).[125] "A 'part[y's] course of performance under the Compact is highly significant' evidence of its understanding of the compact's terms." *Tarrant*, 133 S. Ct. at 2135 (alteration in original) (citation and internal quotation marks omitted).

---

[125] Although not expressly invoking the concept "course of performance," other Minnesota cases similarly recognize that the parties' own construction of an ambiguous contract term is highly probative of its intended meaning. *See Brachmann v. Netzinger*, 293 Minn. 405, 407, 196 N.W.2d 616, 618-19 (1972) (commenting with respect to ambiguous option agreement that "parol evidence concerning the parties' interpretation of the [agreement's] language must control in determining their understanding"); *Kastner v. Dalton Dev., Inc.*, 265 Minn. 511, 517, 122 N.W.2d 183, 187 (1963) (where the parties had agreed "that the option [to purchase] must be exercised on the entire 23 lots," the court noted that "the rule is that the interpretation placed upon the contract by the parties themselves is to be considered by the court, and is entitled to great, if not controlling, influence in ascertaining their understanding of its terms").

The Compact became effective on August 4, 1967, after it was enacted into law by seven states,[126] one of which was Florida.[127] *See* Fla. Stat. § 213.15 (1969). In December 1972, however, Florida enacted legislation: (1) repealing Articles III and IV of the Compact; and (2) adopting as a matter of Florida law an equally-weighted three-factor apportionment formula. *See* § 1, 1971 Fla. Laws at 52. In response to Florida's repeal of Articles III and IV, no party State alleged a violation of the Compact. To the contrary, during a Multistate Tax Commission meeting held on December 1, 1972, the party States unanimously passed a resolution (with Florida abstaining) providing that whereas "the State of Florida has repealed Articles III and IV of the Multistate Tax Compact, while still legislatively, adhering to the spirit of the compact;" and whereas "the State of Florida will continue to strive together with tax administrators, national tax groups, and representatives of the business community to develop new and additional methods of resolving multistate tax problems;" therefore "be it resolved that the State of Florida be recognized as a regular member in good standing of the Multistate Tax Compact and the Multistate Tax Commission." [128] The meeting minutes note that "associate member[] Minnesota ... had been taking part in the meeting during the week." [129] By late 1972, then, party States—both individually and collectively through the Multistate Tax Commission—had unanimously concluded and publicly declared that Florida, a party State that originally enacted Articles III and IV, remained a Compact member in good standing despite its subsequent repeal of those two Articles.

---

[126] Ex. J36, at KC11433.

[127] Ex. J36, at KC11445.

[128] Ex. J43, at MDOR 00015 (Minutes of Meeting of the Multistate Tax Commission, Dec. 1, 1972).

[129] Ex. J43, at MDOR 00014.

48

Party States soon had further occasion to indicate their understanding of the Compact's effect on their sovereign powers. In 1972, the United States Steel Corporation sued the Multistate Tax Commission "its individual Commissioners, and its Executive Director," challenging the constitutionality of the Compact on four stated grounds. *U.S. Steel*, 434 U.S. at 458. In its 1977 brief to the United States Supreme Court, the Commission addressed, among other things, its understanding of the Compact's effect on the sovereign taxing power of party States: "Individual member states of the Compact retain exclusive control over any and all legislation or administrative actions including (i) the rate of tax; (ii) what is included in any tax base, such as what constitutes taxable income or lawful deductions therefrom for income tax purposes; and (iii) the means and methods of determining any tax liability and of collecting any taxes which may be determined to be due ...." [130] The Supreme Court plainly credited this statement by the Commission, for it commented that "individual member States retain complete control over all legislation and administrative action affecting the rate of tax, the composition of the tax base (including the determination of the components of taxable income), and the means and methods of determining tax liability and collecting any taxes determined to be due." *Id.* at 457.

Approximately twenty years later, the Supreme Court likewise credited an agency's interpretation of the multistate compact it administered. In *Alabama v. North Carolina*, eight states including Alabama and North Carolina entered into the Southeast Interstate Low–Level Radioactive Waste Management Compact, which provided for the development of a new facility for the long-term disposal of low-level radioactive waste generated in the region. 560 U.S. at 334. The Compact was administered by a Commission composed of two voting members from each party State. *Id.* North Carolina was designated to "host" the new facility, and thus became

---

[130] Ex. J54, at MDOR 03903.

49

obligated by the compact to "take appropriate steps" to obtain a license to construct and operate the contemplated facility. *Id.* at 335.

Although the compact specifically provided that the Commission was not responsible for any costs associated with creating the new facility, North Carolina "asked the Commission for financial assistance with building and licensing costs." *Alabama*, 560 U.S. at 335. "The Commission responded by adopting a resolution, which declared it was both 'appropriate and necessary' for the Commission 'to provide financial assistance' to North Carolina." *Id.* (quoting record). Thereafter, the Commission provided North Carolina with approximately $80 million in financial assistance towards obtaining licensing. *Id.* at 336-37. After South Carolina withdrew from the agreement, and North Carolina and the Commission reached an impasse concerning a long-term financing plan, North Carolina "informed the Commission it would commence an orderly shutdown of its licensing project." *Id.*

Several party States, joined by the Commission, filed a complaint against North Carolina alleging, among other things, that North Carolina had breached the compact because it was no longer taking "appropriate steps" to obtain licensing. *Alabama*, 560 U.S. at 338, 345. After concluding that the compact term "appropriate steps" was ambiguous, the Court looked to the parties' course of performance to ascertain its meaning: "In determining whether, in terminating its efforts to obtain a license, North Carolina failed to take what the parties considered 'appropriate' steps, the parties' course of performance under the Compact is highly significant." *Id.* at 346. Such evidence "firmly establishes that North Carolina was not expected to go it alone .... The history of the Compact consists entirely of shared financial burdens." *Id.*

50

There is nothing to support the proposition that the other States had an obligation under the Compact to share the licensing costs through the Commission; but we doubt that they did so out of love for the Tarheel State. They did it, we think, because that was their understanding of how the Compact was supposed to work. *One must take the Commission at its word*, that it was "appropriate" to share the cost—which suggests that it would not have been appropriate to make North Carolina proceed on its own.

*Id.* (emphasis added).

Taken together, *U.S. Steel* and *Alabama v. North Carolina* demonstrate that the United States Supreme Court places considerable weight on the manner in which a representative commission interprets the interstate compact it is charged with administering. Naturally, such evidence cannot be used to *contradict* a compact's plain meaning. *Kansas v. Colorado*, 514 U.S. 673, 690-91 (1995). When a contested term is ambiguous, however, course of performance evidence, including the interpretation of a representative administrative commission, is highly significant. *Tarrant*, 133 S. Ct. at 2135.

The *U.S. Steel* Court plainly took the Multistate Tax Commission "at its word" concerning the Compact's effect on the sovereignty of party States. Closely paraphrasing the Commission's appellate brief, the Court concluded not only that the States had "retain[ed] complete control over all legislation … affecting the rate of tax, the composition of the tax base … , and the means and methods of determining tax liability … ," *U.S. Steel*, 434 U.S. at 457, but also that the States had delegated no sovereign power to the Commission itself, *Id.* at 473.

By 1979, then, the Compact's party States had expressly declared in the United States Supreme Court their understanding that the Compact did not abridge their taxing powers. In addition, the Supreme Court had adopted this understanding of the Compact. Consequently, following the 1979 publication of *U.S. Steel*, the Compact could not reasonably be understood as requiring party States to contract away sovereign powers.

51

We note that Minnesota's own enactment of the Compact in 1983 indicates that the Minnesota Legislature, in particular, did not consider itself bound to adopt the Compact's allocation and apportionment provisions. When enacting section 290.171, Minnesota omitted from the Model Act (as drafted in 1966) five of Article IV's eighteen sections. Article IV(4) of the Model Compact provides that "[r]ents and royalties from real or tangible personal property, capital gains, interest, dividends or patent or copyright royalties, to the extent that they constitute nonbusiness income, shall be allocated as provided in paragraphs 5 through 8 of this Article." [131] Minnesota omitted this Model Compact allocation provision from section 290.171, along with Articles IV(5)-(8), which facilitate its implementation. Thus, whereas Article IV of the Model Compact contained eighteen sections, Article IV of section 290.171 had only thirteen sections. [132] The Minnesota Legislature's conclusion that it was free to enact only certain portions of Article IV manifests its understanding that member States were free to adopt or alter the Compact's allocation and apportionment provisions as they saw fit.

By 1979, the Compact's existing party States had clearly and consistently manifested their understanding that they retained sovereign authority to alter or eliminate the Compact's apportionment and allocation provisions. Consequently, we conclude that by the time Minnesota enacted section 290.171 in 1983, the Compact could not reasonably be understood as contractually requiring party states to refrain from using their sovereign powers to alter the apportionment election.

---

[131] Ex. J32, at KC11508.

[132] *Compare* Ex. J32 at KC11507-10 *with* Minn. Stat. § 290.171, Art. IV (1984).

### c.  Course of Performance after 1983

Although the Compact's drafting history and the party States' pre-1983 course of performance are most relevant to our conclusion that the Legislature's 1983 Compact enactment did not constitute a relinquishment of the State's sovereign power to alter the apportionment election, the party States' subsequent course of performance is fully consistent with that conclusion.

As previously noted, the version of the Compact Minnesota enacted in 1983 omitted Articles IV(4)-(8) of the Model Compact governing the allocation of nonbusiness income.[133] Despite this alteration of Article IV, the Multistate Tax Commission admitted Minnesota as a full member of the Commission.[134]  Perhaps more significantly, the Commission allowed Minnesota to remain a full member even after it repealed Articles III and IV in 1987.[135]  Indeed, then-Minnesota Commissioner of Revenue John James was Vice-Chair of the Multistate Tax Commission for fiscal year 1988, and was its Chair for fiscal year 1989.[136]

The Commission has similarly treated other party States that have eliminated or altered the election.  In a 2013 amicus curiae brief filed in the California Supreme Court (supporting the State of California's claim that—despite its enactment of the Compact in 1974—the State retained lawful authority to abrogate the apportionment election), the Commission indicated that as of October 2012,

---

[133] *Compare* Ex. J32 at KC11507-10 with Minn. Stat. § 290.171, Art. IV (1984).

[134] Stip. ¶ 23; Ex. J40, at 12 (Sixteenth Annual Report, Multistate Tax Commission).

[135] Stip. ¶¶ 23-24; Ex. J42, at 3 (Annual Report FY11-12, Multistate Tax Commission); Huddleston Aff. ¶ 10; Getschel Aff. ¶¶ 3, 7-8.

[136] Huddleston Aff. ¶ 11; Ex. J41, at 7.

nine other compact members had enacted a version of the Multistate Tax Compact that ... emphasizes the sales factor and does not recognize an Article III.1 election [to use the Compact's equally weighted apportionment formula]. Three Compact members [including Minnesota] eliminated or limited the election directly. Three amended Article IV to be consistent with their statutory apportionment formula that emphasizes the sales factor. And three, like California, indicted by separate statute or other guidance that the Compact election does not apply to factor-weighting.[137]

The Commission further noted that "[i]n no case has any compact member in any way objected that such an action was inconsistent with the letter or spirit of the Compact."[138]

The record indicates that the Commission has "never sanctioned or expelled a state that amended or repealed Articles III and IV. To the contrary, states that repealed Articles III and IV remained members in good standing with the Multistate Tax Commission."[139] The Commission's

---

[137] Ex. J57, at 03891 (footnotes omitted); *see also id.* at 03896 ("Since 1972, at least ten additional members, including California, have varied from Articles III.1 and IV by enacting mandatory apportionment formulae other than the Article IV equally-weighted formula, without allowing an Article III.1 election.") (footnote omitted).

[138] Ex. J57, at 03896; *see also* Huddleston Aff. ¶¶ 6-7 (indicating that neither the MTC nor any party state ever objected to a repeal of Articles III or IV). In response to a parallel invocation of the Compact election by IBM in Michigan, three dissenting Justices similarly noted:

> [I]t is plain that the member states did not view strict adherence to Articles III and IV as a binding contractual obligation, as Compact members have deviated from the Compact's election provision and apportionment formula without objection from other members.... Nondeviating members have not pursued actions against those states that have deviated, and no member state has intervened on IBM's behalf in this case. Further, the Multistate Tax Commission—the organization charged with administering the Compact—has urged us to reject IBM's rigid interpretation of the Compact. These facts weigh heavily in favor of rejecting IBM's argument that the Compact creates a binding contractual obligation on its member states to refrain from amending the election provision.

*IBM*, 852 N.W.2d at 888 (McCormack, J., dissenting) (citation omitted). Because the *IBM* majority concluded that the Michigan Legislature had never repealed the Compact, *id.* at 872-77, and accordingly that "the Compact's election provision remained in effect" for the tax years in issue, *id.* at 876, the majority had no occasion to consider whether the Compact contractually obligated Michigan not to alter the election and, more specifically, had no occasion to consider the party States' course of performance under the Compact.

[139] Huddleston Aff. ¶¶ 8-9.

ongoing acceptance of party States that alter or eliminate the Compact's apportionment election, and its express and public support of State authority to do so, further evidence the party States' understanding that the Compact does not contractually require them to refrain from using their sovereign powers to alter the Compact's apportionment election.[140]

### 4. Extrinsic Evidence Conclusion

Leaving aside application of the unmistakability doctrine, the Compact's silence concerning the surrender of sovereign power renders it ambiguous as to such surrender. Considering that at least fourteen States have constitutional provisions prohibiting them from contracting away their taxing power, it is highly unlikely that the state tax officials and attorneys general who drafted the Compact intended that party States would surrender their sovereign authority to alter or repeal the apportionment election. Moreover, the party States' course of performance indicates that by the time Minnesota enacted section 290.171 in 1983, the Compact could not reasonably be understood as contractually requiring party states to refrain from using their sovereign powers to alter the apportionment election. We conclude that extrinsic evidence independently supports the conclusion that the Legislature's 1983 Compact enactment did not constitute a relinquishment of the State's sovereign power to alter or repeal the Compact's apportionment election.

---

[140] At some point in time (although on this record we cannot determine exactly when), the Multistate Tax Commission amended the Compact's preface to indicate that it is "a model law," and that it is "not truly a compact in that actions taken under its authority have only an advisory and/or recommendatory effect on its member states." Ex. J44, at 02415. Although these statements are further evidence of the Commission's views concerning the effect of the Compact, we do not rely on them.

## D. Contracts Clause Claim

The Contract Clause of the United States Constitution provides that "[n]o state shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The Minnesota Constitution likewise provides that "[n]o ... law impairing the obligation of contracts shall be passed." Minn. Const. art. I, § 11.

Whether an enactment unconstitutionally impairs a contract is determined by applying a three prong test. *See Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-13 (1983); *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 17-22 (1977); *Jacobsen v. Anheuser-Busch, Inc.*, 392 N.W.2d 868, 872 (Minn. 1986). The threshold question is whether the challenged law substantially impairs a contractual relationship. *Energy Reserves*, 459 U.S. at 411. If so, the State must demonstrate a "significant and legitimate public purpose" for the statute, "such as the remedying of a broad and general social or economic problem." *Id.* at 411-12. Finally, if the State identifies such a purpose, the court must examine whether "the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Id.* at 412 (alterations in original) (quoting *U.S. Trust Co.*, 431 U.S. at 22).

The substantial-impairment inquiry focuses on "the extent to which the law has contravened the reasonable [contract] expectations of the parties." *Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 506 (5th Cir. 2001); *see also Acton Const. Co. v. Comm'r of Revenue*, 391 N.W.2d 828, 833 (Minn. 1986); *Drewes v. First Nat. Bank of Detroit Lakes*, 461 N.W.2d 389, 391 (Minn. App. 1990). Kimberly asserts that by enacting the Compact, Minnesota "committed to provide multistate taxpayers with the election to apportion under the Compact unless and until [it] withdrew from the Compact" and, consequently, that taxpayers reasonably

56

expected "that the Compact's terms w[ould] not be amended on a piecemeal basis." [141] From these premises, Kimberly concludes that "the 1987 Amendment's attempt to eliminate the Compact election [wa]s a *substantial* impairment of the entire Compact." [142] We disagree.

As previously indicated, we have assumed (without deciding) that the Compact is a contract that created binding obligations. *See supra* § V.C.1. Moreover, the Commissioner has acknowledged, and we agree, that the State was bound to honor the Compact's apportionment election while Articles III and IV remained in force.[143] *See supra* § V.C.2.c. We have concluded, however that no Compact provision constitutes a clear and unmistakable promise by the State to refrain from using its sovereign power to alter or repeal the apportionment election contained in Articles III and IV. *See supra* § V.C.2.c. Absent such an obligation, taxpayers could have no reasonable expectation that the Legislature would not alter or eliminate the election. Consequently, the Legislature's 1987 repeal of Articles III and IV did not substantially impair a contractual relationship. *Energy Reserves*, 459 U.S. at 411. We need go no further in the analysis. *See Acton Const.*, 391 N.W.2d at 833 (so holding).

For the foregoing reasons, we conclude that Kimberly has failed to carry its heavy burden to prove beyond a reasonable doubt that the Legislature's 1987 repeal of Articles III and IV was unconstitutional as a violation of the state and federal contracts clauses. *See, e.g., Singer*, 817 N.W.2d at 675. Because this ruling fully resolves the matter, we need not address the parties' remaining contentions.

B.S.D & T.G.H.

---

[141] Kimberly's Mem. Supp. Summ. J. 32.

[142] Kimberly's Mem. Supp. Summ. J. 32.

[143] Comm'r's Reply Mem. Supp. Summ. J. 7.

TURNER, C.J. (concurring specially)

I respectfully concur in all but section III of the court's opinion.

I agree that in enacting the Compact in 1983, Minnesota in no way agreed not to alter or repeal the three-factor equally weighted apportionment election. I further agree that determination resolves both Kimberly's Compacts Clause claim and its Contracts Clause claim.

But I believe a section of an opinion specifically labeled "The Parties' Principal Contentions" and which purports to reference the parties' briefs in doing so, should recite those contentions and cite those briefs accurately. The court's opinion does not follow this principle. For example, the opinion states that appellants contend that the Compact requires Minnesota "to refrain from exercising its sovereign power to eliminate the apportionment election unless and until it first withdraws from the Compact." Slip op. at 16 (citing Kimberly's Mem. Supp. Summ. J. 10, 12, 16, 30; Kimberly's Reply Mem. Supp. Summ. J. 1-2, 4); *see also* slip op. at 16 (claiming that appellants contend that Minnesota "contractually obligated itself both to furnish the apportionment election *and* to refrain from using its sovereign power to repeal the election"). Not even the careful reader will find any mention on any of the cited pages of the phrase "sovereign power" or much of anything, for that matter, like the opinion's recitation of Kimberly's contentions. The opinion goes on to state that appellants "implicitly acknowledg[e] that a State's contractual surrender of sovereign power *normally* must be stated in unmistakably clear language." Slip op. at 16 (citing Kimberly's Mem. Supp. Summ. J. 17; Kimberly's Reply Mem. Supp. Summ. J. 5, 7; Tr. 100-01, 111). There is no such acknowledgment, implicit or explicit, on any of the cited pages. Indeed, many pages later, the opinion concedes that Kimberly in fact "avoids *directly* stating that Minnesota surrendered sovereign power to alter or repeal the [apportionment] election." Slip op. at 37 n.106.

I agree wholeheartedly that a court is entitled to "critically evaluat[e] a litigant's submissions" and to "plainly stat[e] the true import of [the litigant's] arguments." Slip op. at 37 n.106. But in doing so, a court should clearly distinguish between its own editorializing and the litigant's actual submissions. Because of this opinion's failure to do so, I respectfully decline to concur in section III.

J.H.T.